## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| WILLIAM BRENNAN, Individually And On Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>  vs.<br><br>NASH FINCH COMPANY, RON MARSHALL, and LE ANNE M. STEWART,<br><br>    Defendants. | CIVIL ACTION NO. 05cv2934 ADM/AJB<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br><u>**JURY TRIAL DEMANDED**</u> |

### INTRODUCTION

1. This is a federal class action on behalf of purchasers of the common stock of Nash Finch Company ("Nash Finch" or the "Company") between February 24, 2005 and October 20, 2005, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). As alleged herein, defendants published a series of materially false and misleading statements that defendants knew or recklessly disregarded were materially false and misleading at the time of such publication.

### OVERVIEW

2. Nash Finch operates in three segments: Food Distribution, Military Food Distribution, and Food Retailing. Throughout the Class Period, the Company operated 85 corporate-owned stores primarily located in Colorado, Illinois, Iowa, Minnesota, Nebraska, North Dakota, South Dakota, Wisconsin, and Wyoming. Through its

SCANNED
DEC 1 9 2005
U.S. DISTRICT COURT MPLS

distribution operations the Company also served independent retailers and military commissaries in 26 states, the District of Columbia, Europe, Cuba, Puerto Rico, the Azores, and Honduras. Nash Finch was established in 1885, and is headquartered in Minneapolis, Minnesota.

3.     In the summer of 2004, Nash Finch announced a restructuring and reorganization that was supposed to strengthen the Company, and that also had the effect of causing Nash Finch shares to rise. During 2Q:04, purportedly in order to strengthen the Company's operations and to eliminate non-performing assets, the Company took tens of millions of dollars in charges, as well as other measures designed to strengthen the Company. Defendants also restructured Nash Finch's credit lines and issued hundreds of millions of dollars in then-unregistered convertible debt.

4.     On February 24, 2005, the inception of the Class Period, defendants announced the $220 million acquisition of Roundy's Distribution Center ("Roundy's"), a mid-west food distributor, which, according to defendants, was to add almost $1 billion in yearly sales to the Company, be immediately accretive to earnings, and create synergies of almost $10 million per year in cost savings and elimination of redundancies.

5.     Throughout the Class Period defendants knowingly or recklessly issued a series of materially false and misleading statements that were designed to, and that did, artificially inflate the price of Nash Finch shares. Examples of such statements, which primarily related to the success of the Company's reorganization and the integration of Roundy's acquisition, include the following:

\*      The reorganization has resulted in significant *"operational improvement."* (7/15/04 Nash Finch Press Release)

\*      *"The Company continues to focus on strengthening its balance sheet through more efficient inventory and receivables management, leveraging of accounts payable and operational efficiencies."* (10/9/04 Nash Finch Press Release)

\*      *"The Company expects that the acquisition will be immediately accretive to earnings."* (2/24/05 Nash Finch Press Release)

\*      The Company expects that the acquisition will be immediately accretive to earnings. Specifically, depending on the timing and nature of its integration process, *the Company believes that as a result of the acquisition operating earnings, defined as sales less cost of sales and selling, general and administrative expenses, will improve by approximately $31 to $33 million*, net of implementation costs of approximately $3 million, during the twelve months following closing of the transaction. *This estimate includes a portion of the more than $8 million in annual synergies expected to be realized over several years.* (2004 Nash Finch Form 10-K)

\*      *"[W]e completed the acquisition of the distribution centers in Lima and Westville shortly after the close of the first quarter and integration efforts are proceeding according to plan...* The acquisition is a key element of our Food Distribution strategy." (4/21/05 Nash Finch Press Release)

\*      *"Integration of the Lima and Westville operations is proceeding according to plan...* The Company expects that the acquisition of the distribution centers will add approximately $0.30 to $0.34 to its previously disclosed pre-acquisition estimate that 2005 diluted earnings per share would range between $3.40 and $3.55. *As a result, the Company now estimates that its diluted earnings per share for fiscal 2005 will range between $3.70 and $3.89.* (7/13/05 Nash Finch Press Release)

\*      *"Our Company has tremendous opportunities ahead of it."* (9/1/05 Nash Finch Press Release announcing retirement of defendant Marshall) [Emphasis added]

6.    Unbeknownst to investors, however, throughout the Class Period, the

Company was suffering from a host of undisclosed adverse factors that were negatively

impacting its business and would cause it to report declining financial results materially

less than the market expectations defendants had caused and cultivated.  In particular:

- At all times during the Class Period, defendants knew or recklessly disregarded that Nash Finch's net sales growth rate and earnings growth rate could not be sustained due to undisclosed, internal problems relating to the reorganization, and to defendants' inability to integrate Roundy's Distribution Center.

- Throughout the Class Period, it was not true that Nash Finch maintained adequate information management systems or systems of internal, operational or financial controls, such that Nash Finch's reported financial statements were true, accurate or reliable.

- As a result of the aforementioned adverse conditions, which defendants failed to disclose, throughout the Class Period, defendants lacked any reasonable basis to claim that Nash Finch was operating according to plan, or that Nash Finch could achieve guidance sponsored and/or endorsed by defendants.

7.    It was only at the end of the Class Period that investors learned that: (i) the

Company was operating far below expectations; (ii) Nash Finch had significantly under-

reserved for the Roundy's acquisition; (iii) the integration of Roundy's was not

proceeding according to plan; and (iv) the Company's core business was under-

performing guidance.  On October 20, 2005, when defendants reported results for the

third quarter and revised full year 2005 guidance, and the true state of the Company's

performance and financial condition began to emerge, shares of the Company fell by

more than $12.00 per share, or 26% in the single trading day, on very heavy trading

volume.

8.     Defendants were motivated to and did conceal the true operational and financial condition of Nash Finch, and materially misrepresented and failed to disclose the conditions that were adversely affecting Nash Finch throughout the Class Period, because: (i) it enabled defendants to sell more than $300 million in notes in a private placement, which were also registered for sale within the Class Period; and (ii) it also enabled Nash Finch insiders to sell more than $17 million of their privately-held Nash Finch shares while in possession of material adverse non-public information about the Company – including shares sold by defendant Marshall for proceeds of more than  $12 million.

9.     As set forth herein, while the Class Period sales of many of the insiders were unusual in their timing and amount, none were as unusual as those by defendant Marshall; while Marshall had sold virtually no stock between 1998 and the inception of the Class Period, during the Class Period Marshall sold virtually all of his privately held Nash Finch stock.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

12.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Nash Finch maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

13.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

14.     Plaintiff William Brennan, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of Nash Finch at artificially inflated prices during the Class Period and has been damaged thereby.

15.     Defendant **NASH FINCH COMPANY** is a Delaware corporation with its principal place of business at 7600 France Avenue South, Minneapolis, MN 55435. According to the Company's profile, Nash Finch is a Fortune 500 company and one of the leading food distribution organizations in the United States. Nash Finch's core business, food distribution, serves independent retailers and military commissaries in 28 states, the District of Columbia, Europe, Cuba, Puerto Rico the Azores and Honduras. The Company also owns and operates a base of over 80 retail stores, primarily supermarkets under the Econofoods, Family Thrift Center and Sun Mart trade names.

16.     Defendant **RON MARSHALL** ("Marshall") was, during the Class Period, Chief Executive Officer of the Company.  During the Class Period, defendant Marshall signed and certified the Company's SEC filings, including but not limited to Nash Finch's quarterly and year-end financial reports and/or the materially false and misleading Registration Statement issued in connection with the registration of over $300 million of Nash Finch notes.  During the Class Period, while in possession of material adverse, non-public information about the Company, defendant Marshall sold his privately held Nash Finch stock, at prices as high as almost $42.00 per share, for proceeds of more than $12 million.

17.     Defendant **LE ANNE M. STEWART** ("Stewart") was, during the Class Period, Senior Vice President and Chief Financial Officer of the Company.  During the Class Period, defendant Stewart signed and certified the Company's SEC filings, including but not limited to Nash Finch's quarterly and year-end financial reports.

18.     Marshall and Stewart are referred to herein as the "Individual Defendants."

19.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith.

20.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Nash Finch, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.  Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

21.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the Nasdaq National Market exchange (the "Nasdaq"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or

untrue, so that the market price of the Company's publicly traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

22.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Nash Finch, each of the Individual Defendants had access to the adverse undisclosed information about Nash Finch's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Nash Finch and its business issued or adopted by the Company materially false and misleading.

23.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the

accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

24.    Each of the defendants is liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Nash Finch common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Nash Finch's business, operations, management and the intrinsic value of Nash Finch common stock; (ii) enabled defendants to sell over $300 million in convertible notes in a private placement, which were convertible into shares of the Company priced above $50.00 and which shares were also registered for sale within the Class Period; (iii) enabled Nash Finch insiders to sell over $17 million of their privately held Nash Finch shares while in possession of material adverse non-public information about the Company; and (iv) caused plaintiff and other members of the Class to purchase Nash Finch common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

25.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of Nash Finch between February 24, 2005 and October 20, 2005, inclusive (the "Class"), and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs,

successors or assigns and any entity in which defendants have or had a controlling interest.

26.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Nash Finch common shares were actively traded on the Nasdaq. As of July 15, 2005, the Company had over 12.80 million shares of common stock issued and outstanding. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Nash Finch or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

27.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

28.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

29.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)   whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Nash Finch; and

(c)   to what extent the members of the Class have sustained damages and the proper measure of damages.

30.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background to the Class Period:
### Restructuring Complete

31.   Prior to the inception of the Class Period, during the second fiscal quarter of 2004, defendants announced that Nash Finch would take a large charge in connection with a reorganization of its operations and the liquidation of its under-performing assets. Defendants stated that these charges were necessary to strengthen the Company's operations and to make the company more stable and profitable.  Nash Finch's 3Q:F04

Form 10-Q described the charge taken in connection with the restructuring, in part, as follows:

> Note 6 – Special Charge
>
> During the second quarter of 2004, the Company completed a strategic review that identified certain retail stores that did not meet return objectives, provide long-term strategic opportunities or justify additional capital investments. Consequently, the Company announced that it was closing or selling 21 retail outlets. As a result of these store dispositions, the Company recorded a pre-tax special charge of $36.5 million which was reflected in the "Special charge" line within the consolidated statements of income, and $3.3 million of costs reflected in operating earnings, primarily involving inventory markdowns related to the store closures. The special charge included $21.7 million for asset impairments (including $1.1 million of goodwill allocated to the stores being sold), $14.1 million for future lease obligations, $0.1 million in severance and $0.6 million in other charges based on management's estimates of fair value of assets, lease subsidies, future payments on exited real estate, lease terminations and other related costs. The Company had closed 18 stores by the end of the second quarter of 2004 and is continuing to market the three Denver area AVANZA stores.

32.     Defendants led investors to believe that this reorganization was effective and that the Company was operating according to guidance sponsored and/or endorsed by defendants. For instance, when defendants announced results for the second quarter of fiscal 2004, on July 15, 2004, they cited significant *"Operational Improvement"* as a result of the restructuring, and, on November 4, when Nash Finch announced results for the fiscal third quarter ended October 9, 2004, defendants stated that, *"The Company continues to focus on strengthening its balance sheet through more efficient inventory and receivables management, leveraging of accounts payable and operational efficiencies."*

33.     The Company's 3Q:F04 earnings release reaffirmed guidance for fiscal

2004 as follows:

Outlook

The Company estimates that its diluted earnings per share for fiscal 2004
will range between $1.17 and $1.23. This estimate includes:

- $24.3 million, or $1.91(2) per diluted share, of after-tax special charges and related costs pertaining to the store closures recorded in the second quarter of fiscal 2004

- expected annualized pre-tax earnings improvement of approximately $16 million related to the store closures, of which approximately $5.4 million after-tax, or $0.43 per diluted share, is expected to be realized in the second half of fiscal 2004

- the reduction in income tax expense during the third quarter of fiscal 2004 discussed above

- the expected call premium associated with the redemption of the Company's senior subordinated notes of $2.9 million after-tax, or $0.23 per diluted share

- the write-off of unamortized finance and original issuance discount costs totaling approximately $1.6 million or $0.12 per diluted share as a result of the refinancing of the Company's bank credit facility and the redemption of the senior subordinated notes, expected to occur in the fourth quarter of fiscal 2004.

**Defendants' Materially False and Misleading
Statements Made During the Class Period**

34.     On February 24, 2005, the inception of the Class Period, defendants

announced that the Company had agreed to buy two Roundy's Distribution Centers and

two retail stores for approximately $225 million. This acquisition added approximately

$1.0 billion in annual food distribution sales to the Company. In part, Nash Finch's

release stated the following:

Nash Finch Company (Nasdaq:NAFC) announced today that it has signed an agreement with Roundy's, Inc. to acquire the net assets, including customer contracts, of its wholesale food distribution divisions in Westville, Indiana, and Lima, Ohio, and two retail stores in Ironton and Van Wert, Ohio, for approximately $225 million.

The Westville and Lima Divisions to be acquired represent approximately $1.0 billion in annual food distribution sales, servicing over five hundred customers, principally in Indiana, Illinois, Ohio and Michigan. The distribution centers to be acquired fit well with the Company's existing network and no facility closures are anticipated. The strategically located distribution centers will allow the Company to expand merchandising programs in a variety of areas, including the distribution of produce and meat, general merchandise, and health and beauty care. The Company expects that the acquisition will result in productivity improvements and buying efficiencies, which will be realized over several years. Specific examples of productivity improvements include the better balancing of transportation across the Company's distribution network to reduce miles and equipment, enhanced warehouse capacity utilization, and the reduction of outside storage space. *The Company expects that the acquisition will be immediately accretive to earnings.* Specifically, depending on the timing and nature of its integration process, the Company believes that as a result of the acquisition *operating earnings* defined as sales less cost of sales and selling, general and administrative expenses, *will improve by approximately $31 to $33 million,* net of implementation costs of approximately $3 million, during the twelve months following closing of the transaction. This estimate includes a portion of the *more than $8 million in annual synergies expected to be realized over several years.* The impact on earnings per share will depend upon the nature and cost of the related financing, as well as the purchase accounting allocations and related amortization.

Ron Marshall, Chief Executive Officer of Nash Finch, commented on the acquisition, "We have long admired the outstanding customers and dedicated associates of these divisions and are excited for them to join our organization. Those customers have our commitment that they will experience the same levels of outstanding customer service that all Nash Finch customers enjoy today. Customers of both Nash Finch and these Divisions will benefit from our ability to buy product much more efficiently as a combined organization, improving their ability to win in an increasingly competitive market. Most importantly, however, this acquisition continues to underscore our strategic commitment to the independent grocery retailing community." [Emphasis added.]

35.    **4Q & FY:2004 Results.**  On March 2, 2005, Nash Finch published a

release announcing results for the fourth quarter and full fiscal year 2004.  For 4Q:04,

Nash Finch reported net earnings of $11.2 million, or $0.87 per share, compared to net

income of $13.0 million or $1.05 per share for the same period the prior year.  This

release stated, in part, the following:

> Nash Finch Reports Fiscal 2004 Results; *Refinancing Strengthens Balance Sheet; Announced Acquisition Represents $1 Billion in Annual Food Distribution Sales*
>
> Food Distribution Acquisition
>
> The Company announced on February 24, 2005 that it had signed an agreement with Roundy's, Inc. to acquire the net assets, including customer contracts, of its wholesale food distribution divisions in Westville, Indiana and Lima, Ohio, and two retail stores in Ironton and Van Wert, Ohio, for approximately $225 million.
>
> The Westville and Lima Divisions to be acquired represent approximately $1.0 billion in annual food distribution sales, servicing over five hundred customers, principally in Indiana, Illinois, Ohio and Michigan. The distribution centers to be acquired fit well with the Company's existing network and no facility closures are anticipated. The strategically located distribution centers will allow the Company to expand merchandising programs in a variety of areas including the distribution of produce and meat, general merchandise, and health and beauty care. The Company expects that the acquisition will result in productivity improvements and buying efficiencies, which will be realized over several years. Examples of productivity improvements include the better balancing of transportation across the Company's distribution network to reduce miles and equipment, enhanced warehouse capacity utilization, and the reduction of outside storage space. *The Company expects that the acquisition will be immediately accretive to earnings.* Specifically, depending on the timing and nature of its integration process, the Company believes that as a result of the acquisition *operating earnings*, defined as sales less cost of sales and selling, general and administrative expenses, *will improve by approximately $31 to $33 million*, net of implementation costs of approximately $3 million, during the twelve months following closing of the transaction. This estimate includes a portion of the *more than $8*

*million in annual synergies expected to be realized over several years.* The impact on earnings per share will depend upon the nature and cost of the related financing, as well as the purchase accounting allocations and related amortization.

\* \* \*

**Outlook**

*The Company estimates that its diluted earnings per share for fiscal 2005 will range between $3.40 and $3.55 before the accretive effect of the acquisition discussed above.* This compares to fiscal 2004 earnings from continuing operations of $1.18 per diluted share which included several events that had a net unfavorable impact of $24.0 million, or $1.89 per diluted share. This outlook for fiscal 2005 assumes low single digit sales growth in our food and military food distribution segments and flat to slightly negative same store sales in our retail segment. In addition, the Company anticipates some margin improvement across all segments as we continue to focus on productivity efficiencies. Depreciation and amortization will be impacted by capital expenditures during fiscal 2005 of approximately $35 million. We also estimate our average interest rate to be approximately 7.0% in fiscal 2005. Finally, the Company expects its working capital to remain relatively consistent with 2004. [Emphasis added.]

36.    **2004 Form 10-K.** The same day, defendants filed with the SEC the

Company's 2004 Form 10-K, signed and certified by defendants Marshall and Stewart.

In addition to repeating the same, or substantially similar, positive statements regarding

the Company's financial and operational condition, the Company's 2004 Form 10-K

stated, in part, the following:

Critical Accounting Policies

*The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions* that affect the reported amounts of assets, liabilities, revenue and expenses, and related disclosure of contingent assets and liabilities. *Management bases its estimates on historical experience and various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments*

*about the carrying value of assets and liabilities that may not be readily apparent from other sources.* Senior management has discussed the development, selection and disclosure of these estimates with the Audit Committee of our Board of Directors and with our independent auditors. [Emphasis added.]

37.   **Controls.**  The Company's 2004 Form 10-K also attested to the sufficiency

of the Company's controls and procedures, as follows:

TERM 4.  CONTROLS AND PROCEDURES

Disclosure Controls and Procedures

Management of the Company, with the participation and under the supervision of the Chief Executive Officer and Chief Financial Officer has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Exchange Act Rule 13a-15(e)) as of the end of the period covered by this annual report. *Based on this evaluation the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures are effective as of the end of the period covered by this annual report to provide reasonable assurance that material information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the Securities and Exchange Commission's rules and forms.* . . .

* * *

**Management Report On Internal Control Over Financial Reporting**

The management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is defined in Rule 13a-15(f) or 15d-15(f) promulgated under the Securities Exchange Act of 1934 as a process designed by, or under the supervision of, the Company's principal executive and principal financial officers and effected by the Company's board of directors, management and other personnel, *to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:*

Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the Company;

*Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles*, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and

Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

* * *

*The Company's management assessed the effectiveness of the Company's internal control over financial reporting as of January 1, 2005.* In making this assessment, the Company's management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework.

*Based on our assessment, management believes that, as of January 1, 2005, the Company's internal control over financial reporting is effective* based on those criteria. [Emphasis added.]

38.   **Certifications.**  The Company's 2004 Form 10-K also contained

certifications by defendants Marshall and Stewart that attested to the accuracy and

completeness of the Company's financial and operational reports, as follows:

**[CERTIFICATION PURSUANT TO RULES 13a-14(a)/15d-14(a) UNDER THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED]**

1.    I have reviewed this Annual Report on Form 10-K for the fiscal year ended January 1, 2005 of Nash Finch Company

2.    *Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;*

3.      *Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;*

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)      *Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;* and

   d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

   a)      *all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are*

*reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information;* and

b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting. [Emphasis added.]

Date: March 2, 2005
By: /s/ Ron Marshall
Title: Chief Executive Officer

* * *

Date:  March 2, 2005
By: /s/ LeAnne M. Stewart
Title: Senior Vice President
and Chief Financial Officer

* * *

## SECTION 1350 CERTIFICATION OF THE CHIEF EXCECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER

In connection with the Annual Report on Form 10-K of Nash Finch Company, (the "Company") for the period ended January 1, 2005 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), we, Ron Marshall, Chief Executive Officer and LeAnne M. Stewart, Senior Vice President and Chief Financial Officer, respectively, of the Company, certify, pursuant to 18. U.S.C. Section 1350, that to our knowledge:

(1)    the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    *the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Report.* [Emphasis added.]

Date: March 2, 2005
By: /s/ Ron Marshall
Title: Chief Executive Officer

By: /s/ LeAnne M. Stewart
Title: Senior Vice President and

Chief Financial Officer

39.     Unbeknownst to investors, however, the statements contained in Nash Finch's February 24, 2005 and March 2, 2005 releases, as well as those statements contained in the Company's 2004 Form 10-K, referenced above, were each materially false and misleading when made, and were known by defendants to be false or were recklessly disregarded as such thereby, for the following reasons, among others:

(a)     Nash Finch's net sales growth rate and earnings growth rate could not be sustained due to undisclosed, internal problems relating to the reorganization and the integration of the Roundy's acquisition.

(b)     It was not true that Nash Finch maintained adequate information management systems or systems of internal, operational or financial controls such that Nash Finch's reported financial statements were true, accurate or reliable;

(c)     As a result of the aforementioned adverse conditions, defendants lacked any reasonable basis to claim that Nash Finch was operating according to plan, or that Nash Finch could achieve guidance sponsored and/or endorsed by defendants.

40.     Taking advantage of the artificial inflation in the price of the Company's shares caused by publication of defendants' materially false and misleading statements, on March 10, 2005, the Company announced the private placement of $150 million in senior subordinated convertible notes due 2035, equal to $322 million aggregate principal amount at maturity. According to defendants, these notes are convertible at the option of the holder only upon the occurrence of certain events at an initial conversion price of $50.05 per share, representing a 36.50% premium over the last reported sale price of

Nash-Finch's common stock on March 9, 2005. Defendants stated that the Company intended to use the proceeds from this offering, together with borrowings under its senior secured credit facility, to finance the Roundy's acquisition or, alternatively, to repay outstanding indebtedness under the term loan portion of its senior secured credit facility.

41.     On March 31, 2005, the Company announced that it had completed the Roundy's acquisition. Commenting on this acquisition and conditioning investors to believe that the transaction was expected to be trouble-free accretive to earnings, and completed in accordance with guidance that defendants sponsored and/or endorsed, defendant Marshall stated, in part, the following:

> "We are very pleased that this purchase is complete and we look forward to a smooth transition," stated Ron Marshall, Chief Executive Officer. "Over the past few weeks, I have visited many of our new independent operators and I am impressed with their innovative stores and their uniform passion for supermarket retailing. Our continuing commitment to all our independent customers is to help them grow their businesses in an increasingly competitive market. *Everyone at Nash Finch - including the approximately 800 new associates we welcomed to the Company today - is excited about the opportunities we now have to expand our merchandising programs and improve productivity throughout our distribution network.*" [Emphasis added.]

42.     The statements made by defendants and published in the Company's March 31, 2005 press release were materially false and misleading and were known by defendants to be materially false and misleading, or were recklessly disregarded as such, for the reasons stated herein in ¶39, *supra*.

43.     **1Q:05 Results.** On April 21, 2005, Nash Finch published a release announcing results for the fiscal first quarter of 2005. For 1Q:F05, Nash Finch reported earnings of $7.0 million, or $0.54 per share, compared to earnings of $4.7 million or

$0.38 per share for the same period the prior year. This release stated, in part, the following:

> Strategic Acquisition Integration Underway
>
> "We are pleased with the results of our quarter which are in line with our expectations and *represent increases in profitability across all segments of our business*," said Ron Marshall, Chief Executive Officer. *"Moreover we completed the acquisition of the distribution centers in Lima and Westville shortly after the close of the first quarter and integration efforts are proceeding according to plan."*
>
> * * *
>
> *"The acquisition is a key element of our Food Distribution strategy,"* said Ron Marshall. "We gain successful customers with a proven track record within their market areas as well as the opportunity to expand marketing and merchandising programs across our network. We are committed to helping our customers compete in an ever changing marketplace."
>
> * * *
>
> **Outlook**
>
> *The Company is reaffirming its earnings guidance range of between $3.40 and $3.55 in diluted earnings per share for fiscal <u>2005 before the accretive effect of the acquisition discussed above</u>.* This range compares to fiscal 2004 earnings from continuing operations of $14.9 million, or $1.18 per diluted share. Fiscal 2004 results included several events, listed on the schedule attached to this release, which had a net unfavorable impact of $24.0 million, or $1.89 per diluted share, the largest of which was a special charge of $21.0 million, or $1.66 per diluted share, involving primarily non-cash costs associated with the disposition of 21 retail stores. [Emphasis added.]

44.     Taking full advantage of the artificial inflation in the price of Nash Finch shares, caused in substantial part by publication of defendants' materially false and misleading statements about the Company, between April 28 and April 29, 2005, defendant Marshall sold his personally held Company shares for proceeds of more than

$2.5 million, representing more than 200% of Marshall's 2004 gross proceeds from Nash

Finch stock sales.  This sale marked a significant departure from defendant Marshall's

history of not selling Company stock.  In fact, between 1998, when defendant Marshall

joined the Company, and the end of February 2004, defendant Marshall had sold none of

his Nash Finch shares.

45.    **1Q:F05 Form 10-Q.**  On or about May 5, 2005, defendants filed with the

SEC the Company's 1Q:F05 Form 10-Q, signed by defendants Marshall and Stewart.  In

addition to containing Certifications by defendants Marshall and Stewart that were the

same as, or substantially similar to, those filed with the SEC and reproduced herein,

*supra*, the Company's 1Q:F05 Form 10-Q also stated, in part, the following:

Note 1 – Basis of Presentation

***The accompanying unaudited consolidated financial statements have
been prepared in accordance with generally accepted accounting
principles*** for interim financial information. . . .

The accompanying financial statements ***include all adjustments which
are, in the opinion of management, necessary to present fairly the
financial position of the Company*** and its subsidiaries at March 26, 2005,
January 1, 2005 and March 27, 2004, and the results of operations and
changes in cash flows for the twelve weeks ended March 26, 2005, and
March 27, 2004.  All material intercompany accounts and transactions
have been eliminated in the unaudited consolidated financial statements. . .
.

\* \* \*

CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The preparation of financial statements in conformity with generally
accepted accounting principles requires management to make estimates
and assumptions that affect the reported amounts of assets, liabilities,
revenue and expenses, and related disclosure of contingent assets and
liabilities. ***Management bases its estimates on historical experience,***

*consultation with experts and various other assumptions that are believed to be reasonable under the circumstances,* the results of which form the basis for making judgments about the carrying value of assets and liabilities that may not be readily apparent from other sources.

\* \* \*

ITEM 4.  CONTROLS AND PROCEDURES

Management of the Company, with the participation and under the supervision of the Chief Executive Officer and Chief Financial Officer has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Exchange Act Rule 13a-15(e)) as of the end of the period covered by this quarterly report. *Based on this evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures are effective as of the end of the period covered by this quarterly report to provide reasonable assurance that material information required to be disclosed by the Company* in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the Securities and Exchange Commission's rules and forms. There was no change in the Company's internal control over financial reporting that occurred during the Company's most recently completed fiscal quarter that materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting. [Emphasis added.]

46.    The statements made by defendants and contained in the Company's April 21, 2005 release and those statements contained in its 1Q:F05 Form 10-Q were materially false and misleading and were known by defendants to be materially false and misleading at that time, or were recklessly disregarded as such, for the reasons stated herein in ¶39, *supra*.

47.    **Piper Jaffray Presentation**.  With shares of the Company trading above $28.00 per share, on June 3, 2005, Nash Finch announced that it would participate in Piper Jaffray's Consumer Conference on June 8, 2005. At that conference, defendants reiterated many of the same, or similar, materially false and misleading statements as had

been published by the Company – including the materially false and misleading statements regarding the Company's integration of Roundy's.

48.     On July 13, 2005, defendants announced that Nash Finch had filed with the SEC, pursuant to Form S-3, a registration statement to allow for the resale of an aggregate principal amount at maturity of $322 million of senior subordinated convertible notes due 2035, and any shares of Nash Finch common stock issuable upon conversion of the notes.

49.     **2Q:05 Results: Guidance Raised.**  On July 21, 2005, Nash Finch published a release announcing results for the second fiscal quarter of 2005, ended June 18, 2005.  For 2Q:F05 Nash Finch reported net earnings of $9.7 million, or $0.75 per share, compared to earnings of $15.6 million or $1.26 per share for the same period the prior year.  This release stated, in part, the following:

> *"Integration of the Lima and Westville operations is proceeding according to plan,"* said Ron Marshall, Chief Executive Officer. "While we expected integration costs to affect food distribution margins in the short term, as occurred during the second quarter, we did not fully appreciate the degree to which the demands of integrating a significant acquisition would divert attention from daily operations and affect our day to day execution. Given the front-end loading of the integration costs and the steps we have taken to improve execution, *we expect operating margins in this segment to rebound as we begin to realize the synergies inherent in this acquisition."*

> * * *

> Outlook

> *The Company expects that the acquisition of the distribution centers will add approximately $0.30 to $0.34 to its previously disclosed pre-acquisition estimate that 2005 diluted earnings per share would range between $3.40 and $3.55. As a result, the Company now estimates that its*

*diluted earnings per share for fiscal 2005 will range between $3.70 and $3.89.* Further, the Company expects that for fiscal 2005 its interest expense will be approximately $25 million and its combined expense for depreciation and amortization will be approximately $45 million. [Emphasis added.]

50.   **2Q:F05 Form 10-Q.**  On or about July 21, 2005, defendants filed with the

SEC the Company's 2Q:F05 Form 10-Q, signed by and certified by defendants Marshall

and Stewart that were the same as or substantially similar to those previously filed with

the SEC and reproduced herein.  The Company's 2Q:F05 Form 10-Q also stated, in part,

the following:

> Note 1 – Basis of Presentation
>
> *The accompanying unaudited consolidated financial statements of Nash Finch Company ("Nash Finch" or the "Company") have been prepared in accordance with generally accepted accounting principles for interim financial information. . . .*
>
> *The accompanying financial statements include all adjustments which are, in the opinion of management, necessary to present fairly the financial position of the Company* and its subsidiaries at June 18, 2005, January 1, 2005 and June 19, 2004, and the results of operations for the twelve and twenty-four weeks ended June 18, 2005 and June 19, 2004 and changes in cash flows for the twenty-four weeks ended June 18, 2005 and June 19, 2004. All material intercompany accounts and transactions have been eliminated in the unaudited consolidated financial statements. . . .
>
> * * *
>
> ITEM 4.  CONTROLS AND PROCEDURES
>
> Management of the Company, with the participation and under the supervision of the Chief Executive Officer and Chief Financial Officer has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Exchange Act Rule 13a-15(e)) as of the end of the period covered by this quarterly report. *Based on this evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures are effective as of the end of the period covered by this quarterly report to provide reasonable*

*assurance that material information required to be disclosed by the Company* in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the Securities and Exchange Commission's rules and forms. There was no change in the Company's internal control over financial reporting that occurred during the Company's most recently completed fiscal quarter that materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting. [Emphasis added.]

51.     The statements made by defendants and contained in the Company's July 21, 2005 press release and those statements contained in the Company's 2Q:F05 Form 10-Q, were materially false and misleading and were know by defendants to be materially false and misleading, or were recklessly disregarded as such, for the reasons stated herein in ¶___, *supra.*

52.     Taking advantage of the artificial inflation in the price of Nash Finch shares, caused in substantial part by publication of defendants' materially false and misleading information about the Company, between late July and early August 2005, Nash Finch insiders -- including defendant Marshall, sold substantial amounts of their personally held Company stock, as follows:

| David Bersie: Senior VP | | | |
|---|---|---|---|
| | | | |
| Transaction Date | Shares | Price ($) | Proceeds of Sale ($) |
| | | | |
| 7/27/2005 | 3,547 | 41.75 | 148,087.25 |
| 7/28/2005 | 34,750 | 40.82 | 1,418,495.00 |
| 8/2/2005 | 130 | 42.89 | 5,575.70 |
| | | | |
| | 38,427 | | 1,572,157.95 |

| Bruce Cross: Senior VP | | | |
|---|---|---|---|

| Transaction Date | Shares | Price ($) | Proceeds of Sale ($) |
|---|---|---|---|
| 7/26/2005 | 18,000 | 41.37 | 744,660.00 |

| Allistair Graham: Director | | | |
|---|---|---|---|
| Transaction Date | Shares | Price ($) | Proceeds of Sale ($) |
| 8/18/2005 | 12,500 | 40.46 | 505,750.00 |

| Ron Marshall: CEO | | | |
|---|---|---|---|
| Transaction Date | Shares | Price ($) | Proceeds of Sale ($) |
| 4/28/2005 | 6,500 | 35.16 | 228,560.15 |
| 4/29/2005 | 68,500 | 35.00 | 2,397,500.00 |
| 7/26/2005 | 21,500 | 41.49 | 892,035.00 |
| 7/27/2005 | 33,000 | 41.39 | 1,365,870.00 |
| 7/28/2005 | 145,500 | 40.63 | 5,911,665.00 |
| 8/5/2005 | 30,000 | 41.94 | 1,258,200.00 |
| 8/8/2005 | 20,000 | 41.84 | 836,800.00 |
| | 325,000 | | 12,890,630.15 |

| Kathleen McDermott: Senior VP | | | |
|---|---|---|---|
| Transaction Date | Shares | Price ($) | Proceeds of Sale ($) |
| 7/29/2005 | 9,000 | 40.54 | 364,860.00 |

| Jeffrey Poore: Senior VP | | | |
|---|---|---|---|
| Transaction Date | Shares | Price ($) | Proceeds of Sale ($) |
| | | | |

| 8/4/2005 | 18,000 | 42.41 | 763,428.60 |

| Gregory Sandeno: Senior VP | | | |
| --- | --- | --- | --- |
| Transaction Date | Shares | Price ($) | Proceeds of Sale ($) |
| 4/26/2005 | 4,000 | 36.56 | 146,240.00 |
| 8/2/2005 | 1,500 | 42.92 | 64,378.50 |
| | 5,500 | | 210,618.50 |

Insiders sold a total 426,427 shares, garnering proceeds of $17,052,105.20.

53.     On September 1, 2005, Nash Finch published a release that announced that

defendant Marshall would resign as of March 2, 2006.  While Marshall was only 51 years

old at the time.  In this release defendant Marshall was quoted, in part, as follows:

> *"I am very proud of the performance driven culture that the executives and associates have developed at our Company,* allowing us to succeed by focusing on the needs of our independent retailer customers, who include some of the best marketers in the country," said Marshall. "It has been a privilege to work with them, and I will miss our association. *Our Company has tremendous opportunities ahead of it,* but after more than seven years in this position, I believe it is time to turn over the leadership of this enterprise, and consider new challenges. I look forward to assisting Al [Graham, Chairman of the Board] and his committee in their search." [Emphasis added.]

54.     On October 5, 2005, Nash Finch issued a release that announced the

effectiveness of the Company's resale registration statement that had been filed with the

SEC in connection with Nash Finch's previously issued $322 million in senior

subordinated convertible notes.

55.     In connection with this resale, previously, on or about September 26, 2005,

defendants filed with the SEC, pursuant to Form S-3/A, its amended registration

statement, signed by defendants Marshall and Stewart, among others.  In addition to

making many of the same, or similar materially false and misleading statements as had

been made previously and produced herein, *supra*, the Form S-3/A stated, in part, the

following:

> Core Strengths
>
> We believe that the following strengths differentiate us from our competitors and position us for success within our markets:
>
> Industry Leadership in Metrics Critical to Independent Supermarket Retailers.   We believe that our domestic industry leading operating performance, as measured by fill-rate, on-time delivery and selector accuracy, enables us to gain and retain independent retailers. We anticipate that *these qualities will further enhance the value we will add to the Westville and Lima distribution facilities that are being integrated into our distribution network.*
>
> Low Cost and Value Added Distributor.  We believe that we are able to deliver cost savings and provide reliable and efficient service to our customers through:
>
> - maximizing our substantial purchasing power;
>
> - creating operating efficiencies through implementation of distribution center best practices;
>
> - reducing capital requirements through working capital management;
>
> - creating innovations to enhance supply chain management; and
>
> - increasing the productivity of our professional, union and non-union workforce.
>
> * * *
>
> Four Cornerstones—Our Strategy
>
> The four cornerstones of our strategy are to:

\*    take advantage of new business opportunities with new and existing food distribution customers, thereby strengthening our position as one of the leading wholesale choices;

\*    increase our market position as a leading military food distributor and extend our customer base and product offerings;

\*    continue to improve returns from our existing retail operations; and

\*    drive shareholder value through debt reduction and return of cash to shareholders through regular dividend payments.

In addition, we may from time to time identify and evaluate acquisition opportunities in our food distribution and military food distribution segments to the extent we believe such opportunities present strategic benefits to those segments and can be achieved in a cost-effective manner. [Emphasis added.]

56.    The statements made by defendants in the September 1, 2005 release, as well as the Company's September 26, 2005 Form S-3/A Registration Statement, were materially false and misleading and were known by defendants to be materially false and misleading at that time, or were recklessly disregarded as such, for the reasons stated in ¶39, *supra*.

## THE TRUE FINANCIAL AND OPERATIONAL CONDITION OF NASH FINCH IS BELATED DISCLOSED

57.    On October 20, 2005, after the close of regular trading, defendants shocked investors by lowering the Company's guidance for 2005. The release announcing the downward revision stated, in pertinent part, as follows:

Nash Finch Company Provides Fiscal 2005 Earnings Update

MINNEAPOLIS--(BUSINESS WIRE)--Oct. 20, 2005--Nash Finch Company (Nasdaq:NAFC), a leading national food retailer and distributor, today announced that it *is revising its earnings outlook for fiscal year 2005 ending December 31, 2005. The Company now expects fully diluted*

*earnings per share for the year in the range of $3.00 to $3.25 per share.*
The Company reported fully diluted earnings per share of $1.18 in fiscal
2004. Previously the Company had estimated 2005 fully diluted earnings
per share would range between $3.70 and $3.89 per share.

*The revised earnings estimate is due to a decline in retail gross profit
margins, primarily reflecting inadequate execution in pricing across the
Company's retail operations*; depressed wholesale gross profit margins
principally relating to manufacturer promotional spending; and *higher
than expected acquisition integration costs.*

*"Clearly the acquisition of the Westville, Indiana and Lima, Ohio
divisions earlier in the year resulted in a lack of focus in our core
business,"* said Ron Marshall, Chief Executive Officer. *"We have
experienced serious erosion in retail and wholesale gross profit margins,
based on issues that we had thought were readily resolvable.*
Unfortunately, the impact has been deeper than we anticipated and
*margins will take longer to rebound than we had thought,* but these
issues are fixable and we are addressing each one of them." [Emphasis
added.]

58.    On this news, Nash Finch stock plummeted.  The shares, which had closed

at $42.08 on October 20, 2005, opened the next day at $34.47 and closed that day at

$30.04, a decline of $12.76, or 28.6%.

59.    The market for Nash Finch's common stock was open, well-developed and

efficient at all relevant times.  As a result of these materially false and misleading

statements and failures to disclose, Nash Finch common stock traded at artificially

inflated prices during the Class Period.  Plaintiff and other members of the Class

purchased or otherwise acquired Nash Finch common stock relying upon the integrity of

the market price of Nash Finch common stock and market information relating to Nash

Finch, and have been damaged thereby.

60.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Nash Finch common stock by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

61.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Nash Finch's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Nash Finch and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## CAUSATION AND ECONOMIC LOSS

62.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated Nash Finch's stock price and operated as a fraud or deceit on Class Period purchasers of Nash Finch's stock by misrepresenting the Company's financial results.  Over a period of approximately eight months, defendants improperly inflated the Company's financial results.  Ultimately, however, when defendants' misrepresentations and fraudulent conduct came to be revealed and were apparent to investors, shares of Nash Finch declined precipitously – evidence that the prior artificial inflation in the price of Nash Finch's shares was eradicated.  As a result of their purchases of Nash Finch stock during the Class Period, plaintiff and other members of the Class suffered economic losses, *i.e.*, damages under the federal securities laws.

63.     By improperly characterizing the Company's financial results and misrepresenting its prospects, the defendants presented a misleading image of Nash Finch's business and future growth prospects.  During the Class Period, defendants repeatedly emphasized the Company's ability to monitor and control costs and expenses, and consistently reported that the integration of the Roundy's acquisition was proceeding according to expectations.  These claims caused and maintained the artificial inflation in Nash Finch's stock price throughout the Class Period, long enough to allow defendant Marshall to liquidate over $12 million of his personally held Nash Finch shares, and until the truth about the Company was ultimately revealed to investors.

64.     Defendants' false and materially misleading statements had the intended effect of causing Nash Finch's shares to trade at artificially inflated levels throughout the Class Period, reaching a Class Period high of almost $45.00 per share in August 2005.

65.     On October 20, 2005, however, defendants revealed that the Company would come nowhere near achieving guidance previously sponsored and/or endorsed by defendants. That day, defendants reported a huge earnings miss for the third and fourth quarters of fiscal 2005, and revised full-year guidance much lower than previous guidance, after announcing that the acquisition, integration and other merger-related costs were much higher than previously disclosed, and that the Company's core operations were performing much worse than previously disclosed.  These belated disclosures had an immediate, adverse impact on the price of Nash Finch shares.

66.     These belated revelations evidence defendants' falsification of Nash Finch's business prospects.  As investors and the market ultimately learned, the Company's business prospects had been overstated and the costs of integrating Roundy's had been understated.  As this adverse information became known to investors, the prior artificial inflation began to be eliminated from Nash Finch's share price and investors were damaged as a result of the related share price decline.

67.     As a direct result of defendants' statements on October 20, 2005, which indicated that the Company was performing much worse than previously disclosed and that integration costs were running much higher than had been reported, Nash Finch's stock price fell to $30.00 per share from $42.50 per share – a decline of over 26%, on very heavy trading volume.  This dramatic share price decline eradicated much of the

artificial inflation from Nash Finch's share price, causing real economic loss to investors who purchased this stock during the Class Period.

68.     The decline in Nash Finch's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud being revealed to investors and to the market.  The timing and magnitude of Nash Finch's stock price decline negates any inference that the losses suffered by plaintiff and the other members of the Class was caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to defendants' fraudulent conduct.  During the same period in which Nash Finch's share price fell more than 26% as a result of defendants fraud being revealed, the Standard & Poor's 500 securities index was relatively unchanged.  The economic loss, *i.e.*, damages suffered by plaintiff and other members of the Class, was a direct result of defendants' fraudulent scheme to artificially inflate the price of Nash Finch's stock and the subsequent significant decline in the value of the Company's shares when defendants' prior misstatements and other fraudulent conduct was revealed.

69.     The chart below illustrates the artificial inflation in the price of Nash Finch stock during the Class Period, and the dramatic decline in the price of the stock following defendants' belated disclosures regarding the Company's soaring integration expenses,



351702-1

declining core operations and inadequate internal controls, as follows:

## VIOLATIONS OF GAAP AND SEC REPORTING RULES

70.    During the Class period, defendants materially misled the investing public, thereby inflating the price of the Company's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its financial performance, accounting, reporting, and financial condition in violation of the federal securities laws and Generally Accepted Accounting Principles ("GAAP").

71.    GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. § 210.4-01(a)(1), provides that financial statements filed with the SEC that are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate. SEC Rule 13a-13 requires issuers to file quarterly reports.

72.    SEC Rule 12b-20 requires that periodic reports contain such further information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

73.    In addition, Item 303 of Regulation S-K requires that, for interim periods,

the Management Division and Analysis Section ("MD&A") must include, among other

things, a discussion of any material changes in the registrant's results of operations with

respect to the most recent fiscal year-to-date period for which an income statement is

provided.  Instructions to Item 303 require that this discussion identify any significant

elements of registrant's income or loss from continuing operations that are not

necessarily representative of the registrant's ongoing business. Item 303(a)(2)(ii) to

Regulation S-K requires the following discussion in the MD&A of a company's publicly

filed reports with the SEC:

> ***Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in relationship shall be disclosed.*** [Emphasis added.]

Paragraph 3 of the Instructions to Item 303 states in relevant part:

> ***The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.*** This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past. [Emphasis added.]

74.    The GAAP requirement for recognition of an adequate provision for

foreseeable costs and an associated allowance applies to interim financial statements as

required by Accounting Principles Board Opinion No. 28.  Paragraph 17 of this

authoritative pronouncement states that:

The amounts of certain costs and expenses are frequently subjected to year-end adjustments even though they can be reasonably approximated at interim dates. *To the extent possible such adjustments should be estimated and the estimated costs and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.* [Emphasis added.]

75.     The Company's financial statements contained in the fiscal 2005 Form 10-K and/or the quarterly reports filed with the SEC on Forms 10-Q for the quarterly periods throughout the Class Period were presented in a manner that violated the principle of fair financial reporting and the following GAAP, among others:

(a)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1).

(b)     The principle that financial reporting should provide information about an enterprise's financial performance during a period (FASB Statement of Concepts No. 1).

(c)     The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2).

(d)     The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2).

(e)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2).

(f)     The principle that contingencies and other uncertainties that affect the fairness of presentation of financial data at an interim date shall be disclosed in interim reports in the same manner required for annual reports (APB Opinion No. 28).

(g)     The principle that disclosures of contingencies shall be repeated in interim and annual reports until the contingencies and have been removed, resolved, or have become immaterial (APB Opinion No. 28).

(h)     The principle that management should provide commentary relating to the effects of significant events upon the interim financial results (APB Opinion No. 28).

76.     In addition, during the Class Period, defendants violated SEC disclosure rules:

(a)     defendants failed to disclose the existence of known trends, events or uncertainties that they reasonably expected would have a material, unfavorable impact on net revenues or income or that were reasonably likely to result in the Company's liquidity decreasing in a material way, in violation of Item 303 of Regulation S-K under the federal securities laws (17 C.F.R. 229.303), and that failure to disclose the information rendered the statements that were made during the Class Period materially false and misleading; and

(b)     by failing to file financial statements with the SEC that conformed to the requirements of GAAP, such financial statements were presumptively misleading and inaccurate pursuant to Regulation S–X, 17 C.F.R. 210.4-01(a)(1).

77.     Defendants were required to disclose, in the Company's financial statements, the existence of the material facts described herein and to appropriately recognize and report assets, revenues, and expenses in conformity with GAAP. The Company failed to make such disclosures and to account for and to report its financial statements in conformity with GAAP. Defendants knew, or were reckless in not knowing, the facts that indicated that the fiscal 2005 SEC filings and all of the Company's interim financial statements, press releases and public statements, which were disseminated to the investing public during the Class Period, were materially false and misleading for the reasons set forth herein. Had the true financial position and results of operations of the Company been disclosed during the Class period, the Company's common stock would have traded at prices well below that which it did.

## ADDITIONAL SCIENTER ALLEGATIONS

78.     As alleged herein, defendants acted with scienter in that each defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Nash Finch, their control over, and/or receipt and/or modification of Nash Finch's allegedly materially misleading misstatements and/or their associations with the

Company that made them privy to confidential proprietary information concerning Nash Finch, participated in the fraudulent scheme alleged herein.

79.    Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because : (i) it deceived the investing public regarding Nash Finch's business, operations, management and the intrinsic value of Nash Finch common stock; (ii) it enabled defendants to sell over $300 million in convertible notes in a private placement, which notes were convertible into shares of the Company priced above $50.00 and which shares were also registered for sale within the Class Period; (iii) it enabled Nash Finch insiders to sell over $17 million of their privately held Nash Finch shares while in possession of material adverse non-public information about the Company; and (iv) it caused plaintiff and other members of the Class to purchase Nash Finch common stock at artificially inflated prices.

80.    The insider stock sales within the Class Period are set forth below:

| David Bersie: Senior VP | | | |
|---|---|---|---|
| | | | |
| Transaction Date | Shares | Price ($) | Proceeds of Sale ($) |
| | | | |
| 7/27/2005 | 3,547 | 41.75 | 148,087.25 |
| 7/28/2005 | 34,750 | 40.82 | 1,418,495.00 |
| 8/2/2005 | 130 | 42.89 | 5,575.70 |
| | | | |
| | **38,427** | | **1,572,157.95** |

| Bruce Cross: Senior VP | | | |
|---|---|---|---|
| | | | |
| Transaction Date | Shares | Price ($) | Proceeds of Sale ($) |
| | | | |

| 7/26/2005 | 18,000 | 41.37 | 744,660.00 |
|---|---|---|---|

| **Allistair Graham: Director** | | | |
|---|---|---|---|
| **Transaction Date** | **Shares** | **Price ($)** | **Proceeds of Sale ($)** |
| 8/18/2005 | 12,500 | 40.46 | 505,750.00 |

| **Ron Marshall: CEO** | | | |
|---|---|---|---|
| **Transaction Date** | **Shares** | **Price ($)** | **Proceeds of Sale ($)** |
| 4/28/2005 | 6,500 | 35.16 | 228,560.15 |
| 4/29/2005 | 68,500 | 35.00 | 2,397,500.00 |
| 7/26/2005 | 21,500 | 41.49 | 892,035.00 |
| 7/27/2005 | 33,000 | 41.39 | 1,365,870.00 |
| 7/28/2005 | 145,500 | 40.63 | 5,911,665.00 |
| 8/5/2005 | 30,000 | 41.94 | 1,258,200.00 |
| 8/8/2005 | 20,000 | 41.84 | 836,800.00 |
| | 325,000 | | 12,890,630.15 |

| **Kathleen McDermott: Senior VP** | | | |
|---|---|---|---|
| **Transaction Date** | **Shares** | **Price ($)** | **Proceeds of Sale ($)** |
| 7/29/2005 | 9,000 | 40.54 | 364,860.00 |

| **Jeffrey Poore: Senior VP** | | | |
|---|---|---|---|
| **Transaction Date** | **Shares** | **Price ($)** | **Proceeds of Sale ($)** |
| 8/4/2005 | 18,000 | 42.41 | 763,428.60 |

| **Gregory Sandeno: Senior VP** | | |
|---|---|---|

| Transaction Date | Shares | Price ($) | Proceeds of Sale ($) |
|---|---|---|---|
| | | | |
| 4/26/2005 | 4,000 | 36.56 | 146,240.00 |
| 8/2/2005 | 1,500 | 42.92 | 64,378.50 |
| | | | |
| | 5,500 | | 210,618.50 |

## Applicability Of Presumption Of Reliance:
### Fraud-On-The-Market Doctrine

81.      At all relevant times, the market for Nash Finch's common stock was an efficient market for the following reasons, among others:

(a)      Nash Finch's stock met the requirements for listing, and was listed and actively traded on the Nasdaq already defined, a highly efficient and automated market;

(b)      As a regulated issuer, Nash Finch filed periodic public reports with the SEC and the Nasdaq;

(c)      Nash Finch regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)      Nash Finch was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and

certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

82.     As a result of the foregoing, the market for Nash Finch securities promptly digested current information regarding Nash Finch from all publicly available sources and reflected such information in Nash Finch stock price. Under these circumstances, all purchasers of Nash Finch common stock during the Class Period suffered similar injury through their purchase of Nash Finch common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

83.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Nash Finch who knew that those statements were false when made.

351702-1                                        47

## BASIS OF ALLEGATIONS

84.     Plaintiff has alleged the following based upon the investigation of

plaintiff's counsel, which included a review of SEC filings by Nash Finch, as well as

regulatory filings and reports, securities analysts' reports and advisories about the

Company, press releases and other public statements issued by the Company, and media

reports about the Company, and plaintiff believes that substantial additional evidentiary

support will exist for the allegations set forth herein after a reasonable opportunity for

discovery.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

85.     Plaintiff repeats and realleges each and every allegation contained above as

if fully set forth herein.

86.     During the Class Period, defendants carried out a plan, scheme and course

of conduct that was intended to and, throughout the Class Period, did:  (i) deceive the

investing public regarding Nash Finch's business, operations, management and the

intrinsic value of Nash Finch common stock; (ii) enable defendants to sell over $300

million in convertible notes in a private placement, which notes were convertible into

shares of the Company priced above $50.00 and which shares were also registered for

sale within the Class Period; (iii) enable Nash Finch insiders to sell over $17 million of

their privately held Nash Finch shares while in possession of material adverse non-public

information about the Company; and (iv) cause plaintiff and other members of the Class

to purchase Nash Finch common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually (and each of them) took the actions set forth herein.

87.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Nash Finch's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

88.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Nash Finch as specified herein.

89.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Nash Finch's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Nash Finch and its business operations and future prospects in the light of the

circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Nash Finch common stock during the Class Period.

90.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public, which they knew or recklessly disregarded was materially false and misleading.

91.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly for the purpose and effect of concealing Nash Finch's operating condition and future business prospects

from the investing public and supporting the artificially inflated price of its common

stock. As demonstrated by defendants' overstatements and misstatements of the

Company's business, operations and earnings throughout the Class Period, defendants, if

they did not have actual knowledge of the misrepresentations and omissions alleged,

were reckless in failing to obtain such knowledge by recklessly refraining from taking

those steps necessary to discover whether those statements were false or misleading.

92.     As a result of the dissemination of the materially false and misleading

information and failure to disclose material facts, as set forth above, the market price of

Nash Finch common stock was artificially inflated during the Class Period. In ignorance

of the fact that market prices of Nash Finch's publicly traded common stock were

artificially inflated, and relying directly or indirectly on the false and misleading

statements made by defendants, or upon the integrity of the market in which the securities

trade, and/or on the absence of material adverse information that was known to or

recklessly disregarded by defendants but not disclosed in public statements by defendants

during the Class Period, plaintiff and the other members of the Class acquired Nash Finch

common stock during the Class Period at artificially high prices and were damaged

thereby.

93.     At the time of said misrepresentations and omissions, plaintiff and other

members of the Class were ignorant of their falsity and believed them to be true. Had

plaintiff and the other members of the Class and the marketplace known the truth

regarding the problems that Nash Finch was experiencing, which were not disclosed by

defendants, plaintiff and other members of the Class would not have purchased or

otherwise acquired their Nash Finch common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

94.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

95.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against Individual Defendants

96.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

97.    The Individual Defendants acted as controlling persons of Nash Finch within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading. The Individual Defendants were provided with or had

unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

98.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

99.     As set forth above, Nash Finch and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest

thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  December 19, 2005

**Respectfully submitted,**

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**

**s/  Gregg M. Fishbein**

Richard A. Lockridge, #64117
Gregg M. Fishbein, #202009
Nathan D. Prosser, #0339745
100 Washington Avenue South,
Suite 2200
Minneapolis, Minnesota  55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

**MILBERG WEISS BERSHAD
 & SCHULMAN LLP**
Steven S. Schulman
Peter E. Seidman
One Pennsylvania Plaza
New York, New York  10119-0165
(212) 594-5300

**LAW OFFICES OF BRUCE G. MURPHY**
Bruce G. Murphy
265 Llwyds Lane
Vero Beach, FL  32963
Tel:  (828) 737-0500

**LAW OFFICES OF MICHAEL A. SWICK, PLLC**
Michael A. Swick
One William Street, Suite 1000
New York, New York  10004
Tel: (212) 920-4310
Fax: (212) 584-0799

**Attorneys for Plaintiff**

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, _William Brennan_ ("Plaintiff") declare the following claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed the complaint and authorized its filing. Plaintiff retains the Law Offices of Bruce G. Murphy, P.C. and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis.

2. Plaintiff did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a Named and/or Lead Plaintiff either individually or as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| No. of Shares | Securities Symbol | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| 100 | NAFC | Sell | 11/12/05 | 28.41 |
| 100 | NAFC | Buy | 7/11/04 | 37.72 |
| | | | | |
| | | | | |

Please list other transactions on a separate sheet of paper, if necessary.

These securities were acquired or held in (check all that apply): ☐General (non-retirement account) ☐Merger/acquisition/distribution ☐Gift ☒IRA ☐Employer-sponsored plan (401k, 403b, etc.)

5. During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below:

6. The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _7_ day of _December_ 2005.

_____
Signature

_William Brennan_
Print Name

# LOCKRIDGE GRINDAL NAUEN
## P.L.L.P.
### ATTORNEYS AT LAW

SUITE 2200

100 WASHINGTON AVENUE SOUTH

**MINNEAPOLIS, MINNESOTA 55401-2179**

TELEPHONE (612) 339-6900

FACSIMILE (612) 339-0981

SUITE 301

660 PENNSYLVANIA AVENUE, S.E.

**WASHINGTON, D.C. 20003-4335**

TELEPHONE (202) 544-9840

FACSIMILE (202) 544-9850

WWW.LOCKLAW.COM

ROBERT J. SCHMIT
RICHARD A. LOCKRIDGE
CHARLES N. NAUEN*
H. THEODORE GRINDAL
W. JOSEPH BRUCKNER
CHRISTOPHER K. SANDBERG
J. MICHAEL SCHWARTZ
BERT BLACK**
HARRY E. GALLAHER
WILLIAM A. GENGLER
ERIC C. TOSTRUD
ROBERT K. SHELQUIST
HENRI G. MINETTE
GREGG M. FISHBEIN
SUSAN E. ELLINGSTAD
KAREN HANSON RIEBEL
HEIDI M. SILTON

OF COUNSEL
   DANIEL A. FARBER***
   ELIZABETH A. SNELSON
   BRADLEY W. ANDERSON
   PATRICIA A. BLOODGOOD*

*ALSO ADMITTED IN WISCONSIN
**ALSO ADMITTED IN TEXAS
***ADMITTED IN WASHINGTON, D.C. ONLY

CHRISTIAN M. SANDE
SARA L. MADSEN
GREGORY J. MYERS
YVONNE M. FLAHERTY
DARLA JO BOGGS
LISA M. POLLARD****
DAVID J. ZOLL
MARY E. BRIEDÉ
NATHAN D. PROSSER
ELIZABETH R. ODETTE
DAVID W. ASP
R. REID LEBEAU II
CARMEN B. COPHER

****ADMITTED IN NEW YORK ONLY

GOVERNMENT RELATIONS†
   DENNIS M. MCGRANN
   KATHLEEN K. MICHELETTI
   DOUG D. STANG
   ALLYSON J. HARTLE
   REBECCA K. KLETT
   MARA B. HUMPHREY
   MATTHEW S. SCHAFER
   BRIAN M. WILLIAMS
   MEGAN G. HELGE

† NON-ATTORNEY LOBBYISTS

December 19, 2005

Clerk of Court
U.S. District Court
District of Minnesota
300 S. Fourth Street
Minneapolis, MN 55401

**HAND DELIVERED**

Re:   William Brennan, Individually and on Behalf of All Others Similarly Situated v. Nash Finch Company, Ron Marshall, and Le Anne M. Steward, Court File No. _____ (NEW CASE)

Dear Clerk:

Enclosed for filing, please find the $250 filing fee check, Civil Cover Sheet, Summons, Complaint, and Certification of Plaintiff Pursuant to Federal Securities Laws in the above-referenced matter.  Also enclosed is a copy of the Complaint to be returned with a signed/sealed Summons.

If you have questions, please contact me.

Very truly yours,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

Gregg M. Fishbein

GMF/sm
Enclosures