# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| In re NASH FINCH CO. SECURITIES LITIGATION | ) ) ) | Civ. No. 0:05-cv-02934-ADM-AJB |
| | ) | <u>CLASS ACTION</u> |
| This Document Relates To: | ) ) | CONSOLIDATED COMPLAINT FOR |
| ALL ACTIONS. | ) ) | VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| | ) | |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................. 1

II.    JURISDICTION AND VENUE ........................................................... 9

III.   THE PARTIES .................................................................................... 10

IV.    CONFIDENTIAL WITNESSES .......................................................... 12

V.     FACTS SHOWING DEFENDANTS' KNOWLEDGE OF MATERIAL
       ADVERSE INFORMATION ................................................................ 19

     A.   Defendants Knew the Company's Financial Results Would be
            Negatively Impacted if They Did not (1) Effectively Integrate the
            Operations, Systems and Personnel of the Acquired Distribution
            Centers, (2) Retain Existing Customers and Capture Additional
            Customers and (3) Effectively Manage Vendor Promotional
            Programs ................................................................................. 19

     B.   Defendants Knew the Acquisition of the Roundy's Distribution
            Centers Would Not Add $1 Billion of Annual Revenues or Be
            Immediately Accretive to Earnings ........................................... 24

          1.   Defendants Discontinued Improper Advertising Billing
                 Practices Related to Vendor Promotions at Roundy's that
                 Caused Millions of Dollars in Lost Earnings and Then Began
                 Charging Vendors Fees in an Attempt to Recoup the Lost
                 Earnings ........................................................................... 26

          2.   Defendants Discontinued "Diversion" Buying at the Acquired
                 Distribution Centers and Knew the Acquired Distribution
                 Centers' Participation in the Company's Vendor Promotional
                 Programs Did Not Increase Earnings as Expected .................. 30

          3.   Defendants Knew Slotting Allowance Income Was Declining
                 and Less than Projected .................................................... 36

          4.   Defendants Knew Vendors Were Not Being Paid Millions of
                 Dollars on Past Due Invoices ............................................. 39

          5.   Defendants Attempt to Increase Earnings by Engaging in
                 Other Improprieties .......................................................... 41

**Page**

6.      Defendants Knew Nash Finch Was Losing Customers that
        Generated Millions of Dollars in Revenues ..................................... 42

7.      Defendants Knew the Company's Efforts to Reduce Costs By
        $4-$5 Million Through "Network Rationalization" Failed and
        Was Scrapped .................................................................................. 47

8.      Defendants Knew There Were Problems with the Integration
        of Roundy's Accounting Systems that Contradicted Their
        Representations that the Integration Had Gone "Very
        Smoothly" and Was "Ahead of Schedule" ....................................... 48

9.      Defendants Increased Earnings Requirements for Other
        Distribution Centers in an Attempt to Make up the Lost
        Earnings at the Westville and Lima Distribution Centers ................ 53

10.     Defendants Cause the Retail Segment's Profits to Decline by
        Failing to Advertise Price Reductions on Non-Key
        Merchandise and by Manipulating the Allocation of Vendor
        Promotion Income Between the Food Distribution and Retail
        Segments ......................................................................................... 56

C.      Marshall and McDermott's Highly Suspicious Insider Selling,
        Followed by Their Unexpected Resignations and Investigations by
        the Company and the SEC, Confirm Their Knowing Participation in
        the Fraudulent Scheme ............................................................................ 59

VI.     DEFENDANTS FALSE AND MISLEADING STATEMENTS DURING
        THE CLASS PERIOD .......................................................................................... 66

A.      2/24/05-3/3/05: Defendants Falsely Represented the Roundy's
        Acquisition Will Increase Revenues and Earnings ..................................... 66

B.      4/21/05: Nash Finch Reported 1Q05 Results, Defendants Reiterate
        the Acquisition Will Be Immediately Accretive to Earnings and
        Assure Investors the Integration of the Roundy's Distribution
        Centers Is Proceeding on Schedule ........................................................... 75

C.      7/21/05: Nash Finch Reported Disappointing 2Q05 Results Due to
        Unexpected Integration Costs but Defendants Assure Investors the
        Integration Was "Back on Track," the Acquisition Would Still Be

**Page**

Immediately Accretive and that the Company Had Only Lost One $15,000 a Week Customer ......................................................................... 83

D.   9/1/05: The False and Misleading Press Release Announcing Marshall's Resignation................................................................................. 90

VII.   DEFENDANTS REVEAL THE NEGATIVE IMPACT OF THE ACQUISITION ON THE COMPANY'S FINANCIAL CONDITION AND MAKE SUBSEQUENT DISCLOSURES FURTHER DEMONSTRATING THEIR FRAUD................................................................................................. 92

VIII.   PROXIMATE LOSS CAUSATION ................................................... 99

IX.   CLASS ACTION ALLEGATIONS AND FRAUD ON THE MARKET PRESUMPTION OF RELIANCE ...................................................... 102

X.   NO SAFE HARBOR............................................................................ 106

## I.    INTRODUCTION

1.    This is a securities fraud class action on behalf of all persons who purchased the common stock of Nash Finch Company ("Nash Finch" or the "Company") between 2/24/05 and 10/20/05 (the "Class Period") against the Company and three of its current or former officers.  Lead Plaintiff alleges the defendants participated in a scheme to defraud class members by, *inter alia,* making materially false and misleading statements and omissions in violation of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

2.    Nash Finch operates in three segments – food distribution, military food distribution and food retailing.  Since 2004 the Company has been downsizing the food retailing segment and focusing on growing the food distribution segment.  Nash Finch reported in its Securities and Exchange Commission ("SEC") filings that the food distribution industry was (and is) intensely competitive and characterized by low profit margins and increasing consolidation.  The Company reported low organic food distribution sales growth prior to the Class Period and planned to increase food distribution sales and profits by acquiring other food distributors.  On 2/24/05, the first day of the Class Period, Nash Finch announced that it had acquired two distribution centers from Roundy's Supermarkets, Inc. ("Roundy's").

3.    Defendants defrauded class members by falsely representing throughout the Class Period that the two acquired distribution centers represented approximately $1 billion in annual food distribution sales and that the acquisition would be immediately accretive to earnings by improving operating earnings by $31-$33 million and increasing F05 earnings

per share ("EPS") by \$0.30-\$0.34 (or \$4.0-\$4.5 million) from \$3.40-\$3.55 to \$3.70-\$3.89. Defendants made these positive representations in the 2/24/05 press release announcing the acquisition, the 3/2/05 press release reporting the Company's 4Q04 and F04 results, during the Company's 3/3/05 conference call, in the Company's 4/21/05 press release reporting the Company's 1Q05 results, during the 4/21/05 conference call, in the 7/21/05 press release reporting the Company's 2Q05 results and during the 7/21/05 conference call.

4.     During the Company's 4/21/05 conference call, defendants also represented the "integration plan [was] proceeding on schedule" and would be completed "gracefully" without any "particularly heavy lifting" because management was "very organized and disciplined."   In addition, defendants assured investors Roundy's customers were "exceptionally supportive" of the replacement of Roundy's private label products with Nash Finch's private label products.

5.     During the Company's 7/21/05 conference call, the defendants reported that the failure to integrate Roundy's marketing operations as planned and the diversion of management's attention from day-to-day operations caused the Company to report disappointing margins in 2Q05.  But they assured investors the problems would not be a continuing issue because the integration plan was back on track and steps were being taken to restore focus and improve execution.  They also assured investors the acquisition would still be immediately accretive to F05 EPS and increased F05 EPS guidance by \$0.30 - \$0.34 from the \$3.40-\$3.55 guidance provided on 3/2-3/05 and 4/21/05 to \$3.70-\$3.89.   In addition, defendants told investors the acquired distribution centers had lost only one \$15,000 per week customer.

6.     Defendants knew their positive representations about the acquisition were materially false and misleading.  It is undisputed the acquisition did not represent $1 billion of annual food distribution sales and that the acquisition was not immediately accretive to earnings.   In the four quarters following the acquisition (2Q05-1Q06), the acquired distribution centers generated $800 million of revenue – 20% less than what defendants told investors to expect.   In addition, Nash Finch reported F05 EPS of $3.13 which was substantially less than the $3.70-$3.89 they told investors to expect.  In fact, the $3.13 EPS was even less than the $3.40-$3.55 EPS guidance that did not even include the supposed positive impact of the acquisition.

7.     After the Class Period, defendants admitted the substantial shortfall in food distribution revenues and F05 EPS was caused by previously undisclosed problems with the Company's vendor promotional programs that depressed wholesale profit margins, and higher than expected integration costs.  Numerous facts from corroborating sources show the defendants knew about these problems during the Class Period.

8.     Information provided by 14 former Nash Finch employees referred to herein as confidential witnesses and other sources – including documents and pleadings filed in the Company's lawsuit against Marsh Supermarkets, LLC ("Marsh") – show the defendants knew there were numerous undisclosed problems with the integration of the acquired distribution centers that were negatively impacting the financial results of the Company. Several former employees stated that Nash Finch discontinued improper advertising billing practices related to vendor promotional programs at the acquired distribution centers in 3/05 that reduced earnings at the Westville distribution center by approximately $4-$5 million.

Thus, at the beginning of the Class Period, defendants knew the discontinuation of the Roundy's promotional practices at the Westville distribution center alone would wipe out just about all of the $4-$4.5 million increase in F05 EPS they told investors to expect.

9.     The former employees also stated that in 6/05, the Company started charging Roundy's vendors a new administrative fee in an effort to recoup the lost earnings, and retroactively imposed the fee on all vendor invoices received beginning in 4/05.  The imposition of the new administrative fee, however, backfired.  According to the former employees, many of the vendors complained about the new fee, and demanded and received repayment of the new fee.  In addition, many of the vendors discontinued or substantially reduced promotional programs which prevented Nash Finch from offering competitive price discounts and other promotions to its grocery store customers.  As a result, many of the food distribution grocery store customers complained about the lack of promotions and replaced Nash Finch with other food distributors.

10.     Defendants also knew earnings at the acquired distribution centers would decline by approximately $2 million due to the discontinuation of "diversion" buying. Defendants projected earnings to increase by approximately $6 million over the next 12 months from the acquired distribution centers' participation in the Company's vendor promotional programs, but other senior executives at the Company told the defendants during meetings in 2/05 and 3/05 that the projected $6 million increase in earnings was not attainable and they were right.  The expected $6 million increase in earnings was not realized, the shortfall began in 4/05 (the first month following the close of the acquisition),

the amount of the shortfall increased each month and the total amount of the shortfall was approximately $2-$3 million or 50% of the total projected increase.

11.     Two former employees also stated the Company's earnings were less than projected due to a substantial shortfall in projected slotting allowances – monies paid by the Company's vendors in exchange for stocking and displaying their products in desirable locations at the Company's retail stores. The witnesses stated the amount of the shortfall increased each month and that the total amount of the shortfall was approximately $2 million.

12.     The defendants also knew that Nash Finch was losing grocery store customers to competing food distributors for other reasons. Three former Nash Finch employees stated that Martin's Supermarkets – a significant customer with 19 stores in Indiana and Michigan – replaced the Company with Spartan (for health and beauty products) and Caito (for produce). Marshall acknowledged the loss of this large customer after the Class Period. Documents and pleadings filed in the Company's lawsuit against Marsh confirm the defendants knew no later than 4/14/05 that Marsh would not purchase $20 million of product in 2005 because Nash Finch discontinued offering Roundy's private label products. As a result, defendants knew Marshall's representation on 7/21/05 that the Company had only lost one $15,000 per week customer since the acquisition was false. Problems with the integration of the Company's purchasing systems at the Lima distribution center caused "fill rates" and food distribution revenues to decline and resulted in the Company delaying the integration of the purchasing system at the Westville distribution center.

13.     Defendants also knew the Company would not realize "productivity improvements" from "the better balancing of transportation across the Company's distribution network" as they represented.  Defendants initially projected approximately $4-$5 million of cost savings by reassigning grocery store customers to closer distribution centers or distribution centers with lower operating costs.  But customers complained about the changes, the changes were stopped in 7/05 and Nash Finch did not realize the projected cost savings.

14.     There were numerous problems with the integration of the Roundy's accounting system that contradicted the defendants' representations that the integration had gone very smoothly and was ahead of schedule in many respects.  In addition to the problems with the integration of the purchasing system, several former employees said delays in converting the chart of accounts and the failure to train Roundy's employees on how to use the Nash Finch Hyperion-Lawson accounting system led to numerous problems including the generation of inaccurate financial reports.

15.     Defendants also concealed the decline in the retail segment's profitability caused by the failure to advertise price reductions on certain products and the decline in vendor promotion income.  Two former retail segment executives stated that Marshall removed the Company's retail segment president (Michael Lewis) from office just before the beginning of the Class Period and was directly involved in setting the Company's retail pricing strategies.  Moreover, the former executives stated the failure to allocate vendor promotion income to the retail segment that it was entitled to based on its purchase of

hundreds of millions of dollars of product from the food distribution segment also caused the retail segment's profits to decline.

16.     The shortfall in earnings caused by the discontinuation of the Roundy's vendor promotional practices and diversion buying, the imposition of the new administrative fee, the cancellation or reduction of promotions offered by the Company's vendors, the decline in slotting allowances, the loss of customers, the other integration problems and the failure to advertise price reductions were reflected in monthly reports received by the defendants and discussed during monthly meetings.  The witnesses stated that monthly reports comparing actual results to budgeted results were received by the defendants and discussed at monthly meetings in Marshall's conference room.  In addition, the witnesses stated the reports showed earnings at the Westville and Lima distribution centers had plummeted after the acquisition and that the earnings requirements for other divisions and distribution centers were increased as a result.  Witnesses attending the monthly meetings said the decline in vendor promotions, loss of grocery store customers and resulting impact on earnings were discussed and that Marshall constantly yelled at the Company's executives, blamed them for the shortfall and even expelled executives from the meetings.

17.     Defendants concealed the problems with the integration and falsely represented the acquisition would improve the Company's financial results which caused the price of Nash Finch common stock to trade at artificially inflated prices.  While class members unknowingly purchased Nash Finch stock at artificially inflated prices during the Class Period, defendants Marshall and McDermott sold more than $13 million of their Nash Finch stock and then unexpectedly resigned from the Company.  Both the Company and the SEC

are investigating the sales and the Company has publicly disclosed it is fully cooperating with the SEC investigation and has provided the SEC with documents. Several securities experts have been quoted in the financial press as stating the investigations and sudden unexpected departures of Marshall and McDermott show the Company believes it has a serious problem and is mounting an all-out effort to shield the Company.

18.     On 10/20/05, Nash Finch issued a press release announcing that F05 EPS would be $3.00-$3.25 – substantially less than the $3.70-$3.89 they told investors to expect on 7/21/05 – due to (1) a decline in retail gross profit margins primarily reflecting inadequate execution in pricing across the Company's retail operations, (2) depressed wholesale gross profit margins principally relating to manufacturer promotional spending and (3) higher than expected acquisition integration costs. As summarized above and detailed herein, the defendants knew about these problems well before they were publicly disclosed on 10/20/05. In response to this unexpected negative news, the Company's stock price declined 28.6% from $42.34 to $30.23 causing class members to suffer economic losses.

19.     The following chart (which is also attached as Exhibit A) illustrates how defendants' fraudulent scheme caused the price of the Company's common stock to be artificially inflated and how class members were damaged when the Company's true financial condition was revealed to the market.



## II.   JURISDICTION AND VENUE

20.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the
1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the
SEC, 17 C.F.R. §240.10b-5.

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28
U.S.C. §§1331 and 1337, and §27 of the 1934 Act, 15 U.S.C. §78aa.

22.     Venue is proper in this District pursuant to §27 of the 1934 Act, and 28 U.S.C.
§1391(b).  Nash Finch maintains its principal place of business in this District and many of
the acts and practices complained of herein occurred in substantial part in this District.

23.     In connection with the acts alleged in this complaint, defendants, directly or
indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.   THE PARTIES

24.   Lead Plaintiff Central Laborers' Pension Fund ("CLPF") is a pension fund responsible for investing millions of dollars for the benefit of its participants.  CLPF suffered significant losses in connection with its transactions in Nash Finch securities during the Class Period, as reflected in its certification previously filed with the Court on 2/17/06 and incorporated by reference herein.  The Court appointed CLPF as Lead Plaintiff on 4/24/06.

25.   Defendant Nash Finch is a food distribution and retail company with its principal executive offices located in Minneapolis, Minnesota.  The Company operates three business segments, food distribution, military food distribution and food retailing.  The Company's stock is listed on the NASDAQ under the symbol "NAFC."

26.   Defendant Ron Marshall ("Marshall") was a director and Chief Executive Officer ("CEO") of Nash Finch until 2/15/06, when he unexpectedly left the Company.  On 9/1/05, Nash Finch issued a press announcing Marshall was resigning as of 3/2/06.  On 2/16/06, however, the Company simultaneously announced that (1) Marshall was immediately being replaced on an interim basis by Chairman of the Board Allister P. Graham, (2) the Company was still searching for a permanent replacement for Marshall, (3) Nash Finch had voluntarily contacted the SEC to discuss the results of an internal review that focused on trading in Nash Finch common stock by certain unnamed officers and directors in 2005, (4) the internal review was conducted with the assistance of outside counsel following an informal inquiry by the SEC in late 2005, (5) the Company had provided documents to

- 10 -

and was fully cooperating with the SEC and (6) the Company's general counsel, Kathleen McDermott, was also resigning.

27.     In 2005 Marshall's total compensation was almost $15 million.  According to the Company's proxy filed on 3/23/06, in 2005, defendant Marshall received a salary of $673,149, a bonus of $162,000, tax reimbursement payments of $171,080 related to the vesting of 10,000 shares of restricted stock and $193,877 in retirement contributions and other compensation.  During the Class Period, Marshall also sold 325,000 shares of Nash Finch stock for $12.9 million.  The sales are being investigated by the Company and the SEC.

28.     During the Class Period, Marshall made the statements alleged to be misleading.  He assisted in the preparation of the Company's press releases and financial statements and was the primary speaker during the Company's quarterly conference calls.

29.     Defendant LeAnn Stewart ("Stewart") was the Company's Senior Vice President and Chief Financial Officer ("CFO") throughout the Class Period.  Stewart's salary for F05 was not disclosed in the Company's proxy statements filed with the SEC. Throughout the Class Period, Stewart assisted in the preparation of the Company's press releases and participated in the quarterly conference calls.

30.     Defendant Kathleen McDermott ("McDermott") was Senior Vice President, Secretary and General Counsel until 2/16/06, when the Company simultaneously disclosed her resignation, Marshall's earlier than expected departure from the Company and the investigations by the Company and the SEC into the trading of Nash Finch common stock by certain officers and directors.  In a 3/6/06 article in *Supermarket News* reporting on the

unexpected resignations and insider selling investigations, Nash Finch interim CEO Allister Graham, stated the following about McDermott's sudden resignation: "She decided to leave. I have no comment on her reasons."

31.     According the Company's proxy filed on 3/23/06, in 2005, defendant McDermott received a salary of $288,630, a bonus of $22,800 and $84,608 of retirement contributions and other compensation.  During the Class Period, McDermott sold 9,000 shares of Nash Finch stock at inflated prices for $364,860.

32.     During the Class Period, McDermott assisted in the preparation of the Company's press releases, was present at the quarterly conference calls, and signed the 9/1/05 Form 8-K, which contained false and misleading statements as detailed herein.

33.     Marshall, Stewart and McDermott are the Individual Defendants.  They are liable for the false statements pled herein either directly as they made the statements or indirectly as the statements were "group-published" information.

## IV.    CONFIDENTIAL WITNESSES

34.     Several of the allegations included herein are based on information provided by several former Nash Finch employees referred to as confidential witnesses ("CW").  The information provided by the former employees is reliable and credible because (1) each of the witnesses worked at Nash Finch during the Class Period, (2) each witness stated they had personal knowledge of the information provided, (3) the witnesses' job titles and responsibilities show they had personal knowledge of the information provided, (4) many of the witness accounts corroborate one another and (5) the witness accounts are corroborated by other information alleged herein.

35.     CW1 was a marketing manager at the Roundy's distribution center in Westville, Indiana from 8/04 until 9/05 when CW1 resigned.  CW1's job responsibilities included structuring and implementing promotional programs for vendors like Kraft, General Foods, General Mills, Quaker and Proctor & Gamble whose products Nash Finch purchased and then sold and distributed to various grocery store customers.  CW1 reported to vice president of marketing and merchandising Mark Harvey who reported to James Fenzel, the division manager of the Lima and Westville distribution centers.  As detailed below, CW1 stated that Nash Finch (1) discontinued advertising billing practices related to vendor promotional programs at Roundy's that negatively impacted the performance of the Westville distribution center, and (2) implemented other vendor promotions that damaged the Company's relationship with both vendors and grocery store customers, led to a loss of retail customers and reduced earnings by approximately $4-$5 million.  In addition, CW1 stated that there were many problems with the integration of the Roundy's distribution centers and that Nash Finch imposed unrealistic earnings requirements for the acquired distribution centers.

36.     CW2 was an advertising manager at the Westville distribution center until 9/05 when CW2 was terminated.  CW2 reported to CW1 and was responsible for developing and managing advertising campaigns associated with the sale of particular products the Company's vendors were promoting by offering price discounts and rebates.  Like CW1, CW2 stated Nash Finch discontinued problematic advertising billing practices at Roundy's that caused a $4 million earnings shortfall and began charging the Company's vendors additional fees in an attempt to make up for the lost earnings.  CW2 also stated the

imposition of the new fee angered the Company's vendors and caused many of them to reduce or eliminate promotions which negatively impacted the financial performance of the Company.  In addition, CW2 stated the acquired distribution centers lost grocery store customers following the acquisition.

37.     CW3 was an accounting manager at the Roundy's distribution center in Lima, Ohio for 11 years until 7/05 when CW3 resigned.  CW3 was responsible for the accounting at the Lima distribution center including making entries in to the general ledger for sales, payroll and fixed assets.  CW3 reported to assistant controller Frank Blackburn who reported to regional controller Clint Covey.  Covey reported to assistant controller Jan Weinright who reported to defendant Stewart.  As explained below, CW3 said that serious problems arose during the integration of the Lima and Westville distribution centers and that the Lima distribution center was unable to meet budgeted performance goals.  CW3 was also responsible for determining the amount of the new administrative fee to be charged to the Company's vendors and stated the majority of the vendors were upset by the new fee.

38.     CW4 was a buyer's assistant at the Westville distribution center from 2/04 until 3/06 when CW4 resigned due to the Company's unethical business practices related to vendor promotions.  CW4 was responsible for processing purchase orders received from grocery store customers, inputting information related to vendor promotions into a Company database and billing vendors for the promotions.  CW4 reported to director of operations Doug Lynde.  As detailed below, CW4 stated that Nash Finch engaged in abusive vendor billing practices including billing vendors for unauthorized promotions, the new administrative fee and for unsold perishable merchandise that had expired.  CW4 also stated

that many vendors disputed the new fee and CW4 regularly processed thousand of dollars of reimbursements.

39.     CW5 was a produce procurement manager at Nash Finch's Edina office until CW5 was terminated in 10/05.  CW5 was responsible for the procurement and transportation of produce to eight of the Company's distribution centers.  CW5 reported to the vice president of perishables Sal Baio, who reported to the executive vice president of merchandising (James Patitucci until 7/05 when he was replaced by Bruce Cross). CW5 stated that Roundy's lost a big customer believed to be Sentry and other customers as Nash Finch completed the acquisition of Roundy's.  Like CW4, CW5 stated the Company billed vendors for unsold perishable merchandise that had expired.  CW5 also prepared reports that compared actual to budgeted results and said that in 2005 executive management increased earnings targets for certain departments and distribution centers due to the underperformance of other departments and distribution centers.

40.     CW6 was the distribution director of the Company's Omaha, Nebraska distribution center from 1993 until 1/06 when CW6 was terminated.  CW6 was responsible for ensuring that customer orders were transported to retail grocery store customers as well as overseeing the proper warehousing of product prior to shipment.  CW6 reported to Danny Lane, the Manager of the Omaha distribution center who reported to Midwest regional vice president Randall Jagger.  CW6 has personal knowledge of reports that compared actual results to budgeted results and meetings where variances were discussed.  CW6 also stated that the earnings projections for the Omaha distribution center were increased in 2005

because other departments and distribution centers, including the Westville and Lima distribution centers, were underperforming.

41.    CW7 was a human resources coordinator at the Lima distribution center until 7/05 when CW7 was terminated.  CW7 reported to CW8 and was responsible for various human resources tasks including payroll, workers compensation, hiring, unemployment and processing employee complaints.  As detailed below, CW7 stated there were problems with the integration of the distribution centers and that Nash Finch lost grocery store customers following the acquisition.

42.    CW8 was a human resources manager at Roundy's and then at Nash Finch until 7/05, when CW8 left the Company.  CW8 reported to Joel Eulberg, the Company's senior vice president of human resources.  CW8 was responsible for hiring and terminating employees at the Lima and Westville distribution centers along with other human resource duties.   CW8 received reports that showed the earnings of the Lima and Westville distribution centers plummeted after they were acquired by Nash Finch and participated in meetings where the reports were discussed.

43.    CW9 was an accountant at Nash Finch in the Store Brands' marketing department from 7/01 until 10/05 when CW9 resigned.  CW9 was responsible for sales reporting, accounting for vendor promotions and accounting for inter-company transfers between the corporate office and the various distribution centers.   CW9 reported to marketing accounting manager Sheless Davis who reported to accounting manager Anthony Martin who reported to defendant Stewart.  As explained below, CW9 stated that Nash Finch failed to renew "service sales agreements" with about 100 vendors at the end of 2004 that

caused the Company to lose approximately $2 million of projected product placement revenues (also known as slotting allowances) in 2005.

44.     CW10 was an accountant at the Lima distribution center from 1/02 until 7/05 when CW10 resigned.   CW10 reported to CW3 and was responsible for reconciling accounting information from Roundy's accounting system to Nash Finch's accounting system after the acquisition.   Like CW3, CW10 said there were numerous problems with converting the Roundy's accounting system to Nash Finch's accounting system.

45.     CW11 was hired as a consultant in 2/04, became the Director of Process and Planning in 8/04 and was appointed Senior Director of Operations Accounting by Marshall in 7/05 when Marshall terminated most of Stewart's accounting staff.   CW11 was terminated at the end of 10/05.   As Director of Operations Accounting, CW11 reported to Stewart and Marshall and was responsible for determining whether accruals related to vendor promotions were accurate and why Nash Finch was not realizing approximately $6 million of earnings expected from the acquired distribution centers' participation in the Company's vendor promotional programs.

46.     CW12 was an accountant at the Bridgeport distribution center from 12/99 until 5/05 when CW12's position was eliminated.   CW12 reported to controller Karen Cieslinski who reported to regional controller Covey and Danny Lane, the Bridgeport division manager.   CW12 was responsible for processing information related to the Company's vendor promotions and paying vendor invoices.   As detailed below, CW12 stated that vendors complained about not being paid after the Company transferred the processing and payment of vendor invoices from Bridgeport to the Edina headquarters.

- 17 -

47.     CW13 was a senior director of pricing at Nash Finch from 10/04 to 11/05 when CW13 was terminated.  CW13 reported to Michael Lewis, the Company's executive vice president and President of the retail segment until 2/05 when Marshall removed Lewis from his office. CW13 then reported to Patitucci until 7/05 when Patitucci left the Company. At that time CW13 reported to Cross.  CW13's primary job responsibilities were to manage the Company's pricing department which coordinated, implemented and processed all retail pricing strategies.  CW13 said the Company's retail pricing fluctuated significantly after Lewis was removed from his office and that the retail segment's margins and net income declined because the segment was not allocated vendor promotion income to which it was entitled.

48.     CW14 was a senior vice president of retail operations until 8/05 when CW14 resigned.  CW14 reported to Lewis until 2/05 when Marshall removed Lewis from his office. CW14 reported to Patitucci from 2/05 until 7/05 when Patitucci left the Company. At that time CW13 reported to Cross.  CW14 was responsible for managing retail store labor and store conditions.   Like CW13, CW14 said the Company's retail pricing fluctuated significantly after Lewis was removed from his office and that the retail segment's margins and net income declined because the segment was not allocated vendor promotion income to which it was entitled.

## V.   FACTS SHOWING DEFENDANTS' KNOWLEDGE OF MATERIAL ADVERSE INFORMATION

### A.   Defendants Knew the Company's Financial Results Would be Negatively Impacted if They Did not (1) Effectively Integrate the Operations, Systems and Personnel of the Acquired Distribution Centers, (2) Retain Existing Customers and Capture Additional Customers and (3) Effectively Manage Vendor Promotional Programs

49.     Nash Finch's business consists of three primary operating segments: food distribution, military food distribution and retail.  As of 3/31/06, the retail segment is made up 71 stores located primarily in the upper Midwest states of Colorado, Illinois, Iowa, Minnesota, Nebraska, North Dakota, Ohio, South Dakota, Wisconsin and Wyoming.  The Company has been downsizing this business segment since 2004 when it announced a restructuring program that resulted in the closure of numerous unprofitable retail stores.  The number of corporate owned retail stores has declined from 110 at the end of 2003 to 85 at the end of 2004.  As of 3/31/06, the Company operates 71 retail stores.  During the Company's 5/3/06 presentation at Lehman Brothers 9th Annual Retail Seminar, Stewart stated the retail segment was no longer the Company's core business and would continue to be downsized.  Michael J. Lewis was the Company's executive vice president and president of the retail segment until he resigned on 10/28/05.

50.     The military food distribution segment serves over 300 military commissaries and exchanges located in the United States, Europe, Cuba, Puerto Rico, Iceland and Honduras.  Jeffrey E. Poore was the Company's senior vice president in charge of the military distribution segment during the Class Period.

51.     The food distribution segment sells and distributes a wide variety of grocery products from 17 distribution centers (including the two acquired from Roundy's in 1Q05) to approximately 2,000 grocery stores (including the 500 plus customers initially serviced by the two distribution centers acquired from Roundy's) in 26 stores located in the United States.  James M. Patitucci headed the food distribution segment as the Company's executive vice president of merchandising and marketing until approximately 7/05 when he left the Company.  On 8/15/05, the Company issued a press release announcing that Bruce A. Cross, the Company's senior vice president of business transformation, had been promoted to executive vice president of merchandising and that Sarah Miller had been promoted to senior vice president and chief information officer.

52.     Nash Finch's strategy was to increase sales and profits by growing the food distribution segment.  In a 1/24/05 article in *Supermarket News*, Marshall stated that the Company had decided to concentrate most of its resources on growing the distribution segment of the business and in the Company's 2004 Form 10-K, it was reported that the efforts to expand the food distribution segment might include acquisitions.  Prior to the Class Period, Nash Finch reported low organic food distribution sales growth so the defendants knew the Company needed to acquire other food distributors to increase sales and profits.

53.     As reported in the Company's 2004 Form 10-K filed with the SEC on 3/2/05, the defendants knew their were several risks associated with their strategy to expand the distribution segment of the business that could negatively impact the business and operations of Nash Finch.  For example, the defendants knew food distribution sales and profits could

decline due to the intensely competitive nature of the consolidating food distribution industry.

> ***Competition is intense among the distributors in the food distribution segment as evidenced by the low margin nature of the business. Success in this segment will be measured by the ability to*** leverage scale in order to gain pricing advantages, to ***provide superior merchandising programs*** and services to the independent customer base and to use technology to increase distribution efficiencies. We compete with local, regional and national food distributors, as well as with vertically-integrated national and regional chains using a variety of formats, including supercenters, supermarkets and warehouse clubs, that purchase directly from suppliers and self-distribute products to their stores. ***We face competition from these companies on the basis of price, quality, variety and availability of products, strength of private label brands, schedules and reliability of deliveries, and the range and quality of customer services. Continuing our quality service*** by focusing on key metrics such as our on-time delivery rate, fill rate, and selector accuracy ***will be essential in maintaining our competitive advantage***. We believe we lead the industry in on-time delivery rate, fill rate and selector accuracy, which were 97.8%, 96.1%, and 99.6%, respectively, for fiscal 2004.

54.    In addition, the defendants knew – and disclosed in the 2004 Form 10-K – the Company's business and operations could be negatively impacted if they failed to effectively integrate any acquired distribution businesses, failed to retain existing customers or capture additional customers.

*Risks and Costs Associated with Expansion and Acquisition*

> ***Efforts to grow our distribution businesses may include acquisitions. Acquisitions entail various risks such as*** identifying suitable candidates at acceptable rates of return, ***timely and effectively integrating the operations, systems and personnel of the acquired business, retaining the customer base of the acquired operations, expenses of any undisclosed or potential environmental or legal liabilities and diversion of management's time and attention from other business concerns***. Successful integration of any new operations will depend on our ability to manage those operations, realize opportunities for revenue growth presented by strengthened product offerings and expanded geographic market coverage, maintenance of the customer base and, to some degree, eliminate redundant and excess costs. ***A failure to effectively manage these risks could increase the costs or reduce the benefits***

*to be derived from acquisitions and expansion, and therefore negatively impact our business and operations.*

**Customer Retention and Obtaining New Customers in the Distribution Business**

*Increasing the growth and profitability of our distribution business is particularly dependent upon our ability to retain existing customers and capture additional distribution customers through our existing network of distribution centers, enabling us to more effectively utilize the fixed assets in that business.* Our ability to achieve these goals is dependent, in part, upon our ability to continue to provide industry-leading customer service, offer competitive products at low prices, maintain high levels of productivity and efficiency, particularly in the process of integrating new customers into our distribution system, and offer marketing, merchandising and ancillary services that provide value to our independent and military commissary customers. *If we are unable to execute these tasks effectively, we may not be able to attract significant numbers of new customers and attrition among our existing customer base could increase, either or both of which could have an adverse impact on our revenue and profitability.*

55.     As reported in the 1/24/05 *Supermarket News* article and in the Company's 2005 Form 10-K, the ability to retain customers in the intensely competitive and consolidating food distribution business (and therefore, the ability to increase growth and profits in the food distribution segment), was particularly dependent on the effective management of the Company's vendor promotional programs.  In the 2005 Form 10-K, the Company reported the following:

*Changes in vendor promotions or allowances, including the way vendors target their promotional spending, and our ability to effectively manage these programs could significantly impact our margins and profitability.*

*We engage in a wide variety of promotional programs cooperatively with our vendors.* The nature of these programs and the allocation of dollars among them evolve over time as the parties assess the results of specific promotions and plan for future promotions. *These programs require careful management in order for us to maintain or improve margins while at the same time driving sales for us and for the vendors. A reduction in overall promotional spending or a shift in promotional spending away from certain types of promotions that we have historically utilized could have a*

- 22 -

***significant impact on our gross profit margin and profitability.*** Our ability to anticipate and react to changes in promotional spending by, among other things, planning and implementing alternative programs that are expected to be mutually beneficial to the manufacturers and us, will be an important factor in maintaining or improving margins and profitability. ***If we are unable to effectively manage these programs, it could have a material adverse effect on our results of operations and financial condition.***

56.     As reported in the Company's 2004 and 2005 Forms 10-K, the vendor promotions included off-invoice allowances and performance-based allowances. Off-invoice allowances were discounts offered by the Company's vendors on certain merchandise purchased during a specified period of time that were used to support a variety of marketing programs to grocery stores such as reduced price offering for specific time periods. These discounts would increase consumer demand which benefited the Company by increasing sales and profits. The off-invoice discounts were deducted from the vendor invoice and therefore reduced the Company's cost of sales.

57.     Performance-based allowances were rebates paid by the vendors to Nash Finch upon the completion of a specified activity such as purchasing or selling product during a certain time period. The basic performance requirement could also be accompanied by additional performance requirements such as providing advertising or special in-store promotions, and tracking specific shipments of goods to retailers during a specified time period (known as count-recount promotions). The billing for these performance-based allowances was normally in the form of a "bill-back" in which Nash Finch was invoiced by the vendor at the regular price with the understanding the Company would bill-back the vendor for the requisite allowance when the performance was satisfied. Nash Finch also assessed an administrative fee that was reflected on the invoices sent to the vendors to

recoup the Company's reasonable costs of performing the tasks associated with administering the count-recount promotions.

58.     The defendants also knew that some analysts were skeptical about the Company's ability to improve results in the food distribution business and to continue the appreciation in the stock price which increased substantially prior to the Class Period.  JP Morgan analyst Janet King wrote in a 2/22/05 report that the Company's stock price had increased 69% in 2004 and 12.4% in 2005 as Nash Finch reaped benefits from the bankruptcy of Flemings as well as the decisions to close unprofitable retail stores and refinance its debt.  But King also downgraded the rating on Nash Finch stock from neutral to overweight because the stock was trading near its all time high and because she believed margin expansion in the food distribution segment was unsustainable.  The Company's stock price declined 11%, closing at $37.91 on 2/23/05 following the downgrade.

**B.      Defendants Knew the Acquisition of the Roundy's Distribution Centers Would Not Add $1 Billion of Annual Revenues or Be Immediately Accretive to Earnings**

59.     On 2/24/05, two days after JP Morgan analyst King issued the report downgrading the Company's stock, Nash Finch announced it was acquiring two food distribution centers in Westville, Indiana and Lima, Ohio from Roundy's.  As detailed in §VI, throughout the Class Period, defendants repeatedly told investors that (1) "[t]he Westville and Lima Divisions to be acquired represent approximately $1.0 billion in annual food distribution sales," (2) "the acquisition will be immediately accretive to earnings," and (3) the Company's "operating earnings will improve by approximately $31 to $33 million,

net of implementation costs of approximately $3 million during the 12 months following closing of the transaction."  The acquisition closed on 3/31/05.

60.     Each of these statements was materially false and misleading.  It is undisputed the acquisition (1) did not "represent approximately $1.0 billion in annual food distribution sales," (2) was not "immediately accretive to earnings" and (3) did not add "approximately $31 to $33 million" to "operating earnings."  In the four quarters since the acquisition was completed (2Q05-1Q06), Nash Finch reported $800 million of revenues from the Roundy's acquisition – 20% less than the $1 billion defendants repeatedly told investors to expect.[1] Moreover, the acquisition was not "immediately accretive to earnings" and actually had a negative impact on the Company's earnings.

61.     Nash Finch reported $3.13 EPS in 2005 which was *less than* the $3.70-$3.89 EPS guidance provided by the Company on 7/21/05 that included the purported accretive effect of the acquisition.  Moreover, the $3.13 EPS in 2005 was also *less than* the $3.40-$3.55 EPS guidance provided by the Company on 3/2/05 and 4/21/05 that *did not include* the purported accretive effect of the acquisition.  In short, the acquisition had an immediate negative impact on the Company's results.

---

[1]     In the Company's 7/21/05 press release it was reported that the acquired distribution centers added $185 million to 2Q05 food distribution sales.  In the 11/10/05 press release it was reported that the acquired distribution centers added $245 million to 3Q05 sales.  In the 3/16/06 press release it was reported that the acquired distribution centers added $193 million to 4Q05 food distribution sales and $632 million to F05 food distribution sales.  In the 4/27/06 press release it was reported that the $170 million increase in 1Q06 food distribution sales was primarily the result of sales by the acquired distribution centers.

62.     On 10/20/05, the end of the Class Period, Nash Finch substantially reduced F05 EPS guidance from $3.70-$3.89 to $3.00-$3.25, which caused the Company's stock price to decline by 28.6%. The Company attributed the substantially lowered guidance to (1) depressed wholesale gross profit margins related to manufacturer promotional spending, (2) higher than expected integration costs and (3) a decline in retail gross profit margins. As alleged below, numerous facts from corroborating sources show the defendants knew about and concealed these problems during the Class Period and therefore knowingly or recklessly misrepresented the acquisition would immediately improve the Company's results and that the integration of the two distribution centers was proceeding according to plan.

> **1.     Defendants Discontinued Improper Advertising Billing Practices Related to Vendor Promotions at Roundy's that Caused Millions of Dollars in Lost Earnings and Then Began Charging Vendors Fees in an Attempt to Recoup the Lost Earnings**

63.     Several witnesses including CW1, CW2, CW3 and CW4 stated that Nash Finch discontinued problematic vendor promotions at the acquired distribution centers as soon as the acquisition was completed in 3/05 that caused a $4-$5 million reduction in earnings at the Westville distribution center alone. Specifically, the witnesses stated that Nash Finch discontinued improper advertising billings related to performance based vendor promotions.

64.     CW1 and CW2 stated that Roundy's purchased merchandise from vendors during a promotional period and agreed to perform various advertising services to promote the resale of the merchandise to consumers. In exchange for the advertising services, the vendor would rebate a portion of the cost of the merchandise sold during the promotional

period.  Roundy's would bill-back the vendor for an advertising fee based on the quantity of merchandise sold during the promotional period.  According to CW1 and CW2, it was a common practice at Roundy's to improperly bill vendors for merchandise that was not sold during the promotional period.

65.     According to CW1 and CW2, Mark Harvey, the vice president of merchandising and marketing and CW1's supervisor, reported these improper practices to sales vice president Bob Dernbach and vice president of national accounts Gary Spinazze in 3/05 before the acquisition closed on 3/31/05.  CW1 and CW2 also stated the practices were immediately discontinued and that the financial performance of the Westville distribution center suffered as a result.  CW1 and CW2 stated the discontinuation of the improper advertising billing eliminated approximately $4-$5 million of earnings for the Westville distribution center.  CW1 said the discontinuation of the advertising billing practices eliminated $94,000 of earnings per week or approximately $4.9 million of annual earnings.

66.     The 2/24/05 asset purchase agreement between Nash Finch and Roundy's (which was signed by Stewart) indicates the defendants knew about the advertising billing practices *before* the Class Period as a result of their pre-acquisition due diligence.  According to the asset purchase agreement, the companies executed a confidentiality agreement on 12/7/04 and Roundy's provided Nash Finch (1) each contract, agreement, invoice, sales order and any other arrangement for the purchase and sale of inventory, (2) all sales promotion and advertising contracts and (3) all contracts and agreements with any customer of the distribution centers.

67.     CW1, CW2, CW3 and CW4 stated that in 6/05, Nash Finch began charging a new administrative fee to vendors in an attempt to recoup the lost earnings caused by the discontinuation of the improper advertising billings.  Specifically, CW1 and CW2 stated that Nash Finch added 5% to 20% to the amounts that were deducted from the vendor invoices. For example, CW2 stated that Nash Finch normally deducted 1% or $1,000 from a $100,000 vendor invoice to reflect merchandise sold during a promotional period plus $200 as the new administrative fee.  CW1, CW3 and CW4 stated the amount of the new administrative fee was decided at the corporate level and that the Company's vendors were classified into percentage categories.  CW3 said a billing chart was created at the corporate level and sent to the Lima distribution center that listed which vendors would be billed and at what percentages. Regional controller Covey told CW3 the new billing policies were decided at the Edina headquarters.  CW4 received a list containing the new billing policy from Lynde at a meeting in 6/05 at the Westville distribution center and, according to CW4, Lynde said the new billing policy was a result of discontinuing the advertising billing practices.

68.     Moreover, CW1, CW2 and CW3 stated the new fee was retroactively applied to all vendor invoices that had been received since 4/05.  CW1, CW2 and others were instructed by Harvey (who was instructed by Dernbach) to review all vendor invoices received between 4/05 and 6/05, determine the amount of the promotional discount deducted from the invoices, assess the new administrative fee on those amounts and deduct them from current invoices.  CW3 and CW3's accounting staff also reviewed vendor invoices to determine the amount of vendors' products purchased during a certain time period to assess the new fee and then created an invoice that reduced the amount paid by Nash Finch to the

vendor.  CW3 and the accounting staff were also directed by Covey to assess the new fee on purchases made before the acquisition.

69.     According to the witnesses, the imposition of the new administrative fee backfired.  Nash Finch did not recoup the lost earnings caused by the discontinuation of the problematic advertising billing and lost additional earnings due to the vendors' reactions to the new fee.  CW1, CW2, CW3 and CW4 stated that just about all of the vendors were extremely angry at the imposition of the new administrative fee.  CW1 stated that Proctor & Gamble, Kraft and Acosta Sales & Marketing were extremely upset and that Tropicana (a division of Quaker) discontinued its promotional programs with Nash Finch.  CW2 also stated that Quaker stopped offering advertising promotions and that Kelloggs greatly reduced the level of advertising promotions.  CW2 stated that some vendors, including Kraft, received repayment of the administrative fee after threatening legal action.  As a result, the amount of advertising revenues that Nash Finch could deduct from vendor invoices was substantially reduced which further negatively impacted the financial performance of the Company.  CW4 also said many vendors disputed the new fee and CW4 regularly processed reimbursements.  CW4 stated five to six vendors received reimbursements each month until CW4 resigned in 3/06.

70.     Because the vendors stopped or greatly reduced their promotions, Nash Finch could no longer offer the same price discounts and other promotions to its grocery store customers.  According to CW1 and CW2, many of the Company's grocery store customers frequently complained about the less attractive promotions and threatened to – and did – replace Nash Finch with a different distributor.   Grocery store customers complained

frequently to CW2 and other advertising managers.  Throughout the summer of 2005, CW1 and CW2 participated in weekly Thursday conference calls with other Nash Finch advertising managers who also stated vendors were reducing the advertising promotions because Nash Finch was "bleeding the vendors to death" with the invoice deductions and that the grocery stores were complaining about the less attractive promotions and threatening to replace Nash Finch with other distributors.  In fact, CW2 stated that the reduced advertising spending by the vendors due to the excessive deductions being claimed by Nash Finch "definitely sounded like a crisis" in the summer of 2005.

> ## 2. Defendants Discontinued "Diversion" Buying at the Acquired Distribution Centers and Knew the Acquired Distribution Centers' Participation in the Company's Vendor Promotional Programs Did Not Increase Earnings as Expected

71.     In addition to the lost earnings caused by the discontinuation of the advertising billing practices and the imposition of the new retroactive administrative fee, defendants also knew that (1) the acquired distribution centers' earnings would decline by approximately $2 million due to the discontinuation of diversion buying and (2) the Company was not realizing approximately $6 million of projected additional earnings from the acquired distribution centers' participation in the Company's vendor promotional programs.  According to CW11, Nash Finch substantially reduced diversion buying at the Roundy's distribution centers as part of the integration plan to transition the distribution centers to the Company's vendor promotional programs.

72.     CW11 said diversion buying was a common practice in the food distribution industry whereby diverter companies purchase larger volumes of vendor merchandise at

lower prices by pooling together orders from several food distributors. CW11 stated that vendors knew about "diversion" buying and did not object to the practice but would not offer off invoice discounts or performance-based promotions on merchandise acquired through a diverter company. CW11 said that Roundy's did much more diversion buying than vendor promotions to obtain price discounts prior to the acquisition whereas Nash Finch relied more on vendor promotions that diversion buying.

73.     CW11 stated the Company maintained a "synergy report" which was a one page Excel spreadsheet that listed various "synergies" – increased income or decreased costs – defendants projected the Company to achieve as a result of the integration of the acquired distribution centers. According to CW11, the synergy report was prepared by Matt Yates, a consultant with Deloitte Consulting who assisted the Company with pre-acquisition due diligence and post-acquisition integration. In addition to the one page summary of expected synergies, CW11 stated that there were approximately 40 pages of supporting spreadsheets detailing each of the expected synergies included in the summary spreadsheet.

74.     CW11 stated the synergies included expected cost savings from (1) headcount reductions, (2) the participation of the acquired distribution centers in Nash Finch's vendor promotional programs including larger discounts from the increased volume of purchased merchandise that would result from the acquired distribution centers, (3) "network rationalization" – the more efficient utilization of the Company's distribution centers and (4) integration of computer systems. For each synergy, CW11 said the report included the dollar amount expected to be realized each month. According to CW11, the total amount of the expected synergies was approximately $12 million, which was projected to be fully realized

by 4/06 – one year after the close of the acquisition – and then continue for each year through 2009.

75.     CW11 said the three largest items on the synergy report were network rationalization, the acquired distribution centers' participation in the Company's vendor promotions and the discontinuation of diversion buying at the acquired distribution centers. For example, CW11 said that "network rationalization" activities were scheduled to be implemented in 2005 but that the total costs savings of approximately $4-5 million was not projected to be realized until late 2005 or early 2006.  CW11 also stated the report projected approximately a $2 million reduction in annual earnings (or $170,000 per month) from the discontinuation of diversion buying at the acquired distribution centers but projected approximately a $6 million increase in annual earnings (or $500,000 per month) from the acquired distribution centers' participation in the Company's vendor promotions.

76.     Several Nash Finch executives did not believe the $6 million synergy projected to be realized from the acquired distribution centers' participation in the Company's vendor promotions was attainable.  According to CW11, Yates met with the Company's executive vice presidents and vice presidents on a daily basis in 2/05 and 3/05 to discuss the amounts to be included in the synergy report.   In addition, throughout 2/05 and 3/05, CW11 participated in meetings with Stewart, Patitucci, Cross, Spinazze, Dernbach and Yates where the amounts to be included in the synergy report – and in the Company's budget – were discussed.  CW11 stated that Cross would periodically update Marshall on the meetings and that Marshall personally attended approximately three of the meetings.

77.     According to CW11, Patitucci and Spinazze, the individuals responsible for delivering the projected synergies related to the acquired distribution centers' participation in the Company's vendor promotional programs, repeatedly stated during the meetings that the $6 million of projected earnings was not attainable.  Specifically, CW11 stated that Patitucci and Spinazze said the $6 million projection was not consistent with the vendor promotion income reflected in the financial statements of the acquired distribution centers that were received and reviewed during the Company's preacquisition due diligence.  According to CW11, other executives said the $6 million could be realized based on representations from Roundy's executives that there was additional vendor promotion income generated by the Westville and Lima distribution centers that was not reflected in their financial statements because the income had not been internally allocated those distribution centers.  The $6 million projected increase was included in the final synergy report and in the Company's budget despite the objections of Patitucci and Spinazze.  CW11 said that Spinazze left the Company shortly after the synergy report was finalized at the end of 3/05.

78.     Patitucci and Spinazze were right.  CW11 stated that earnings did not improve by the projected $6 million.  According to CW11, the Company maintained monthly reports that compared actual to budgeted results at the acquired distribution centers, other divisions within the Company and in a roll-up report for the Company as a whole.  These reports were discussed in monthly meetings that were held in Marshall's conference room at the Edina headquarters approximately two weeks after the end of the month.  The meetings were attended by Marshall, Stewart, Cross, Poore, Patitucci, other executives and CW11.  The

meetings began in the morning, typically lasted most of the day and sometimes went into the night.

79.     CW11 said the reports showed the $6 million projected increase in earnings included in the budget was not being met, the amount of the shortfall was increasing each month and that the total amount of the projected shortfall was approximately $2-$3 million or 50% of the projected increase.  During the meetings in 5/05 and 6/05, CW11 stated the negative variances were discussed and that Marshall blamed his executives for not delivering the projected $6 million and told them to do a better job of executing.  In fact, CW11 stated that Marshall constantly yelled at the executives, reprimanded them for the shortfalls and even expelled executives from the meetings.

80.     By 7/05, there were also concerns about whether the less than budgeted increase in earnings was overstated.  According to CW11, Marshall fired several of Stewart's accounting staff – including Anthony Martin and Rich Runyun – in the beginning of 7/05 because of concerns about the accounting for vendor promotions.  Specifically, CW11 stated that vendor promotional discounts and rebates were being accrued (which would have reduced costs of sales and increased earnings) even though there were not signed contracts or other documentation supporting the accruals.  After the terminations, CW11 was tasked with reviewing all of the accruals and documentation related to the vendor promotions to determine if the accruals were accurate.

81.     From 7/05 to approximately the middle of 8/05 CW11 and CW11's team reviewed the accruals and documentation and discovered more than 100 errors in the accruals, including (1) accruals that were higher than the discounts or rebates reflected in the

vendor contracts, (2) accruals that were made without any supporting documentation and (3) the failure to reverse the accruals upon payment of the discounted invoice amount. As a result, CW11 and CW11's team made numerous adjusting entries that reduced the accruals by approximately $1 million and contacted the Company's vendors in an attempt to obtain the documentation needed to support the accruals. CW11 said the adjusting entries were not recognized in the Company's publicly reported financial statements until 3Q05 – after the Class Period. In the Company's 3Q05 Form 10-Q, defendants acknowledged the substantial reduction in gross margins from 10.7% in 3Q04 to 9.0% in 3Q05 was caused by gross margin declines in the food distribution segment "principally relating to the management of manufacturer promotional spending and inadequate execution in pricing across our retail operations, as well as an increase in unallocated corporate overhead that was also related to management of manufacturer promotional spending."

82.     CW11 tried to get the vendors to provide documentation to support the accruals made from 4/05. Although CW11 was able to get some of the Company's vendors to provide the necessary documentation to support some of the accruals, other vendors refused to provide documentation or allow the discounts the Company had accrued for which the vendors were not contractually liable. CW11 stated that some vendors agreed to provide documentation for merchandise purchased prospectively but many of those vendors would not provide the larger price discounts the Company projected (and included in the synergy report and budget) based on the increased volume of merchandise purchased as a result of the acquisition of the acquired distribution centers and what the defendants believed were the discount rates received by Roundy's based on their pre-acquisition due diligence. Due to the

above, CW11 said the project confirmed the $6 million projected increase in earnings attributable to the acquired distribution centers' participation in Nash Finch's vendor promotions was unattainable. Thus, although the defendants knew about the substantial shortfall in projected vendor promotion earnings months earlier, by 8/05 they accepted the fact the projections were unattainable as Patitucci and Spinazze repeatedly told them in 2/05 and 3/05.

83.     The defendants questioned whether Roundy's had purposely misstated the financial statements of the two acquired distribution centers and misrepresented there was additional vendor promotion income not reflected in the financial statements due to the magnitude of the earnings shortfall and the confirmation from CW11's investigation that the $6 million projection was not attainable. Specifically, CW11 participated in the month-end meetings in 7/05 and 8/05 with Marshall, Stewart, Cross and other executives where they discussed the possibility that Roundy's had overstated the dollar amount of vendor promotion discounts and rebates at the two acquired distribution centers by allocating a larger dollar amount of the discounts and rebates to the Lima and Westville distribution centers than was proper. Although this possibility was discussed, CW11 stated that no action was taken before CW11 left the Company at the end of 10/05.

### 3.     Defendants Knew Slotting Allowance Income Was Declining and Less than Projected

84.     Defendants also knew the Company's earnings in 2005 were negatively impacted by a substantial decline in slotting allowance income. CW11 explained that vendors paid food distributors to purchase certain products they were attempting to sell in larger volumes so the products would be in stock and available for resale to grocery stores.

Similarly, vendors also paid grocery stores to stock products they were attempting to sell in larger volumes for resale to consumers. CW11 stated that slotting allowance income was declining, substantially less than projected and that the amount of the shortfall was increasing each month in 2005. CW11 said the monthly budget to actual reports received by the defendants and discussed during the month-end meetings reflected the decline in slotting allowance income. CW11 attributed the substantial decline in slotting allowance income to the vendors' reducing these types of promotions in favor of performance based promotions.

85.     CW9 also stated that Nash Finch lost approximately $2 million of slotting allowance rebates in 2005 because the Company failed to renew approximately 100 service sales agreements with vendors (including Kraft, Proctor & Gamble, General Mills, Nestle, MasterFoods and many others) at the end of 2004. Under the service sales agreements, vendors paid Nash Finch for the manner in which their products were displayed in the Company's retail stores. According to CW9, the Company continued to display the vendors' products under the mistaken assumption the agreements had been renewed. In 2/05 or 3/05, however, it was discovered the agreements had expired and that the vendors had no obligation to pay. CW2, the advertising manager at the Westville distribution center, stated that Nash Finch was claiming excessive slotting allowances in 2005 which negatively impacted the Company's relationship with its vendors.

86.     The information provided by CW2, CW9 and CW11, indicate the Company was improperly accruing slotting allowances when the vendors had no contractual obligation to pay. Indeed, CW9 recalled that the Store Brands' marketing department did not report a shortfall in slotting allowances in 1Q05 despite the failure to renew the contracts. In

addition, CW9 was instructed by accounting manager Leslie McVicker to make entries to the Company's general ledger in 2Q05 that increased the amount of vendor promotion income by hundreds of thousands of dollars so the Store Brands' marketing department would meet 2Q05 projections. CW9 questioned the appropriateness of the entries because McVicker told CW9 the entries needed to be made because the Store Brands' marketing department was falling short of projections and because CW9 had never before been instructed to make such entries.

87.     In addition, Marshall's termination of Martin and others in 7/05 further shows defendants knew the Company was improperly accruing slotting allowances when the vendors had no contractual obligation to pay. CW9 stated that Anthony Martin, the accounting manager that reported to Stewart, lost his job because of the failure to renew the agreements and, as alleged above, CW11 stated Marshall fired Martin and others in 7/05 due to concerns about the accounting for vendor promotions.

88.     CW9 stated the Company scrambled to renew the expired agreements in 2Q05 and 3Q05 but that more than half of the expired contracts had not been renewed by the time CW9 resigned in 10/05. As alleged above, CW11 and CW11's team also contacted vendors in 7/05 and 8/05 in an attempt to obtain documentation supporting accruals related to vendor promotions including slotting allowances. CW9 and CW11 said that Andrea Sather was hired in approximately 4/05 to, among other things, help deal with the expired agreements. Sather told CW9 that she attended a meeting in early 6/05 with defendants Marshall, Stewart and other executives at the Edina headquarters during which the failure to renew the agreements and the difficulty ensuring payment from the vendors was discussed.

### 4.    Defendants Knew Vendors Were Not Being Paid Millions of Dollars on Past Due Invoices

89.    In addition to the problems caused by the imposition of the new administrative fee and the attempts to obtain documentation from the Company's vendors to support the vendor promotion accruals, defendants also knew the Company's relationship with its vendors was deteriorating because the vendors were not being paid.  According to CW11, just about all of the Company's vendors were complaining about (1) not being paid on a timely basis, (2) the Company paying a discounted amount in violation of contract terms that only allowed a 2% discount if the invoice was paid within 10 days and (3) the amount of outstanding payables exceeding the vendors' credit limit.  CW11 stated the failure to timely pay vendor invoices and the additional volume of vendor merchandise purchased by the Company as a result of the business from the Lima and Westville distribution centers caused the Company to exceed credit limits imposed by the vendors.  CW11 said that many vendors refused to deliver additional merchandise until the Company paid the past due amounts.

90.    CW12 also said many of the Company's vendors complained about not being paid.  Prior to the acquisition, CW12 processed vendor invoices for payment at the Bridgeport distribution center.  CW12 received reports from the Edina headquarters that included the inventory shipped to the Bridgeport distribution center and the terms of vendor promotions related to the inventory.  CW12 stated that Kim Torrey, an employee CW12 worked with at the Bridgeport distribution center, entered the information into the distribution center's AS400-based accounts receivable system.  CW12 received the specific vendor invoices from Cieslinski (CW12's boss) and entered the information into an Excel spreadsheet.  Using the spreadsheet and the information entered into the AS400 system,

CW12 would access the Company's Lawson accounts payable system and make the appropriate deductions to the invoiced amounts to reflect the vendor promotions.  CW12 said the Lawson system generated reports reflecting the reduced invoice amount that was actually paid to the vendor.

91.    In 1/05, Cieslinski told CW12 that regional controller Covey had directed that all accounts payable activities would be processed at the Edina headquarters rather than the Bridgeport distribution center.  From 3/05 until CW12 left the Company in 5/05, CW12 was responsible for training Bonnie Larson, the accounting employee at Edina now responsible for processing the accounts payable.  CW12 stated that Larson had an extremely difficult time handling the job because of the large volume of transactions and Larson's unfamiliarity with the overall procedure or the systems used to process the invoices and issue vendor payments.  In fact, CW12 received as many as 20 phone calls per day from Larson.  As a result, CW12 said vendor payables became severely backlogged with approximately $6 million owed to several of the Company's largest vendors.

92.    CW12 received many calls on a daily basis from the Company's vendors – including Pilgrim's Pride, Pennex and Tyson's – who were extremely frustrated with the Company's failure to pay their invoices.  The vendors told CW12 that their phone calls to the Edina headquarters were not being returned.  CW12 told Larson about the vendor complaints during numerous telephone calls on a daily basis.  In addition, CW12 participated in several conference calls with Cieslinski and Covey during which the problem was discussed and Cieslinski and CW12 offered to process the payables to help alleviate the problem.

However, Covey did not accept the offer and the problems were not resolved by 5/05 when CW12 left the Company.

### 5. Defendants Attempt to Increase Earnings by Engaging in Other Improprieties

93. In addition to imposing the new retroactive administrative fee, failing to pay vendors millions of dollars on past due invoices, paying discounted amounts to vendors in violation of contractual payment terms, and improperly accruing amounts related to vendor promotions, several witnesses said the Company was also engaging in other improprieties to reduce costs and increase earnings. For example, according to CW4, Nash Finch implemented vendor promotions in the Westville region despite vendors' express written request for the Company not to do so. CW4 explained that vendors offered promotions like price discounts during specified time periods in specified geographical locations. The specifications of the vendor promotions were included on a "Nash Finch Deal Sheet," an Excel spreadsheet that listed the products offered at a discount, the discounted cost of the products and which of Nash Finch's distribution centers were eligible to implement the promotions. The Westville distribution center received about 50-60 deal sheets per week that were processed by CW4 and CW4 stated that 50-75% of the deal sheets did not include the Westville distribution center as eligible to implement the promotions.

94. CW4 was instructed by director of operations Doug Lynde, CW4's superior, to implement the promotions in the Westville distribution center and to bill the vendors for the promotional programs. On numerous occasions, CW4 expressed CW4's concerns to Lynde about the impropriety of implementing the promotional programs at the Westville

distribution center in direct contravention of the specified deal sheet terms.  Lynde told CW4 the directives had come from the Company's headquarters in Edina and had to be followed.

95.     CW4 and CW5 said that Nash Finch improperly charged back the cost of perishable items that were not sold prior to the expiration date.  CW4 and CW5 said that Nash Finch purchased large amounts of perishable merchandise at discounted prices in the hopes of reselling the merchandise before the expiration date.  CW4 said the vendors did not allow unsold expired perishable merchandise to be charged back and that some vendors discovered and disputed the improper charge-backs, and successfully recovered amounts improperly deducted from the vendor invoice.  CW4 also said the Company maintained a "Code Date" report on an excel spreadsheet that tracked the amount of charge backs by vendor.  The report listed the vendor, the product, the amount of product purchased by Nash Finch, the amount of the chargeback, whether vendors were disputing the charge back and whether the vendor was reimbursed.

### 6.     Defendants Knew Nash Finch Was Losing Customers that Generated Millions of Dollars in Revenues

96.     As alleged above, Nash Finch reported $800 million of sales revenues from the Westville and Lima distribution centers in the four quarters following the acquisition (2Q05-1Q06) which was $200 million or 20% less than the $1 billion they told investors to expect.  According to CW11, the Company's budget to actual reports *never* projected $1 billion of sales from the Roundy's distribution centers and that level of sales was never discussed during the month-end meetings attended by Marshall, Stewart, CW11 and the other senior executives at the Company.  According to CW11, $750-$800 million of revenues from the

- 42 -

two distribution centers was reflected in the reports that were discussed during the monthly meetings.

97.     Further, several witnesses, including CW1, CW2, CW5, CW7 and CW11, stated the Company's sales revenues declined in 2005 due to reduced orders from grocery store customers and other grocery store customers replacing Nash Finch with other food distributors.  In addition to losing grocery store customers to other distributors that offered more attractive promotions, the defendants also knew that Nash Finch was losing grocery store customers to competitors for other reasons.  For example, CW1, CW2 and CW11 stated that after the acquisition, Martin's Supermarkets – a significant customer with 19 stores in Indiana and Michigan – discontinued all health and beauty products supplied by Nash Finch in favor of Spartan and discontinued using Nash Finch as a supplier of produce in favor of Caito.  After the Class Period during the Company's 11/10/05 conference call, Marshall admitted the acquired distribution centers lost the produce business of a large customer and that the Company expected to lose that business *before the acquisition*.

98.     According to CW2, Nash Finch lost customers to competitors like Spartan because Spartan assigned as many as five or six retail counselors to an account whereas Nash Finch only offered one.  In addition, CW2 explained that Spartan is a cooperative buying organization that pays rebates to grocery stores that joined the cooperative.  CW2 stated that Nash Finch lost grocery store customers in Wisconsin and Michigan to Spartan after a decline in the quality of service caused by Nash Finch closing a warehouse in Michigan specifically designated to service the stores.  According to a 3/25/06 article in *The Grand*

*Rapids Press* and a message board posting about the article, Spartan added 51 stores to its distribution base since 3/05 and most of those stores left Nash Finch.

99.     CW5, the produce procurement manager who worked at the Company's headquarters in Edina, stated that Roundy's lost more than $1 million of produce business from a large customer believed to be Sentry before the acquisition closed on 3/31/05 because Sentry was not satisfied with the quality and service level of Roundy's produce.  CW5 also stated that Nash Finch lost other Roundy's customers after the acquisition closed, although CW5 could not recall the names of the specific customers.

100.    Documents and pleadings filed in the Company's lawsuit against Marsh show the defendants knew ***no later than 4/14/05*** that Nash Finch would not receive $20 million of revenue in 2005 from Marsh.  The complaint filed by Nash Finch on 10/24/05 and the 8/27/01 Supply Agreement appended thereto show that Marsh was contractually obligated to purchase $12 million of product annually commencing on 1/1/02 and an aggregate of $60 million of product during the term of the supply agreement.  In the complaint, Nash Finch alleged the Supply Agreement required Marsh to use its best efforts to purchase $12 million of product from Roundy's per year, that Roundy's generally honored its obligations but that by 1/1/05 Marsh had only purchased $28 million of product, or $8 million less than required. The Company also alleged that Marsh failed to purchase any product in 2005 and that Marsh informed Nash Finch divisional president Fenzel in a 4/14/05 letter that it would not purchase any product – effective 5/15/05.

101.    The 4/14/05 letter responded to a 3/28/05 letter from Nash Finch informing Marsh that it would no longer be supplying Roundy's private label products to Marsh.

According to the Company's preliminary exhibit list, Nash Finch has documents showing the aggregate purchases under the supply agreement were $32.4 million short of the $60 million requirement.  Thus, the pleadings and documents in the lawsuit show that the defendants knew Marsh would not generate $20 million of revenue in 2005 *no later than 4/14/05*.

102.   In its counterclaim, Marsh asserted that Nash Finch breached the supply agreement by (1) replacing Roundy's private label products with the Company's "Our Family" private label products which were not an adequate substitute and caused Marsh to lose revenues, and (2) failing to provide the same cost of product and fees and programs, including advertising, credit and incentive programs, that were previously in effect.

103.   CW7 also stated that the Company lost grocery store customers because Nash Finch discontinued distributing products that Roundy's distributed before the acquisition. CW7 learned of the loss of customers at weekly staff meetings attended by CW7, director of sales Rick Pittenger, Jim Fenzel, Jeff Weber and director of MIS Mike Parish.  CW7 also said that Pittenger had regular meetings with defendant Marshall and strongly believed the loss of grocery store customers was communicated to Marshall during those meetings because the Lima distribution center was very profitable prior to the acquisition.

104.   The 2/24/05 asset purchase agreement shows the defendants planned to discontinue offering Roundy's private label products before the acquisition.  Specifically, it was disclosed in §5.16 of the asset purchase agreement that there would be 30 days of Roundy's private label product following the closing date and that Nash Finch had the option to sell back to Roundy's any private label product that remained 30 days after the closing.

105.   According to CW11, the defendants also knew sales and revenues were declining at the Lima distribution center because of problems related to the integration of the Company's OMI purchasing system.   CW11 stated that Nash Finch completed the integration of the purchasing system at the Lima distribution center in 5/05.  The Company's purchasing system included (1) the "Biceps" system that tracked the Company's purchases of merchandise from vendors (including vendor promotions) and generated purchase orders, and (2) the "Prompt" system which tracked the Company's payables to the vendors.  In addition, the Company's "SWAT" system generated reports provided to the Company's grocery store customers when merchandise was delivered.   The reports listed the merchandise being delivered, the corresponding accounts numbers, the price of the merchandise and what grocery stores the merchandise was being delivered to.

106.   According to CW11, there were problems with the integration of the OMI purchasing system. CW11 stated that orders from grocery store customers were not included in the reports detailing the merchandise purchased by the grocery store customers.  As a result, CW11 said that merchandise ordered was not delivered at all or in amounts that were less than what the customer had ordered.  This, in turn, caused a substantial reduction in fill rates – defined in the Company's SEC reports as the percentage of cases shipped relative to the number of cases ordered – to as low as 88-89%.  Nash Finch reported a 96.1% fill rate for 2004 in its 2004 Form 10-K.   CW11 explained that one of the reasons ordered merchandise was not delivered was because of mapping problems related to the integration. Specifically, CW11 stated that if a grocery store customer ordered a product that the distribution center did not have in stock, the mapping function of the purchasing system

would automatically replace the out of stock product with a substitute product that was in stock.  However, substitute products were not being included in deliveries because the mapping function of the newly integrated purchasing system was not functioning as planned.

107.    In addition, CW11 said the grocery store customers complained that the reports provided by Nash Finch were not customized and therefore not as useful as the reports provided by Roundy's before the acquisition.  According to CW11, the discontinuation of the customized reports, the substantially reduced fill rates and the inaccurate reports provided by Nash Finch caused many of the Lima distribution center's grocery store customers to become extremely agitated and many of them reduced orders or replaced Nash Finch with other food distributors.  CW11 estimated the problems with the integration of the purchasing system caused Nash Finch to incur additional costs of approximately $500,000 to $750,000. CW11 said that the Company did not implement the OMI Purchasing system at the Westville distribution center because of the problems caused by the implementation of the OMI purchasing system at the Lima distribution center.

> ### 7.    Defendants Knew the Company's Efforts to Reduce Costs By $4-$5 Million Through "Network Rationalization" Failed and Was Scrapped

108.    Throughout the Class Period, defendants represented the acquisition of the two distribution centers would result in "productivity improvements" from "better balancing of transportation across the Company's distribution network to reduce miles and equipment, enhanced warehouse capacity utilization, and the reduction of outside storage space."

109.    According to CW11, Nash Finch was projecting a $4-$5 million reduction in costs on the one page synergy report through network rationalization.  CW11 stated the plan

was to realize the cost savings by (1) assigning its grocery store customers to distribution centers that were closer to the customer thereby reducing transportation costs and (2) increasing the volume of business at distribution centers with lower operating costs. CW11 said the synergy report projected most of the $4-$5 million in network rationalization costs to be realized in 2006 but that it was well known in 2005 that the projected savings would not be attained because the plan to assign customers to other distribution centers was scrapped at Marshall's direction in 7/05 after the grocery store customers complained.

110.    The grocery store customers complained about the changes for several reasons. First, CW11 stated that the grocery store customers complained because the individuals that had always worked with them in the past were being changed due to the change in distribution centers.  In addition, the change required the grocery store customers to change the identifying product numbers on their grocery store shelves because the Nash Finch distribution centers used different identifying product account numbers.  CW11 said this was a major project for the grocery store customers that they did not want to undertake because of the time it would take to change all of the product account numbers and the costs of making the changes.

>    **8.    Defendants Knew There Were Problems with the Integration of Roundy's Accounting Systems that Contradicted Their Representations that the Integration Had Gone "Very Smoothly" and Was "Ahead of Schedule"**

111.    In addition to the problems caused by the integration of the vendor promotions – the decline in earnings and loss of customers following the discontinuation of the improper advertising billings and the implementation of the new administrative fee – several witnesses

stated there were other serious problems with the integration of the two distribution centers acquired from Roundy's. For example, CW1 and CW3, the accounting manager at the Lima distribution center, stated serious problems arose during the integration which CW3 attributed to ineffective and incompetent leadership. CW3 stated that assistant controller Weinright (who reported to Stewart) and regional controller Covey were key players involved in the integration and overlooked critical items that severely compromised the Company's ability to effectively integrate the operations of the Lima and Westville distribution centers. CW1 also said that Covey was in charge of the conversion process.

112. Specifically, CW3 stated there were problems transferring Roundy's customized GEAC accounting platform to Nash Finch's Hyperion-Lawson system. CW1 stated the conversion from the Roundy's accounting system to the Nash Finch system was delayed multiple times and that employees at the Westville distribution center experienced a high degree of stress and frustration following the acquisition because of difficulties employing and reconciling the accounting systems used by Roundy's and Nash Finch.

113. According to CW1 and CW3, Nash Finch significantly delayed converting the Roundy's chart of accounts until 7/05. A chart of accounts is a list of each account on the general ledger and its identifying account number. The accounts and account numbers were different on the GEAC and Hyperion-Lawson systems so it was imperative to determine which Hyperion-Lawson accounts the various GEAC accounts would be converted to as early as possible and before the information could actually be transferred.

114. In 4/05 and 5/05, CW3 repeatedly asked Blackburn (CW3's boss), Covey and King to approve the conversion of the chart of accounts, but the requests were rejected. In

mid 6/05, Covey approved the conversion of the chart of accounts at the Lima and Westville distribution centers because there were continuous and persistent problems during the integration related to developing budgets and meeting performance goals.  The conversion at the Lima distribution center was completed by 7/05 but the conversion at the Westville distribution center was not completed by the time CW3 resigned in 7/05.

115.   CW3 stated that the delay in the conversion of the chart of accounts precluded the Westville and Lima distribution centers from producing accurate reports detailing the financial results of the distribution centers.  Prior to the acquisition, CW3 prepared weekly financial reports including profit and loss statements.  After the acquisition, CW3 said the employees at the Lima distribution center were instructed by Covey to use Nash Finch's Hyperion-Lawson system to prepare financial reports before the conversion of the chart of accounts and without first receiving adequate training on the Hyperion-Lawson system – including training related to the proper entry of accounting transactions and the corresponding preparation of weekly reports.  CW3 and other accounting personnel expressed concerns about their lack of familiarity with the Hyperion-Lawson system but Covey directed them to use the system anyway.

116.   As a result, CW3 said that the accounting personnel did not know the correct way to account for transactions in the Hyperion-Lawson system and that many of the accounting entries were applied to the wrong Hyperion-Lawson accounts which in turn caused the financial reports to be inaccurate.  For example, CW3 stated there were many inconsistencies between various revenue and expenses line items in the reports generated before and after the acquisition.  CW10, who reported to CW3, also said there were

numerous problems with the integration at the Lima distribution center due to no direction from upper management and that no one knew what to do.  Specifically, CW10 said there were numerous problems caused by the difficulties encountered in converting Roundy's inventory and accounting systems to the Hyperion-Lawson system.  CW10 explained that prior to the acquisition goods delivered to the Lima distribution center were scanned into the EXE system which recorded the type of product, quantity, date of receipt and other information.  The recorded information would then "filter" into the "Prompt" system for transfer to the Roundy's GEAC general ledger.  CW10 said that after the acquisition, the information from the Prompt system was supposed to transfer to the Nash Finch Hyperion-Lawson system but there were a number of problems.  Specifically, CW10 said data from the EXE and Prompt systems did not post to the appropriate general ledger accounts in the Hyperion-Lawson system.

117.   For example, CW10 stated that inventory at the Lima distribution center was not accurately reflected in the reports because the merchandise received by the Lima distribution center was not accurately reflected in the Hyperion-Lawson system.  CW10 said the inventory reported in the Roundy's prompt system was transferred to the Hyperion-Lawson system but there were discrepancies.  Part of CW10's job was to determine if inventory had been improperly included in a "suspense" account, an account the Hyperion-Lawson system would automatically transfer amounts to if they could not otherwise be processed.  But CW10 stated that much of the missing inventory could not be found in the suspense accounts or anywhere else in the Hyperion-Lawson system and that the problem was not resolved by the time CW10 resigned in 7/05.

- 51 -

118.    CW3 said the reports generated using the Hyperion-Lawson system following the acquisition contained so many inaccuracies that the reports were useless.  The inability to prepare accurate financial reports was particularly important because both the Lima and Westville distribution centers were not meeting budgeted results following the acquisition (due, in part, to the discontinuation of the advertising billing practices and the imposition of the new administrative fee).

119.    CW7, the human resources coordinator at the Lima distribution center, also stated there were problems with the integration.  Specifically, CW7 said the two most significant elements relating to the integration problems were the outdated technology and information systems at Nash Finch and very poor management.  According to CW7, Nash Finch had severely antiquated software programs in all areas of operations that precluded the Company from effectively monitoring sales and productivity.  For example, CW7 stated the Nash Finch GEAC system used to retrieve human resources information and prepare reports was outdated, very difficult to use and did not provide the flexibility and resources that the Roundy's PeopleSoft system did. Consequently, CW7 could not prepare reports requested by management.

120.    CW7 and CW7's colleagues repeatedly voiced their concerns about the shortcoming with the GEAC system, including to operations manage Jim Fenzel and general manager Jeff Weber, but no action was taken before CW7 left Nash Finch in 7/05.

**9.   Defendants Increased Earnings Requirements for Other Distribution Centers in an Attempt to Make up the Lost Earnings at the Westville and Lima Distribution Centers**

121.   As alleged above, the defendants knew the acquisition of the Roundy's distribution centers would not add $1 billion of sales and be immediately accretive to F05 earnings because they received reports that showed the acquired distribution centers were underperforming and attended monthly meetings where those reports were discussed. Several witnesses stated that earnings targets were increased for other divisions and distribution centers in an attempt to make up the shortfall.   CW5 and CW6 stated that internal earnings requirements were increased for certain departments and distribution centers in 2005 to compensate for other departments and distribution centers that were underperforming.   As alleged above, CW1 and CW2 stated that the Westville distribution center did not meet projections due to the discontinuation of the improper advertising practices and the imposition of the new administration fee.   CW11 stated there was a $2-$3 million shortfall in projected vendor promotion earnings at the Lima and Westville distribution centers.   CW3, the accounting manager at the Lima distribution center, stated the Lima distribution center was also unable to meet budgeted performance goals.   CW6 stated the Westville, Lima and Bridgeport distribution centers were underperforming in 2005. CW8 attended weekly and monthly meetings and received financial reports that showed the earnings of the Lima and Westville distribution centers plummeted after they were acquired by Nash Finch.

122.    CW5, CW6 and CW11 stated that annual budgets for each distribution center and department[2] were prepared that included projections for revenues and earnings that actual performance was measured against.   CW5 said the annual budgets were created in September when budget template spreadsheets were distributed to CW5 and other department heads who would enter projected performance results for their departments and then return them their superiors.   CW5 submitted the budget for produce to vice president Baio and executive vice president of merchandising Patitucci.   CW5 said the executive vice presidents almost always increased the projected performance results to levels that were unrealistic and therefore difficult to achieve.   CW1 also said unrealistic earnings projections were imposed by Nash Finch after the acquisition particularly given the elimination of the advertising billing practices that reduced the Westville distribution center's earnings by millions of dollars.   CW11 stated that Patitucci and Spinazze told the defendants during meetings in 2/05 and 3/05 that the $6 million of projected earnings related to the acquired distribution centers' participation in the Company's vendor promotions was not attainable.

123.    Several witnesses also stated the Company maintained monthly reports that compared actual to budgeted results for each distribution center and division and the Company as a whole.   CW11 stated the monthly reports were received and reviewed by

---

[2]      According to CW5, the departments included (1) perishables which encompassed produce, meat, bakery and deli, (2) Store Brands or the Company's private label products, (3) grocery which included canned goods and all other merchandise, (4) central buying which procured trucks, fuel and other items in high volume and (5) merchandising/marketing/advertising.

Marshall, Stewart and the Company's other senior executives and were discussed for hours at the month-end meetings held in Marshall's conference room.

124.    CW5 prepared and submitted monthly reports - that included profit and loss statements and related accounting reports – to his supervisors (executive vice president of merchandising Patitucci and Cross, and vice president of perishables Baio) that would compare actual results to the budgeted projections.  CW6 also stated the Omaha distribution center submitted monthly reports that compared actual results to budgeted projections with explanations for the variances.  CW6 participated in monthly conference calls with personnel from the distribution center (including his superior Omaha branch manager Danny Lane and Lane's boss, regional vice president Randall Jagger) and the Edina headquarters (including David Bersie, who reported to Patitucci) during which the reports were discussed.  CW6 believed Marshall knew about the variance reports because during these meetings Jagger and Bersie stated that Marshall mandated how the variances were to be reported.  In addition, Lane told CW6 that Marshall and the Company's senior vice presidents at the Edina headquarters would meet shortly after the monthly conference calls to discuss the performance of the Company's distribution centers and divisions.  Lima vice president of operations Jeff Weber told CW8 that he participated in monthly conference calls with Marshall and other Company executives during which the reports showing the plummeting earnings at the Lima and Westville distribution centers were discussed.

125.    According to CW5, if actual results were less than the budgeted projections, executive management (vice presidents and higher) would increase the projections for the following quarter to make up for the shortfall.  In addition, internal memos were distributed

by email to department heads describing the new projections. CW5 also stated that if a department could not meet projections, other departments would have to make up the shortfall which caused significant acrimony among departments. CW5 stated that projections were increased in 2005. CW6, also stated the Edina headquarters commonly made changes to and increased the earnings projections for the Omaha distribution center in 2005 to compensate for other underperforming distribution centers including the Westville and Lima distribution centers.

> **10.   Defendants Cause the Retail Segment's Profits to Decline by Failing to Advertise Price Reductions on Non-Key Merchandise and by Manipulating the Allocation of Vendor Promotion Income Between the Food Distribution and Retail Segments**

126.   In the Company's 10/20/05 press release, defendants stated the substantial reduction in F05 EPS was caused, in part, by inadequate execution in pricing across the Company's retail operations. During the Company's 11/10/05 conference call, Marshall explained that retail margins had declined because the Company had raised prices on certain products without also advertising the price changes.

> We made some poor decisions in terms of pricing strategies, particularly related to C&D items in our system. And these were basically trees falling in the forest. We lowered some prices on non-key items and didn't tell anybody about it. It was a very poor decision, and it's the decision that is in the process of being rectified right now.

127.   Information provided by CW13 and CW14, employees that worked in the retail segment, shows the defendants knew about the negative impact from the pricing strategies *and* the failure to allocate vendor promotion income to the retail segment. Defendants knew about the declining margins because the results of the retail segment were reflected in reports

they received and discussed during monthly meetings they attended.  Further, CW13 and CW14 stated Marshall was directing the retail pricing strategies during the Class Period after he had removed the president of the Company's retail segment, Michael Lewis, just before the beginning of the Class Period.

128.    According to CW13, in 1/05 and 2/05, retail pricing strategies were made during meetings led by Lewis, the Company's executive vice president and president of the retail segment.  The Company's 2005 proxy disclosed that Lewis resigned from Nash Finch effective 10/28/05.  But Lewis was not involved in the Company's retail pricing strategies during the Class Period.  According to CW13 and CW14, Marshall removed Lewis from his office in late 1/05 or early 2/05 and transferred him to another office on a different floor at the Edina headquarters.  Moreover, CW13, CW14 and the Company's other retail personnel were expressly instructed by Cross and Patitucci to not speak with Lewis.

129.    Nash Finch never publicly disclosed Lewis was no longer involved in the management of the retail segment and CW13 and CW14 did not know why Lewis was removed.  CW13 and CW14 said that after Lewis was removed, pricing strategies and directives were issued by Cross or Patitucci.  CW14 also said that Tammy DeBoer and an external consultant named Terry Buckley were also involved in formulating the Company's retail pricing strategies.  But CW13 stated that the Company's retail operations were in a constant state of chaotic flux after Lewis' removal.  CW13 said that beginning in late 3/05 or early 4/05 retail pricing fluctuated significantly with prices being raised excessively in one period and then dramatically lowered the next.  CW13 regularly received directives from Cross or Patitucci to significantly raise prices on merchandise in an attempt to increase

earnings and the frequency of the directives received from Cross increased after Patitucci left the Company in 7/05.  CW14 attended meetings with Marshall, Patitucci, Cross, Stewart, DeBoer, Kelly and other executives between 2/05 and 7/05 where reports reflecting the performance of each of the Company's segments were discussed.  CW14 said that Marshall constantly directed Patitucci and DeBoer to make adjustments relating to retail pricing and sales strategies and, like CW11, said that Marshall would regularly yell at the executives attending the meetings and sometimes expelled executives from the meetings.

130.    CW14 believed the Company lowered prices on "C" and "D" items but sales volume did not increase because the Company failed to advertise the price change.  As a result, margins declined.  CW14 explained that Nash Finch characterized grocery items by descending rank from A to D depending on how frequently the product was purchased as well as the brand.  For example, CW14 explained that milk and eggs were "A" items because they were purchased frequently whereas infrequently purchased pickle relish was a "C" or "D" item.  Items from brand leaders like Del Monte and Heinz were categorized as "A" or "B" items and generic and lesser know brands were "C" and "D" items.

131.    The defendants also knew Marshall's explanation during the 11/10/05 conference call – attributing the decline in retail margins to the failure to advertise price reductions on C&D items – was incomplete and misleading.  Defendants also knew the retail segment's results were being manipulated by the allocation of vendor promotion income between the retail and food distribution segments.  CW13 and CW14 said retail profits and losses significantly fluctuated due to changes in the amount of vendor promotion income allocated to the segment.  It was reported in the Company's 2005 Form 10-K that $376.7

million of food distribution revenue was generated from sales to the retail segment. According to CW14, the retail segment purchased all of its merchandise from the Company's food distribution segment and was entitled to a portion of the rebates and discounts offered by the Company's vendors. CW14 estimated the retail segment accrued about $200,000 of vendor promotion income per month but said that misallocations resulted in significant fluctuations to the retail segment's earnings in 2005. CW13 said that thousands of dollars of vendor promotion income would be reported in one month and then negative amounts would be reported for a subsequent month. CW13 and CW14 said that Lewis frequently met with Marshall to express his concerns about the amount of vendor promotion income allocated to the retail segment prior to being removed in 2/05. CW14 attended one of the meetings with Marshall and Lewis during which Lewis told Marshall the retail segment was not being allocated an amount of vendor promotion income it was entitled to. CW14 said the misallocations continued after Lewis' removal.

### C.   Marshall and McDermott's Highly Suspicious Insider Selling, Followed by Their Unexpected Resignations and Investigations by the Company and the SEC, Confirm Their Knowing Participation in the Fraudulent Scheme

132.   As alleged herein, defendants knew their public statements about (1) the financial impact of the distribution centers acquired from Roundy's on Nash Finch's results and (2) the integration of the distribution centers, were materially false and misleading. Defendants' insider sales, therefore, are not necessary to establish scienter in this case. But defendants' suspicious insider selling followed by their unexpected departures from Nash Finch and investigations by the Company and the SEC confirm the defendants knew their public statements were materially false and misleading. During the Class Period, Marshall

and McDermott sold 334,000 shares of Nash Finch stock for more than $13.2 million.  As

shown in the following charts, defendants sold their stock at prices that were 30-40% higher

than the $30.23 price the stock fell to after the Class Period on 10/21/05.

### Ron Marshall, CEO and Director

| Date | Shares | Exercise Price | Sales Price | Sales Proceeds | Profit | Return on Investment |
|---|---|---|---|---|---|---|
| 4/28/2005 | 6,500 | $8.50 | $35.16 | $228,540 | $173,290 | 314% |
| 4/29/2005 | 68,500 | $8.50 | $35.00 | $2,397,500 | $1,815,250 | 312% |
| 7/26/2005 | 21,500 | $16.84 | $41.49 | $892,035 | $529,975 | 146% |
| 7/27/2005 | 33,000 | $16.84 | $41.39 | $1,365,870 | $810,150 | 146% |
| 7/28/2005 | 145,500 | $16.84 | $40.63 | $5,911,665 | $3,461,445 | 141% |
| 8/5/2005 | 30,000 | $22.19 | $41.94 | $1,258,200 | $592,500 | 89% |
| 8/8/2005 | 20,000 | $22.19 | $41.84 | $836,800 | $393,000 | 88% |
| **Total** | **325,000** | $15.74 | $39.66 | **$12,890,610** | **$7,775,610** | **152%** |

### Kathleen McDermott, Senior Vice President, Secretary and General Counsel

| Date | Shares | Exercise Price | Sales Price | Sales Proceeds | Profit | Return on Investment |
|---|---|---|---|---|---|---|
| 7/29/2005 | 9,000 | $17.35 | $40.54 | $364,860 | $208,710 | 134% |
| **Total** | **9,000** | **$17.35** | **$40.54** | **$364,860** | **$208,710** | **134%** |

133.    As shown in the following chart, Marshall and McDermott sold just about all

of their stock and the sales comprised a substantial percentage of their holdings and vested

options.

| Defendant | Shares Sold | Stock Holdings | % of Sales to Stock Holdings | Vested Options as of 10/20/05 | % Sales to Stock Holdings and Vested Options |
|---|---|---|---|---|---|
| Marshall | 325,000 | 365,000 | 89.04% | 59,000 | 76.65% |
| McDermott | 9,000 | 12,781 | 70.42% | 24,000 | 24.47% |

134.    Marshall and McDermott's sales were also dramatically out of line with their

sales before the Class Period.  Marshall sold 325,000 shares during the Class Period, six

times more than  the 52,192 shares he sold in the 14 months prior to the Class Period.

McDermott sold 9,000 shares during the Class Period after selling no shares in the 14 months prior to the Class Period.

135.    The timing of the sales was particularly suspicious.  Marshall sold 75,000 shares of Nash Finch stock on 4/28-29/05 when he knew (1) the Company had discontinued the problematic vendor promotional programs at the Roundy's Westville distribution center that caused a $4-$5 million reduction in earnings, (2) Patitucci and Spinazze were repeatedly saying the $6 million projected increase in vendor promotion income was not attainable, and (3) Nash Finch was losing grocery store customers due to poor service, the discontinuation of Roundy's private label products and competition from other food distributors.  Indeed, Marshall and McDermott knew that Marsh had informed Nash Finch on 4/14/05 that it would not purchase any merchandise from Nash Finch which would result in a loss of $20 million of revenue in 2005 (and $12 million in 2006) from that customer alone.

136.    Marshall and McDermott's sales in 7/05 and 8/05 were even more suspicious.  In addition to knowing the adverse inside information described above, Marshall and McDermott also knew that (1) Nash Finch's sales and earnings were declining as a result of the implementation of the new administrative fee that angered the Company's vendors and caused them to discontinue offering promotions, (2) there were serious problems with the integration of the Roundy's distribution centers, (3) the Company was continuing to lose business and customers and (4) the Company was increasing earnings requirements due to the underperformance of the Westville and Lima distribution centers and other departments.  Further, Marshall and McDermott's sales in 7/05 and 8/05 were just two to three months before the Company's 10/20/05 public disclosure that F05 EPS would be ***substantially less***

than what they told investors to expect *before* the purported accretive effect of the acquisition.

137.   In addition to the suspicious sales by Marshall and McDermott, other senior executives at the Company also sold a majority of their stock when the numerous problems with the integration of the acquired distribution centers that caused the Company to substantially lower F05 EPS guidance remained concealed from investors.  Bruce Cross sold 18,000 shares or 52.3% of his stockholdings and vested options on 7/26/05 at $41.37 per share for $744,660.  David Bersie, the Company's senior vice president of retail operations in the Midwest region, sold 38,427 shares, or 81.3% of his stockholdings and vested options on 7/27-28/05 and 8/2/05 at an average price of $41 per share for $1,572,158.  Jeffrey Poore, the Company's senior vice president of the military food distribution segment sold 18,000 shares or 86.2% of his stockholdings and vested options on 8/4/05 at $42.41 per share for $763,380.

138.   The Company has admitted the insider sales and the subsequent departures from the Company by Marshall and McDermott are suspicious.  On 2/17/06, Nash Finch issued a press release announcing that it had voluntarily contacted the SEC about sales by certain unnamed officers and directors after conducting an internal review with the assistance of outside counsel.  The press release stated in part:

> In addition, the Company said today that it has voluntarily contacted the Securities and Exchange Commission (SEC) to discuss the results of an internal review that focused on trading in the Company's common stock by certain officers and directors of the Company during 2005. The Board of Directors conducted the internal review with the assistance of outside counsel following an informal inquiry from the SEC late last year regarding such trading. The Company has offered to provide certain documents and the SEC

has accepted the offer. The Company will continue to fully cooperate with the SEC.

139.    The financial press immediately reported the unnamed officers and directors undoubtedly included Marshall and McDermott and that numerous securities law experts believed the defendants' departures from the Company shortly after their suspicious insider selling suggested Nash Finch believed it had a serious problem and was mounting an all-out effort to shield the Company.   For example, on 2/17/06, the *Saint Paul Pioneer Press* published an article that stated in part:

> *Food distributor Nash Finch disclosed Thursday it is under federal investigation for insider trading by unidentified executives and directors and said it had replaced its chief executive officer and general counsel.*
>
> *The company said it conducted an internal review of insider stock trading in 2005 following an inquiry late last year from the Securities and Exchange Commission. It said it had "provided certain documents" to the SEC and that it "will continue to fully cooperate."*
>
> *Ron Marshall, chief executive for the past seven years, has been replaced* by Allister Graham, board chairman, on an interim basis, the company said. Marshall announced his resignation last September but had been scheduled to depart March 2.  *General Counsel Kathleen McDermott also resigned from the company.*  Nash Finch did not elaborate on reasons for the departures.
>
> *Marshall sold $10.6 million in company stock shortly before the company disclosed deep problems that sent share prices plummeting last year. McDermott sold 9,000 shares of stock in July, valued at $364,000, according to regulatory filings.*
>
> *To securities experts, Thursday's announcements suggest the Nash Finch board believes it has a serious potential problem and is mounting an all-out effort to shield the company.*
>
> The SEC even has a recipe that such companies should follow: investigate quickly, cooperate fully, disclose all documents and fire employees who might be implicated.
>
> *"They're trying to minimize the likelihood of formal action against the company," said Jim Cox, a securities law expert at Duke University.*

But investors didn't seem worried. Nash Finch shares rose 21 cents Thursday to close at $31.12.

*Nash Finch has been under a cloud since last October, when it first revealed serious problems in digesting the food distribution business it had purchased in February from Roundy's supermarket chain.*

*While its stock plunged 29 percent the day after the announcement, Marshall's portfolio wasn't as badly hurt, because he'd unloaded the lion's share of his holdings, some 324,500 shares, in the preceding months.*

*Experts in corporate finance aren't surprised such activity could raise a red flag. "Those are large amounts of money that the SEC would be interested in," said Rajesh Aggarwal, an associate professor of finance at the University of Minnesota's Carlson School of Management. "Officers and directors are supposed to know, have drummed into them, that this is the kind of thing that will get them in trouble."*

Since the stock plunge, at least 10 law firms have announced plans to file class-action lawsuits against Nash Finch on behalf of shareholders and bondholders. The company earlier said the suits were "without merit" - a view it reiterated Thursday.

\*        \*        \*

*Cox, the Duke securities expert, was struck by the sudden departures at the top. "Companies rarely get rid of their CEO and their general counsel at the same time," he said.*

*Turning over results of an internal investigation also is a bit of a last resort.*

*Companies prefer to protect such information from the prying eyes of plaintiffs' attorneys, but turning it over to the SEC strips away attorney-client privilege. "That indicates to me that outside counsel has come in and saw something and said, 'We've got to tell the SEC what we know so far,' "Cox said.*

140.    In a 2/18/06 article published by the *Minneapolis Star Tribune*, University of Minnesota assistant professor Karen Schnatterly said she expected the SEC investigation would become a "scandal" and could result in criminal liability, particularly for Marshall.  In addition, John Gavin, a former stock analyst who runs the Plymouth-based SEC Insight

research firm, stated that there should not have been surprises like the earnings revision issued on 10/20/05 given the nature of Nash Finch's business.  The article, titled **"Nash Finch on tightrope as it readies SEC report; The departure of two top executives could be a sign of more trouble, experts say,"** stated in part:

> The news this week that Fortune 500 firm Nash Finch Co. faces continuing SEC scrutiny of insider selling could portend a troubling turn for the company as it presents the findings of an internal review to federal authorities, experts said Friday.

> The Edina company announced in regulatory filings that two top executives were stepping down as the company cooperated with federal investigators in the matter.

> **"I would expect this is going to move into scandal territory," said Karen Schnatterly, an assistant professor of strategic management at the University of Minnesota's Carlson School of Management.**

> The company did not identify whose trades were being examined, but former CEO Ron Marshall was among those engaged in selling large blocks of stock before Oct. 20, when Nash Finch announced poorer-than-expected earnings for fiscal 2005.

> That announcement sent the company's stock through the floor, falling nearly 30 percent Oct. 21.

> **"A Fortune 500 company is not supposed to lose 30 percent of its value in one day, unless the nature of its business just exposes them to that," said John Gavin, a former stock analyst who runs the Plymouth-based SEC Insight research firm.**

> **"The food business is pretty well recession-proof. It's not prone to surprises. There should be no surprises."**

> The company said that Marshall was stepping down two weeks ahead of his scheduled resignation and that general counsel Kathleen McDermott was also resigning.

> Two interim replacements were named to fill their posts, with board Chairman Allister Graham becoming interim CEO and deputy general counsel Kathleen Mahonry moving to the general counsel's position.

SEC visit can be 'pretty scary'

*Schnatterly said the movements may be signs that the board of directors wants to distance the company from the people targeted by the Securities and Exchange Commission probe. The company needs to "bend over backward" to answer whatever questions the SEC may have, she said.*

*"For the SEC to come calling is a pretty scary thing for companies," she said. "Whoever is responsible and the company could be held criminally liable. With the CEO stepping down, that doesn't look so good for the CEO himself."*

## VI.   DEFENDANTS FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

### A.   2/24/05-3/3/05: Defendants Falsely Represented the Roundy's Acquisition Will Increase Revenues and Earnings

141.   <u>False Statement</u>: On 2/24/05, Nash Finch issued a press release announcing the acquisition of the Roundy's distribution centers. In the press release, the defendants told investors the acquisition would add "$1.0 billion in annual food distribution sales," be "immediately accretive to earnings" and improve operating earnings by $31-$33 million. The press release, titled "Nash Finch Agrees to Buy Two Roundy's Distribution Centers; Represents Approximately $1.0 Billion in Annual Food Distribution Sales; Additions Advance Company's Strategic Plan; No Facility Closures Anticipated," stated in part:

> Nash Finch Company announced today that it has signed an agreement with Roundy's, Inc. to acquire the net assets, including customer contracts, of its wholesale food distribution divisions in Westville, Indiana, and Lima, Ohio, and two retail stores in Ironton and Van Wert, Ohio, for approximately $225 million.
>
> *The Westville and Lima Divisions to be acquired represent approximately $1.0 billion in annual food distribution sales,* servicing over five hundred customers, principally in Indiana, Illinois, Ohio and Michigan. The distribution centers to be acquired fit well with the Company's existing network and no facility closures are anticipated. The strategically located distribution centers will allow the Company to expand merchandising programs in a variety of areas, including the distribution of produce and meat, general merchandise, and health and beauty care. The Company expects that the acquisition will result in productivity improvements and buying

efficiencies, which will be realized over several years. Specific examples of productivity improvements include the better balancing of transportation across the Company's distribution network to reduce miles and equipment, enhanced warehouse capacity utilization, and the reduction of outside storage space. ***The Company expects that the acquisition will be immediately accretive to earnings. Specifically, depending on the timing and nature of its integration process, the Company believes that as a result of the acquisition operating earnings will improve by approximately $31 to $33 million, net of implementation costs of approximately $3 million, during the twelve months following closing of the transaction.***

The impact on earnings per share will depend upon the nature and cost of the related financing, as well as the purchase accounting allocations and related amortization.

142.    The acquisition and defendants' representations about the positive impact of the acquisition on the Company's financial results were repeated in numerous articles published by the financial press and in reports issued by JP Morgan analyst Janet King on 2/25/05 and PiperJaffray analyst Eric Larson on 2/28/05.  PiperJaffray raised F05 EPS estimates by $0.35 and wrote the acquisition "will be immediately accretive."  In her report, King wrote that the acquisition strategically looked like a good move but stated JP Morgan was apprehensive Nash Finch was searching for growth at what appeared to be a high price. Further, in a 2/25/05 article in the *Minneapolis Star Tribune*, it was reported that one reason Roundy's sold the distribution centers was because competition from Wal-Mart supercenters had caused Roundy's sales to decline in Ohio, Michigan and Indiana.  Because there was some skepticism about the acquisition, defendants knew it was important for the Company to actually deliver the benefits they represented the acquisition would provide.

143.    <u>False Statement</u>: On 3/2/05, Nash Finch issued a press release reporting the Company's 4Q04 and F04 results.  In the press release, the defendants repeated the positive

statements made in the 2/24/05 press release about how the Roundy's acquisition would

improve the Company's sales and earnings and provided initial EPS guidance for 2005.

The Company announced on February 24, 2005 that it had signed an agreement with Roundy's, Inc. to acquire the net assets, including customer contracts, of its wholesale food distribution divisions in Westville, Indiana and Lima, Ohio, and two retail stores in Ironton and Van Wert, Ohio, for approximately $225 million.

**The Westville and Lima Divisions to be acquired represent approximately $1.0 billion in annual food distribution sales,** *s*ervicing over five hundred customers, principally in Indiana, Illinois, Ohio and Michigan. The distribution centers to be acquired fit well with the Company's existing network and no facility closures are anticipated. The strategically located distribution centers will allow the Company to expand merchandising programs in a variety of areas including the distribution of produce and meat, general merchandise, and health and beauty care. The Company expects that the acquisition will result in productivity improvements and buying efficiencies, which will be realized over several years. Examples of productivity improvements include the better balancing of transportation across the Company's distribution network to reduce miles and equipment, enhanced warehouse capacity utilization, and the reduction of outside storage space. **The Company expects that the acquisition will be immediately accretive to earnings. Specifically, depending on the timing and nature of its integration process, the Company believes that as a result of the acquisition operating earnings, defined as sales less cost of sales and selling, general and administrative expenses, will improve by approximately $31 to $33 million, net of implementation costs of approximately $3 million, during the twelve months following closing of the transaction. This estimate includes a portion of the more than $8 million in annual synergies expected to be realized over several years.** The impact on earnings per share will depend upon the nature and cost of the related financing, as well as the purchase accounting allocations and related amortization.

\*     \*     \*

Outlook

**The Company estimates that its diluted earnings per share for fiscal 2005 will range between $3.40 and $3.55 before the accretive effect of the acquisition** discussed above. This compares to fiscal 2004 earnings from continuing operations of $1.18 per diluted share which included several events that had a net unfavorable impact of $24.0 million, or $1.89 per diluted share. This outlook for fiscal 2005 assumes low single digit sales growth in our food

- 68 -

and military food distribution segments and flat to slightly negative same store sales in our retail segment. In addition, ***the Company anticipates some margin improvement across all segments*** as we continue to focus on productivity efficiencies. Depreciation and amortization will be impacted by capital expenditures during fiscal 2005 of approximately $35 million. We also estimate our average interest rate to be approximately 7.0% in fiscal 2005. Finally, the Company expects its working capital to remain relatively consistent with 2004.

144.   During the 3/3/05 conference call hosted by Marshall, Stewart and McDermott, the defendants reiterated the benefits of the acquisition including Marshall's unequivocal representation that the transaction "will be immediately accretive to earnings."

Marshall: As we've discussed before, Nash Finch is well-positioned strategically to take advantage of new business opportunities in food distribution. Our industry leadership in those metrics critical to independent supermarket retailers, as well as our position as a premier low-cost value-added distributor, continues to drive the results you saw today in our Food Distribution segment. ***The opportunity to acquire the Westville, Indiana and Lima, Ohio food distribution divisions from Roundy's will allow us to take our company to the next level. These divisions represent approximately $1 billion in annual food distribution sales, servicing over 500 customers.*** Among them are some of the finest and most successful independent retailers in the United States. The distribution centers to be acquired fit well with the Company's existing network. As a result, we do not anticipate any facility closures.

*   *   *

***The transaction will be immediately accretive to earnings.***  Depending on how quickly the expected benefits are realized and how expensive the integration is, we believe that, as a result of this acquisition, ***operating earnings will improve by approximately 31 to $33 million net of implementation costs of approximately $3 million during the 12 months following the closing of the transaction.***  The impact on earnings per share will depend, of course, upon the cost of the related financing as well as the purchase accounting allocations and the related amortization.  Our already-strong cash flows will be further strengthened by this transaction, allowing us to continue to deliver immediately.

Finally, as we outlined in the press release, we estimate that ***diluted earnings per share for fiscal 2005 will range between $3.40 and $3.55 before the accretive effect of the acquisition just discussed.*** This compares to 2004

- 69 -

earnings from continuing operations of $1.18 per diluted share, which includes several events that had a net unfavorable impact of $1.89 per diluted share.

This outlook for fiscal 2005 assumes low single digit sales growth in our Food Distribution and Military segments and flat to slightly negative same-store sales in our retail segment. In addition, ***the Company anticipates some margin improvement across all segments, as we continue to focus on productivity efficiencies.***

145.   In response to a question from JP Morgan analyst Janet King, Marshall assured investors there were "significant opportunities" to improve gross margins at the acquired Roundy's distribution centers and that the Company's guidance was "very cautious" and would probably be exceeded.

Janet King – JP Morgan – Analyst:  Hi. It's actually Janet King calling in for Steve. I have 2 questions. My first question is in regards to the acquisition of the Roundy's division. It seems like the EBITDA margins for those 2 divisions are significantly below your core margin, even with the synergies. I was wondering if that's what we should [be] modeling, and you know, if you could just comment on that acquisition.

*       *       *

Marshall: Janet, let us pull up what you're looking at and if we can't respond to you on the call, Lee and I will give you a call and sort of talk you through what the issue is.

***As it relates to Roundy's, you are right; the margins of that business are below the margins that we enjoy in our regular food distribution business, and we think that there are significant opportunities to improve that through enhanced productivity. You know, we are comfortable with the numbers that we have provided in terms of prospective synergies.*** I will tell you that one of the advantages of now passing 50 is I've had a chance to see a lot of other transactions, and ***we are always very cautious about the sort of numbers that we release on these sorts of matters.*** I remember, several years ago when Albertson's and American Stores merged and when Fred Meyer and Kroger merged and when Safeway had their series of transactions 5 or 6 years ago. ***We want to make sure that we're very cautious in the guidance that we give. We're going to work very hard to exceed those numbers and our guys are very, very good.***

146.    Marshall stated that core food distribution margins – margins excluding the impact of the Roundy's distribution centers – would also improve.

> Homar Astevauld – Piper Jaffray – Analyst: Okay. Then maybe you know, also, *you say that you expect margin improvement across all segments, including Food Distribution. Is that then excluding the impact of the new distribution acquisition*?

> Marshall: That is correct; that is correct. *In our core businesses, we still believe there are opportunities for efficiencies to be gained.*

147.    On 3/4/05, analysts from JP Morgan and PiperJaffray issued reports in which they repeated defendants' false positive statements.  For example, JP Morgan reported that "[management] appears confident that it can improve margins within these 2 divisions and expects to eventually achieve at least $8M in annual synergies from the acquisition." PiperJaffray reiterated its "buy" rating on the Company's stock and stated that they expected the two distribution centers to add $0.25-$0.30 to F05 EPS.

148.    <u>Facts showing why defendants' statements were materially false and misleading and that defendants knew it:</u> Numerous facts from corroborating sources show the defendants knew or were reckless in not knowing that their statements about the beneficial impact of the Roundy's acquisition on the Company's results were false and misleading.  Specifically:

(a)    As explained in §V.B and VII, it is undisputed that the acquisition (1) did not "represent approximately $1.0 billion in annual food distribution sales," (2) was not "immediately accretive to earnings" and (3) did not add "approximately $31 to $33 million" to "operating earnings."  In the four quarters since the acquisition was completed (2Q05-1Q06), Nash Finch reported $800 million of revenues from the Roundy's acquisition – 20%

less than the $1 billion defendants repeatedly told investors to expect.  Moreover, the acquisition was not "immediately accretive to earnings" and actually had a negative impact on the Company's earnings.  Nash Finch reported F05 EPS of $3.13, which was less than the $3.40-3.55 guidance provided on 3/2/05 that did not even include the accretive impact of the acquisition.

(b)     In addition, as detailed in §VII, defendants have admitted the substantial shortfall in F05 EPS was caused by depressed wholesale profit margins related to manufacturer promotional spending and higher than expected integration costs.  These admissions were made (1) in the Company's 10/20/05 press release, (2) in the Company's 11/10/05 press release and 3Q05 Form 10-Q, (3) during the Company's 11/10/05 conference call, (4) in the Company's 3/16/06 press release and F05 Form 10-K and (5) during the 3/16/06 conference call.  Allistar Graham, the Company's Chairman of the Board, also acknowledged the positive statements about the acquisition should not have been made.  In a 3/6/06 article in *Supermarket News*, he was quoted as saying "'the integration could have been handled better in terms of not forecasting the kind of rapid improvements we did.'"

(c)     As explained in §V.B, the witness accounts show the defendants knew about the problems that caused the substantial shortfall in F05 EPS when they told investors on 2/24/05, 3/2/05 and 3/3/05 that the acquisition would be immediately accretive to earnings.  As detailed in §V.B.1-3, the witness accounts show that defendants knew earnings would decline due to the discontinuation "diversion" buying and the improper advertising billing at Roundy's and the decline in slotting allowances.  As detailed in §V.B.6, defendants knew Nash Finch never projected a $1 billion increase in annual food distribution sales and

that the Company had already lost business from Martin's Supermarkets, and was losing customers like Marsh that were not happy with the replacement of Roundy's private label products with Nash Finch private label products, other customers that were not happy with the promotions offered by Nash Finch and other customers that were offered better deals from competitors like Spartan.

(d)     As detailed in §V.B.1, defendants knew the discontinuation of the advertising billing caused a $4-$5 million decline in earnings at the Westville distribution center.  In addition, as detailed in §V.B.2, Marshall and Stewart were repeatedly told by Patitucci and Spinazze during meetings in 2/05 and 3/05 that the $6 million increase in earnings included in the synergy report attributable to the acquired distribution centers' participation in the Company's vendor promotions was not attainable.  Thus, Marshall misled by assuring investors during the 3/3/05 conference call that the defendants were (1) "comfortable with the numbers that we have provided in terms of prospective synergies," and (2) "always very cautious about the sort of numbers that we release on these sorts of matters."

(e)     Defendants knew about the lost customers and discontinuation of the diversion buying and advertising billing practices – and the resulting negative financial impact on the Company – given their positions at the Company and the importance of the acquisition to the Company's results.  As explained in §V.A, defendants knew – as they disclosed in the Company's SEC filings – the importance of the acquisition on future results. They specifically told investors the Company's financial results would be negatively impacted if they did not effectively integrate the operations, systems and personnel of the

Roundy's distribution centers, retain existing customers, capture additional customers and effectively manage vendor promotional programs.  Moreover, they knew the successful integration of the acquired distribution centers were particularly important because Nash Finch operated in an intensely competitive and consolidating food distribution industry with low profit margins.

(f)     As detailed in §§V.B.2 and V.B.9, defendants received reports and participated in meetings where the integration of the acquired distribution centers was discussed.  Moreover, defendants admitted they were involved in the integration.  During the Company's 4/21/05 conference call Marshall said he personally met with Roundy's largest customers in the first couple of days following the 2/24/05 announcement of the acquisition. During the 7/21/05 conference call Marshall stated the acquisition was a key element of the Company's food distribution strategy and that he personally focused on customer retention and the transition from Roundy's private label products to Nash Finch's private label products.

(g)     The 2/24/05 asset purchase agreement between Nash Finch and Roundy's (which was signed by Stewart) indicates the defendants knew about the advertising billing practices *before* the Class Period as a result of their pre-acquisition due diligence. The asset purchase agreement indicates the due diligence began no later than 12/7/04 when the companies executed a confidentiality agreement.  In addition, according to §§2.01(ix) and 3.12 of the asset purchase agreement, Roundy's provided to Nash Finch (1) each contract, agreement, invoice, sales order and any other arrangement for the purchase and sale

of inventory, (2) all sales promotion and advertising contracts and (3) all contracts and agreements with any customer of the distribution centers.

(h)    The asset purchase agreement also shows the defendants knew they planned to discontinue offering Roundy's private label products which caused several customers – including Marsh – to drop Nash Finch as a distributor after the acquisition. Specifically, it was disclosed in §5.16 of the asset purchase agreement that there would be 30 days of Roundy's private label product following the closing date and that Nash Finch had the option to sell back to Roundy's any private label product that remained 30 days after the closing.

**B.    4/21/05: Nash Finch Reported 1Q05 Results, Defendants Reiterate the Acquisition Will Be Immediately Accretive to Earnings and Assure Investors the Integration of the Roundy's Distribution Centers Is Proceeding on Schedule**

149.   <u>False Statement</u>: On 4/21/05, Nash Finch issued a press release and held a conference call to report 1Q05 results. Defendants repeated their prior representations that the acquisition would add $1 billion of sales and be immediately accretive to earnings. In addition, they reaffirmed the F05 EPS guidance originally provided on 3/2/05 and assured investors there was "no heaving lifting" associated with the integration of the Roundy's distribution centers which was "proceeding on schedule" and "going well" with customers supportive of the change to the Company's private label products. The press release stated in part:

> On March 31, 2005 the Company announced it had completed the purchase from Roundy's Inc. of the net assets, including customer contracts, of the wholesale food distribution divisions in Westville, Indiana, and Lima, Ohio, and two retail stores in Ironton and Van Wert, Ohio, for approximately $225 million.

*The Westville and Lima Divisions represent approximately $1.0 billion in annual food distribution sales,* servicing approximately 500 stores principally in Indiana, Illinois, Ohio and Michigan. *The Company expects the acquisition will be immediately accretive to earnings. Depending on the purchase accounting allocations and related amortization, operating profits, defined as sales less cost of sales and selling, general and administrative expense, are expected to increase by $31 to $33 million during the first twelve months following the acquisition, net of implementation costs of approximately $3 million.* This estimate includes a portion of the annual synergies expected to be realized over several years. No facility closures are expected given the strategic fit of these distribution centers into the Nash Finch network.

*"The acquisition is a key element of our Food Distribution strategy,"* said Ron Marshall. *"We gain successful customers with a proven track record within their market areas as well as the opportunity to expand marketing and merchandising programs across our network.* We are committed to helping our customers compete in an ever changing marketplace."

\*       \*       \*

Outlook

*The Company is reaffirming its earnings guidance range of between $3.40 and $3.55 in diluted earnings per share for fiscal 2005 before the accretive effect of the acquisition discussed above.*

150.    During the conference call, Stewart told investors the integration of the acquired distribution centers was proceeding on schedule, reiterated the acquisition would add $1 billion of sales and increase EBITDA by as much as $33 million and that as a result, "we are clearly very optimistic about the prospects for our company for the remainder of 2005 and beyond." Indeed, she unequivocally represented the acquisition "will be immediately accretive to earnings."

As previously announced, we completed, after the end of the first quarter, our strategic acquisition of (audio gap) distribution warehouses, the related customer contracts, and two retail stores from Roundy's. *The acquired assets represent approximately $1 billion in annual sales from approximately 500 stores in Indiana, Illinois, Ohio and Michigan markets,*

*which are a great fit with our existing distribution network. Our integration plan is proceeding on schedule. We expect that this acquisition will increase EBITDA by as much as $33 million net of integration costs during the first 12 months of operation.*

The purchase price was approximately $225 million and was financed with the proceeds of a senior subordinated convertible note offering, as well as drawings on our existing fin (ph) credit facility. This morning's release includes a detailed description of the convertible note offering so that you can see that compared to other types of debt financing, the dilutive effects of this instrument, if any, will be minor. While we now have clarity on the financing costs of the deal, we have not yet completed preparation of the necessary purchase accounting allocations and related amortization. As a result, we cannot, at this time, provide guidance on how this acquisition will affect the company's earnings per share. I fully expect we'll be prepared to provide that guidance in conjunction with our second quarter 2005 earnings release.

*As a result of all of these factors, we are clearly very optimistic about the prospects for our company for the remainder of 2005 and beyond. Leaving aside the effect of the acquisition, which will be immediately accretive to earnings, our outlook for 2005 is unchanged. We continue to estimate that diluted earnings per share will range between $3.40 and $3.55.*

151.    In response to a question from Lehman Brothers analyst Meredith Adler, Marshall assured investors that the integration of the two Roundy's distribution centers was progressing seamlessly and that Roundy's customers were comfortable with the replacement of Roundy's private label products with Nash Finch's private label products.

Meredith Adler – Lehman Brothers – Analyst:  I've got a couple of questions for you. First, I don't know how much you can say about what is involved in integrating these two acquired distribution centers, but it'd be helpful for us -- you say it's on plan, but what is actually involved, how complex is it?

Marshall: The integration plan, Meredith, really extends over a year and there are several elements. ***Obviously, the earliest elements are just making sure that they're plugged into our accounting and merchandising and payroll systems here. That's already been done.***

***The second step of integration, and the one that has the most visibility with our customers, is the implementation of the Our Family private label brand into the stores and new customers.*** That is happening as we speak and, in fact, on March 30th, the day before closing, we had trailers stacked up in

the yards of these two distribution centers still with Our Family product. *That process will occur in two steps. The first step is an immediate one that should be finished by the end of June, which is replacing like for like items, replacing around these private label items with an Our Family Nash item.*

*The next step after that, which will be completed by the end of the year, is fully integrating the Nash line. The Nash private label line is both broader and a deeper line than the Roundy's line in those two houses. So that'll take place over the course of the year.*

*As we go forward, we're going to be expanding our general merchandise and health and beauty care operations in that part of the world that will allow us to acquire some additional volume.* That's factored into the synergies. *That, too, should be finished this year.* As part of that, there'll be some rebalancing of customers and rebalancing of our distribution network.

*There's nothing that's particularly heavy lifting here. There's just a lot of it. We tend to be very organized and disciplined about these things and I'm really comfortable this thing's going to move forward gracefully.*

Adler: Have you met with the customers that you have acquired? Are they comfortable with the new private label and the new management, the new ownership?

Marshall: *Yes, we really believe they are. And the customer base has been exceptionally supportive.* I'm sure you've probably seen some of the statements in the trade press from our customers over the past several weeks. We began the process of introducing ourselves to their customers immediately after the announcement. I personally did the largest customers in the first couple of days. And, as I said, there are over 500 stores representing approximately 300 customers.

During the HartScott Rodino period, the 30 days before closing, one of our executives in conjunction with one of their people, one of the Roundy's people, visited every customer in the process. We had cuttings, private label comparisons for Our Family product, both here in our offices for the larger customers, at food shows that Roundy's was sponsoring during the month of March, as well as on site presentations. *So we've worked very, very hard to make sure that the comfort level of these customers is very high and I think they all appreciate that Nash is a company that better aligns their strategic interests than perhaps other companies and that particularly the Our Family product, once they've gone through the inconvenience of the transition, will be a very strong positive for them.*

- 78 -

152.    Marshall also assured investors the integration was being handled gracefully and that the heavy lifting would be completed in a couple of months.

> Blaine Marter – Lowe Partners – Analyst:  OK great. And Ron, just one final question. You know, your extensive interview in the Supermarket News, you talked about the market, you talked about consolidation opportunities. *Is Roundy's taking up all your time or do you still have more capacity to look at some other things?*

> Marshall: Well, you're clearly right now, Roundy's is taking a lot of our time, both from a management perspective and financial perspective. *I think there is a relatively short period of adjustment that we need to go through here. I think it is a relatively short period. As I said earlier in response to a question, we tend to handle these things fairly gracefully, and I think we'll be through the heavy lifting really within a couple of months, and as opportunities arise we'll clearly look at them.*

153.    The statements made by the defendants in the 4/21/05 press release and during the conference call were repeated to the market in reports issued the following day by PiperJaffray analyst Eric Lawson, JP Morgan analyst Janet King and Lehman Brothers analyst Meredith Adler.

154.    <u>Facts showing why defendants' statements were materially false and misleading and that defendants knew it:</u> Defendants knew their statements on 4/21/05 were materially false and misleading for the reasons set forth in §V.  Specifically:

(a)    Defendants knew the acquisition would not add $1 billion of annual sales or be immediately accretive to earnings for the same reasons they knew those representations were false and misleading when made on 2/24/05, 3/2/05 and 3/3/05.  As detailed in §§V.B and VII, it is undisputed that the acquisition was not immediately accretive to F05 earnings and did not represent $1 billion of annual food distribution sales.  Further, as detailed in §VII, defendants admitted – after the Class Period – that the substantial shortfall

in food distribution sales and F05 EPS was caused by ineffective management of vendor promotional programs and higher than expected integration costs.

(b)     As detailed in §V.B.1, defendants knew the discontinuation of the advertising billing practices at Roundy's significantly reduced the earnings of the Westville and Lima distribution centers when they told investors on 4/21/05 the acquisition would be immediately accretive to earnings and that the integration plan was proceeding on schedule.

(c)     As detailed in §V.B.2, the defendants also knew earnings would decline by approximately $2 million due to the discontinuation of diversion buying at the acquired distribution centers and that Patitucci and Spinazze were repeatedly telling defendants the projected $6 million increase in earnings from the acquired distribution centers' participation in the Company's vendor promotions was unattainable.

(d)     As detailed in §V.B.3, defendants also knew earnings from slotting allowances were declining and less than budget because the Company failed to renew approximately 100 slotting allowance contracts with its vendors at the end of 2004 before they expired and because vendors were no longer willing to execute new contracts in any event.

(e)     As detailed in §§V.B.2 and V.B.9, defendants knew about the earnings declines from their receipt of reports and participation in meetings and in just a few weeks started charging Roundy's vendors the new administrative fee for all product sold and promotional services rendered since 4/05 in an unsuccessful attempt to recoup the lost earnings.

(f)      As detailed in §V.B.6, defendants knew that Roundy's customers were not "exceptionally supportive" of the replacement of Roundy's private label products with Nash Finch's private label products as Marshall represented during the conference call. Indeed, on 4/14/05, just one week before the conference call, Marsh informed the Company it would not purchase or accept delivery of any Nash Finch product because Nash Finch discontinued offering Roundy's private label products. As alleged in the Company's lawsuit, Marshall and the other defendants knew that Marsh's failure to purchase Nash Finch product would reduce 2005 revenues by $20 million.

(g)      Defendants knew the integration plan was not proceeding on schedule. As detailed in §§V.B.1 and V.B.2, they knew the integration of Roundy's marketing and merchandising operations was not proceeding on plan due to the decline in earnings caused by the discontinuation of diversion buying and advertising billing practices and the failure to generate the budgeted earnings from the acquired distribution centers' participation in the Company's vendor promotions. As detailed in §V.B.6, they knew there were problems with the implementation of the Company's Our Family private label brand into Roundy's grocery store customers because customers like Marsh were refusing to accept delivery of the product. As detailed in §V.B.6, defendants also knew problems related to the integration of the Company's purchasing system at the Lima distribution center was causing a substantial decline in fill rates and revenues. As detailed in §V.B.7, defendants knew the Company would not realize $4-$5 million of "network rationalization" cost saving because grocery store customers complained about being assigned to other distribution centers. Indeed, the plan was scrapped in 7/05 at Marshall's direction. As detailed in §V.B.8, they knew the

distribution centers were not "plugged into [the Company's] accounting and merchandising and payroll systems" as represented by Marshall during the conference call.   Several witnesses directly involved in the accounting integration stated there were numerous problems and delays related to the transfer from the Roundy's GEAC accounting platform to the Company's Hyperion-Lawson accounting system, including delays in the conversion of the chart of accounts which was still months from being completed.

(h)     As explained in §V.C, the suspicious insider selling by Marshall and McDermott followed by their unexpected departures from the Company and the investigations by the Company and the SEC strongly infer the defendants knew their statements were false and misleading.   Just one week after the 4/21/05 press release and conference call, Marshall sold 75,000 shares of his Nash Finch stock for more than $2.6 million.   Marshall sold the shares for $35 per share, almost four times the $8.50 exercise price.

(i)     Because the defendants knew about the undisclosed problems related to the acquisition and integration of the distribution centers, they knowingly or recklessly misled investors by representing the integration did not involve any "particularly heavy lifting" and that the Company was "very organized and disciplined about [the integration]" and "really comfortable [the integration was] going to move forward gracefully."   Indeed, as detailed in §VII, the defendants belatedly admitted after the Class Period they had botched the integration and that it had actually caused F05 EPS to be less than the Company's guidance *before* the effect of the acquisition.

**C.      7/21/05: Nash Finch Reported Disappointing 2Q05 Results Due
to Unexpected Integration Costs but Defendants Assure
Investors the Integration Was "Back on Track," the Acquisition
Would Still Be Immediately Accretive and that the Company
Had Only Lost One $15,000 a Week Customer**

155.    <u>False Statement</u>: On 7/21/05, Nash Finch issued a press release and held a

conference call to report 2Q05 results.  In the press release and during the conference call,

the defendants admitted the demands of the integration had diverted attention from daily

operations and caused a decline in margins, but assured investors that food distribution

operating margins would improve because the Company had already incurred the costs

associated with the integration and had taken steps to improve execution.  In addition, the

Company stated the acquisition would add $0.30-$0.34 to F05 EPS.

Food Distribution Results

Food distribution segment sales for the second quarter of 2005
increased 44.2% to $647.7 million compared to $449.2 million in the second
quarter 2004, and for the first 24 weeks of 2005 increased to $1.098 billion
from $880.3 million. The acquisition of the distribution centers added $185
million in food distribution sales during the second quarter. Excluding the
impact of the acquisition, food distribution sales increased 3.0% in the second
quarter and 3.7% year-to-date over the prior year. Second quarter 2005 food
distribution segment profits increased 20.3% to $21.3 million versus $17.7
million in the year earlier quarter, but decreased as a percentage of sales from
3.9% to 3.3%. In the 24 week comparison, segment profits in the 2005 period
were $36.9 million compared to $32.2 million in the 2004 period.

*"Integration of the Lima and Westville operations is proceeding
according to plan," said Ron Marshall, Chief Executive Officer.* "While we
expected integration costs to affect food distribution margins in the short term,
as occurred during the second quarter, we did not fully appreciate the degree
to which the demands of integrating a significant acquisition would divert
attention from daily operations and affect our day to day execution. *Given the
front-end loading of the integration costs and the steps we have taken to
improve execution, we expect operating margins in this segment to rebound
as we begin to realize the synergies inherent in this acquisition."*

*      *      *

Outlook

>  ***The Company expects that the acquisition of the distribution centers will add approximately $0.30 to $0.34 to its previously disclosed pre-acquisition estimate that 2005 diluted earnings per share would range between $3.40 and $3.55. As a result, the Company now estimates that its diluted earnings per share for fiscal 2005 will range between $3.70 and $3.89.*** Further, the Company expects that for fiscal 2005 its interest expense will be approximately $25 million and its combined expense for depreciation and amortization will be approximately $45 million.

156.    During the conference call, Marshall and Stewart reported the initial marketing integration had not gone as well as Marshall would have liked and that the Company had underestimated short term integration costs that caused the Company to report disappointing food distribution margins in 2Q05.  But they assured investors that (1) this would not be a continuing issue, (2) the integration was back on track, (3) margins would rebound, (4) they continued to be very optimistic about the acquisition and (5) the acquisition would still be immediately accretive by adding $0.30-$0.34 to F05 EPS.

>  **Stewart: . . . *As Ron observed, we are generally pleased with the progress we made during the quarter in integrating these operations into ours and continue to be confident about the possibilities the acquisition presents for us.***

*       *       *

>  **Marshall: . . . *Integration of the Lima and Westville distribution centers is proceeding on schedule. While the initial marketing integration of the acquired division didn't go as well as I would have liked, operational, logistical, and technical integration have gone very smoothly and ahead of schedule in many respects. We are already seeing improvements in customer service and satisfaction that we knew that we could bring to the businesses. As we said earlier, these centers fit very well within our existing distribution network and they present a number of unique opportunities to expand our distribution business, increase efficiencies, and improve customer service.***

*       *       *

- 84 -

Although food distribution certainly had a good quarter, it should have been, and it will be, better. *We could have done a much better job in the early stages of integration, planning, and organizing the transition. While these issues were invisible to our customers, they did affect margins. In addition, the shifting of resources to integrate the acquisition certainly made us less aggressive in managing our core business.*

*We are fully focused on making necessary improvements and we expect margins to rebound, as spending to integrate the acquired business decreases and as we begin to realize the synergies inherent in the acquisition.*

\* \*

*In summary, we remain confident about our ability to capitalize on all of the opportunities our Westville-Lima acquisition presents.* We were reminded in the second quarter that any acquisition, especially one as significant as this, also entails some short-term costs beyond the initial purchase price. Some, like the cost of integrating information technology systems, were very quantifiable and easy to budget. Others, like the diversion of management attention from day-to-day operations as they focus on the task of integration, are far less quantifiable, but still very real. I think we underestimated those less quantifiable post-acquisition impacts. Fortunately, *with the integration plan back on track and the steps we are taking to restore focus and improve execution, this will not be a continuing issue.*

*We continue to be very optimistic about the prospects for our Company for the remainder of 2005 and beyond. We still expect that our pre-acquisition businesses will perform inline with earlier guidance for the year and that the acquisition will increasingly be accretive to earnings. As a result, we estimate that diluted earnings per share for the Company, as a whole, will range between $3.70 and $3.89 for 2005.*

157.    In response to a question from Brean Murray analyst Gary Giblen, Marshall

reiterated the private label integration had gone very, very well and that Nash Finch had only

lost one $15,000 a week customer.

Gary Giblen – Brean Murray – Analyst: Okay, thanks for the explanation. The last question is, is your Roundy's customer retention on target and what -- can you give us a percentage of customers that just went away, as might occur in any transition or –

Marshall: I'll tell you, Gary, as we focus on this integration, ***the 2 areas that I focused personally on were customer retention and private label integration, moving out the old Roundy's private label and moving in the new Our Family line. And I'm happy to report to you that I'm very pleased, very pleased with the results of both.***

As you can imagine, the moment that we announced the acquisition, every wholesaler in the Midwest began to call on these customers. The result of all of that activity, Gary, is ***we lost one $15,000 a week retailer. One $15,000 a week retailer. Now, I think that is a fabulous result.***

***As it relates to our private label integration, it's gone very, very well.*** The quality of the Our Family brand I think is selling itself, not only to our retailers but to their customers. ***And the overall level of service that these customers are getting today I think, and they tell me, is much, much higher than they had been experiencing for years. So I think it's going great.***

158.    The statements made by the defendants in the press release and conference call were repeated to the market in reports issued on 7/22/05 by Lehman Brothers analyst Meredith Adler, Piper Jaffray analyst Eric Larsen and JP Morgan analyst Janet King.

159.    <u>Facts showing why defendants' statements were materially false and misleading and that defendants knew it</u>: Defendants knew their statements on 7/21/05 were materially false and misleading for the reasons set forth in §V.  Specifically,

(a)    Defendants knew the acquisition would not add $1 billion of annual sales or be immediately accretive to F05 earnings (by adding $0.30-$0.34 to the previous F05 EPS guidance of $3.40-$3.55) for the same reasons they knew those representations were false and misleading when made on 2/24/05, 3/2/05, 3/3/05 and 4/21/05.  As detailed in §V.B.1, defendants knew the discontinuation of the advertising billing practices at Roundy's had significantly reduced the earnings of the Westville and Lima distribution centers. Moreover, by 7/21/05, they knew the attempt to recoup the lost earnings by the retroactive imposition of the new administration fee had angered the Company's vendors and resulted in

the vendors eliminating or reducing promotions which in turn caused the Company's grocery store customers to complain about the lack of price discounts and replace Nash Finch with other food distributors.

(b)     As detailed in §V.B.2, defendants knew earnings at the acquired distribution centers declined by approximately $2 million due to the discontinuation of diversion buying and that earnings were not increasing as expected from the acquired distribution centers' participation in the Company's vendor promotional programs.  Indeed, the defendants knew from the monthly reports and month-end meetings that the amount of the shortfall was increasing each month.  Moreover, they also knew there was uncertainty about the legitimacy of the vendor promotion accruals that caused Marshall to fire most of the accounting staff in the beginning of 7/05 and task CW11 with reviewing the vendor promotional accruals and documentation to determine if the less than expected increase in earnings was overstated.

(c)     As explained in §V.B.3, defendants knew the amount of slotting allowance income was declining, substantially less than projections and that the amount of the shortfall was increasing each month.

(d)     As explained in §§V.B.1, V.B.2 and V.B.9, defendants knew about the earnings declines from their receipt of monthly reports and participation in the month-end meetings where the reports were discussed.  Indeed, Marshall was berating the Company's executives during the month-end meetings, the witnesses stated the problems were constantly discussed during weekly and monthly meetings and that the problem had reached crisis levels in the summer of 2005.

(e)     As explained in §V.B.6, defendants knew Marshall's representations that the private label integration had gone very, very well and that the Company had only lost one $15,000 a week retail customer were false.  The witness accounts and the $200 million revenue shortfall show the Company had lost millions of dollars in revenues.  During the Company's 11/10/05 conference call, Marshall admitted the acquired distribution centers lost the produce business of a large customer and that the Company expected to lose that business before the acquisition.  The Company's lawsuit against Marsh shows the defendants knew Marsh had told the Company on 4/14/05 that it would not purchase additional product because of the discontinuation of Roundy's private label products.  Indeed, the defendants knew by 7/21/05 that Marsh refused to retract its 4/14/05 letter and failed to purchase any product since 5/15/05 – which reduced 2005 sales by $20 million.

(f)     As detailed in §V.B.6, defendants also knew revenues and earnings were declining due to the loss of customers and the substantial reduction in fill rates resulting from the problems integrating the Company's purchasing system at the Lima distribution center.  In fact, the problems were so bad that the integration of the purchasing system at the Westville distribution center was postponed.

(g)     As detailed in §V.B.7, defendants knew the Company would not realize $4-$5 million of "network rationalization" cost saving because the plan to assign grocery store customers to lower cost distribution centers was scrapped in 7/05 after the grocery store customers complained about the change.

(h)     As explained in §V.B.4 and §V.B.8, the defendants also knew the operational, logistical and technical integration had not gone very smoothly as represented

by Marshall during the conference call.  The problems with the implementation of the purchasing system at the Lima distribution center caused substantial declines in fill rates and revenues and, as a result, the Company delayed the implementation of the purchasing system at the Westville distribution center.  Several witnesses directly involved in the accounting integration stated there were numerous problems and delays related to the transfer from the Roundy's GEAC accounting platform to the Company's Hyperion-Lawson accounting system, including delays in the conversion of the chart of accounts.

(i)     Given the undisclosed integration problems and their negative impact on the Company's earnings, defendants knew there was no reasonable basis for Marshall's assurances that (1) the "integration plan [was] back on track," (2) the problems with the initial marketing integration and the diversion of attention from managing the core business that caused the Company to report disappointing margins would "not be a continuing issue" because of the steps taken to restore focus and improve execution and (3) the defendants "continued to be very optimistic about the prospects for [Nash Finch] for the remainder of 2005 and beyond."

(j)     As explained in §V.C, the suspicious insider selling by Marshall and McDermott, followed by their unexpected departures from the Company and the investigations by the Company and the SEC strongly infer the defendants knew their statements were false and misleading.  In 7/05 and 8/05, Marshall sold 250,000 shares of his Nash Finch stock for more than $10 million and McDermott sold 9,000 shares on 7/29/05 for $364,000 after selling no stock in the 14 months prior to the Class Period.

(k)    The short time between defendants' positive statements and the 10/20/05 pre-announcement indicates the defendants knew their statements were materially false and misleading.  In fact, on 10/24/05, JP Morgan analyst Janet King issued a report in which she questioned how the Company's wholesale (*i.e.*, distribution) margins could decline as much as they did so soon after the guidance provided on 7/21/05.  "Wholesale margins were negatively impacted by lower vendor allowances, according to mgmt; however, *we are puzzled as to why margins could be so materially impacted between NAFC's Q205 earnings release (when mgmt reaffirmed core FY05 guidance on 7/21) and now.*"  She also noted the integration of the Roundy's distribution centers was a serious problem which contradicted the assurances made on 7/21/05 that integration issues were being addressed and would not be a continuing issue: "*Management had indicated at its Q205 conference call that integration issues . . . were being addressed and would not be a 'continuing issue' [but] it appears that integration issues were more serious than management had initially thought.*"

(l)    The undisclosed termination of the accounting staff by Marshall in 7/05 and the unannounced resignations of the top food distribution officers at the Company – James Patitucci, the executive vice president of merchandising and marketing and Spinazze – also indicate the defendants knew about the problems that caused their statements to be materially false and misleading.

**D.    9/1/05: The False and Misleading Press Release Announcing Marshall's Resignation**

160.    <u>False Statement</u>: On 9/1/05, Nash Finch issued a press release announcing the resignation of Marshall as of 3/2/06.  The press release stated in part:

Nash Finch Company, a leading national food distributor, today announced that ***Chief Executive Officer Ron Marshall has advised the Company that he will resign as of March 2, 2006***. Mr. Marshall will continue as CEO and as a Director of the Company until that date and will assist in the search for his successor. Allister Graham, Chairman of the Nash Finch Board of Directors, will chair a special committee of the Board to conduct that search.

Marshall, 51, has served as Nash Finch CEO since June 1998. "I am very proud of the performance driven culture that the executives and associates have developed at our Company, allowing us to succeed by focusing on the needs of our independent retailer customers, who include some of the best marketers in the country," said Marshall. "It has been a privilege to work with them, and I will miss our association. ***Our Company has tremendous opportunities ahead of it, but after more than seven years in this position, I believe it is time to turn over the leadership of this enterprise, and consider new challenges.*** I look forward to assisting Al and his committee in their search."

161. As detailed in §V.B, Marshall knew his representation that the "Company has tremendous opportunities ahead of it" was false and misleading due to the numerous problems with the integration of Roundy's distribution centers. Indeed, in just several weeks the Company would disclose the problems, substantially reduce F05 EPS guidance and admit the acquisition would not be immediately accretive to earnings but in fact reduce earnings.

162. In addition, Marshall's representation that he was resigning because it was "time to turn over leadership of the enterprise and consider new challenges" was misleading. Marshall resigned because he knew investors would soon learn of the integration problems, their impact on the Company's earnings and that Marshall had unloaded just about all of his Nash Finch stock for more than $12 million dollars. Indeed, after the problems were disclosed, the Company and the SEC commenced investigations into the sales and Marshall unexpectedly left the Company before 3/2/06.

## VII.   DEFENDANTS REVEAL THE NEGATIVE IMPACT OF THE ACQUISITION ON THE COMPANY'S FINANCIAL CONDITION AND MAKE SUBSEQUENT DISCLOSURES FURTHER DEMONSTRATING THEIR FRAUD

163.   On 10/20/05, Nash Finch issued a press release announcing a substantial reduction in EPS guidance for F05 – just three months after defendants (1) assured investors the Roundy's acquisition would increase F05 EPS to $3.70-$3.89 and (2) sold millions of dollars of their Nash Finch stock.

> Nash Finch Company, a leading national food retailer and distributor, today announced that it is revising its earnings outlook for fiscal year 2005 ending December 31, 2005. ***The Company now expects fully diluted earnings per share for the year in the range of $3.00 to $3.25 per share.*** The Company reported fully diluted earnings per share of $1.18 in fiscal 2004. ***Previously the Company had estimated 2005 fully diluted earnings per share would range between $3.70 and $3.89 per share.***
>
> ***The revised earnings estimate is due to a decline in retail gross profit margins, primarily reflecting inadequate execution in pricing across the Company's retail operations; depressed wholesale gross profit margins principally relating to manufacturer promotional spending; and higher than expected acquisition integration costs.***
>
> ***"Clearly the acquisition of the Westville, Indiana and Lima, Ohio divisions earlier in the year resulted in a lack of focus in our core business,"*** ***said Ron Marshall, Chief Executive Officer. "We have experienced serious erosion in retail and wholesale gross profit margins, based on issues that we had thought were readily resolvable. Unfortunately, the impact has been deeper than we anticipated and margins will take longer to rebound than we had thought, but these issues are fixable and we are addressing each one of them."***

164.   In response to the unexpected negative information, the price of the Company's stock plunged 28.6% from $42.34 on 10/20/05 to $30.23 on 10/21/05, on volume of more than 1.9 million shares – nearly 12 times the average daily trading volume.  By comparison, the peer group actually increased 0.8% and the NASDAQ increased 1.1%.  Because the 10/20/05 disclosure revealed the true impact of the acquisition on the

Company's financial condition which had been misrepresented and concealed by defendants during the Class Period, the decline in Nash Finch's stock price removed the artificial inflation and provides a measure of the economic damages that were caused by defendants' fraudulent scheme.

165. As alleged above, the defendants knew that wholesale margins would be negatively impacted by lower vendor allowances and integration problems well before the 10/20/05 public disclosure. Analysts' reaction to the 10/20/05 preannouncement showed they believed the defendants knew about the problems earlier. For example, on 10/24/05, JP Morgan analyst Janet King issued a report in which she questioned how the Company's wholesale (*i.e.*, distribution) margins could decline as much as they did so soon after the guidance provided on 7/21/05. "Wholesale margins were negatively impacted by lower vendor allowances, according to mgmt; however, *we are puzzled as to why margins could be so materially impacted between NAFC's Q205 earnings release (when mgmt reaffirmed core FY05 guidance on 7/21) and now."* She also noted that the integration of the Roundy's distribution centers was a serious problem which contradicted the assurances made on 7/21/05 that integration issues were being addressed and would not be a continuing issue: "*Management had indicated at its Q205 conference call that integration issues . . . were being addressed and would not be a 'continuing issue' [but] it appears that integration issues were more serious than management had initially thought."*

166. In a 2/18/06 article published by the *Minneapolis Star Tribune*, former stock analyst John Gavin also stated that the 29% decline in the Company's stock price was suspicious given the recession-proof nature of Nash Finch's business.

"A Fortune 500 company is not supposed to lose 30% of its value in one day, unless the nature of its business just exposes them to that," said John Gavin, a former stock analyst who runs the Plymouth-based SEC Insight research firm.

"The food business is pretty well recession-proof.  It's not prone to surprises.  There should be no surprises."

167.   Defendants continued to attribute the Company's disappointing financial results to problems related to the acquisition.   On 11/10/05, Nash Finch reported disappointing 3Q05 results that were significantly less than analysts' expectations.  The Company reported EPS of $0.83 which was 23% less than 3Q04 EPS of $1.09 and 13.5% less than PiperJaffray's estimate of $0.96.  The Company also reported that food distribution profit margins declined from 3.7% to 3.3% due to (1) problems managing vendor promotional programs and (2) higher than expected integration costs.  During the 11/10/05 conference call, the defendants did not disclose that Nash Finch discontinued the Roundy's vendor promotional programs and implemented the new (and retroactive) administrative fee that angered vendors and negatively impacted results.  But they did acknowledge that changes in vendor promotional programs caused the margin erosion.  For example, Stewart stated the following:

> *The decrease in the segments' profit margin during the third quarter reflects problems managing the promotional programs offered by our vendors.*  We engage in a wide variety of promotional programs cooperatively with our vendors.  The nature of these programs and allocation of dollars among them evolve over time as the parties discuss the results of specific promotions and plans for future promotions.
>
> These promotions require careful management in order to maintain or improve profit margins, while at the same time driving sales for Nash Finch and the manufacturer.  *A shift in promotional spending from certain types of promotions means that we need to be proactive in planning and implementing alternative programs that are expected to be mutually beneficial to the manufacturer and us.*

While ***we have not effectively managed these programs***, we understand what has to be done and are proceeding to make the changes necessary to improve our operating results and drive sales.

168.    Bruce Cross, who replaced Patitucci as executive vice president of merchandising in 8/05, also acknowledged that Nash Finch was negatively impacted by changing its vendor promotions.

[T]he whole balance of vendor funds in today's market are really something that you have to pay close attention to.  And manage to make sure as we change from one program to other programs, that we're making sure that we don't lose anything in that transition.  And as we talked about, we clearly did.

169.    In the 3Q05 Form 10-Q filed with the SEC on 11/10/05, defendants acknowledged problems with the integration negatively impacted the Company's financial results.

We believe the acquisition of the Lima and Westville divisions provides a uniquely valuable strategic opportunity for us to further leverage our existing relationships in the regions in which these divisions operate and to grow our food distribution business in a cost-effective manner. ***The demands of integrating this acquisition have, however, diverted attention and resources from our day-to-day operational execution and made us less aggressive in managing our core business***, as discussed below. In addition, ***some elements of the logistical and technical integration have fallen behind schedule, necessitating the shift of additional resources to those tasks. In combination, these factors have temporarily affected margins and delayed the realization of the financial benefit of the synergies inherent in this acquisition.***

170.    On 1/18/06, Lehman Brothers analyst Meredith Adler issued a report after meeting with Marshall, Stewart, Cross and Poore in which she wrote the defendants admitted Nash Finch's "business suffered so significantly" because (1) the Company "struggled initially to convert the Roundy's facilities to its vendor programs" and (2) the Company "moved too quickly to complete the integration, causing some disruption to customers and some confusion at its facilities."

171.    In a 3/6/06 article in *Supermarket News*, interim CEO Graham conceded the defendants had misstated the positive impact the acquisition of the Roundy's distribution centers would have on the Company's results.  Graham was quoted in the article as stating "the integration could have been handled better in terms of not forecasting the kind of rapid improvements we did."

172.    On 3/16/06, Nash Finch reported 4Q05 and F05 results in line with the revised guidance provided on 10/20/05.  The Company reported declines in food distribution margins and again attributed the declines to "inadequate execution in the management of manufacturer promotional spending" and "a more complex and costly integration process than we had expected."  During the conference call, Stewart stated the decline in food distribution profit margins during 2005 was caused by ineffective management of manufacturer promotional spending and a more complex and costly integration process that diverted management's attention from the Company's core business operations.  Cross stated that the Company was still "working very diligently to . . . reestablish our vendor relationships."

173.    Like the 3Q05 Form 10-Q, the 2005 Form 10-K reported that integration problems had negatively impacted the Company's financial results and that as a result, some elements of the integration had been slowed down and additional resources had been shifted to integration-related tasks.

> We believe the acquisition of the Lima and Westville divisions provides a valuable strategic opportunity for us to leverage our existing relationships in the regions in which these divisions operate and to grow our food distribution business in a cost-effective manner. ***The demands of integrating this acquisition did, however, diverted attention and resources from our day-to-day operational execution and made us less aggressive in***

*managing our core business. . . . In light of these issues, we have slowed some elements of the logistical and technical integration, and shifted additional resources to those tasks. In combination, these factors have affected margins and delayed the realization of the financial benefit of the synergies inherent in this acquisition.*

174.    On 4/27/06, Nash Finch reported disappointing 1Q06 results including $0.29 EPS which was significantly below First Call consensus estimates of $0.64.  The Company reported a further decline in food distribution margins to 2.9% caused by additional integration costs and an increasing portion of the distribution business coming from larger and non-traditional grocery stores with lower margins.

175.    On 4/28/06, the Company's stock price declined 20% from $30.13 on 4/27/06 to $24.16 on 4/28/06.

176.    The investigations of the defendants' sales and their unexpected departures from the Company after the Class Period strongly infers the defendants knew they misrepresented the true impact of the acquisition on the Company's financial results during the Class Period.  In late 2005, the SEC notified the Company of an informal inquiry into the sales of Nash Finch common stock by certain officers and directors in 2005.  As a result, the Board of Directors commenced an investigation with the assistance of outside counsel.  However, the SEC inquiry and Company investigation were not publicly disclosed until 2/16/06.

177.    On 2/16/06, the Company publicly disclosed its investigation into the insider selling that was prompted by the SEC's informal inquiry and that Nash Finch had provided documents to, and was fully cooperating with, the SEC.  Moreover, in the same press release, the Company reported that (1) defendant Marshall was being immediately replaced by

Graham before Nash Finch had located a permanent replacement and before the 3/2/06 departure date announced on 9/1/05 and (2) defendant McDermott was resigning from the Company.  As alleged above in §V.C, numerous articles appeared in the financial press that reported the announcement indicated the Company believed it had a serious potential problem that could turn into a scandal and was mounting an all out effort to shield Nash Finch.  In addition, Standard & Poor's placed Nash Finch on CreditWatch with negative implications stating that the "issues related to the review could potentially result in negative consequences for Nash Finch, including possible penalties."

178.    The numerous firings and changes in executive management also strongly infer defendants knew about the problems that were concealed during the Class Period.  In 2/05, Marshall removed Lewis from his office and appointed Patitucci and Cross to manage the retail segment of the business.  Spinazze left the Company shortly after the $6 million of additional income projected to be realized from the acquired distribution centers participation in the Company's vendor promotions was included in the budget despite Patitucci and Spinazze repeatedly saying the projection was not attainable.  In 7/05, Patitucci unexpectedly left the Company and Marshall fired Martin and Runyun due to improper accruals related to vendor promotions.  In 11/05, the Company announced that Kathleen Miller had replaced Mark Sorensen as vice president and corporate controller.  Then in 6/2/06, the Company announced that Miller intended to resign as of 6/16/06.  On 2/16/06, the Company announced the unexpected departures of defendants Marshall and McDermott.

## VIII.   PROXIMATE LOSS CAUSATION

179.   During the Class Period, as detailed elsewhere in this Complaint, defendants engaged in a fraudulent scheme to deceive the market.  The scheme included a course of conduct that artificially inflated Nash Finch's stock price and operated as a fraud or deceit on Class Period purchasers of Nash Finch securities.  Defendants misrepresented and concealed the true impact of the acquired distribution centers on the Company's financial results.  They concealed numerous problems with the integration of the acquired distribution centers that caused a substantial reduction in revenues and earnings and falsely represented (1) the acquired distribution centers represented approximately $1.0 billion in annual food distribution sales, (2) the acquisition would be immediately accretive to F05 EPS and (3) the integration of the distribution centers was proceeding according to plan.  In addition, defendants Marshall and McDermott sold more than $13 million of their Nash Finch stock and then suddenly and unexpectedly resigned from the Company, prompting investigations by the Company and the SEC.

180.   Defendants' false and misleading statements and omissions caused and maintained the artificial inflation in Nash Finch's stock price throughout the Class Period. The stock traded at artificially inflated prices throughout the Class Period reaching a Class Period high of $43.90 per share on August 3, 2005.  If defendants disclosed the true impact of the acquisition on the Company's financial results – as they did on 10/20/05 – the price of the Company's stock would have declined thereby removing the artificial price inflation.

181.   On October 20, 2005, defendants revealed the true impact of the acquisition on the Company's financial results which had been misrepresented and concealed during the

Class Period. The defendants disclosed the acquisition would not be immediately accretive to F05 EPS, by substantially reducing F05 EPS guidance from $3.70-$3.89 to $3.00-$3.25. Although defendants did not confess they were misrepresenting and concealing the true impact of the acquisition the Company's financial results during the Class Period, they acknowledged the substantial reduction in F05 EPS was "due to a decline in retail gross profit margins, primarily reflecting inadequate execution in pricing across the Company's retail operations; depressed wholesale gross profit margins principally relating to manufacturer promotional spending; and higher than expected acquisition integration costs." In addition, the Company stated that "the acquisition of the Westville, Indiana and Lima, Ohio divisions earlier in the year resulted in a lack of focus in our core business" and that it had "experienced serious erosion in retail and wholesale gross profit margins, based on issues that we had thought were readily resolvable" but that "the impact has been deeper than we anticipated and margins will take longer to rebound than we had thought." As detailed in §VII, the defendants continued to acknowledge the cause of the problems when the Company reported 3Q05 results on 11/10/05, 4Q05 and F05 results on 3/6/06 and 1Q06 results on 4/27/06.

182.    On October 21, 2005, the stock price plummeted 28.6% or $12.11 per share to $30.23 per share on trading volume of over 1.9 million shares, ***over 21 times*** the previous day's trading volume of only 87,744. Because the 10/20/05 disclosures revealed the true impact of the acquisition on the Company's financial condition which had been misrepresented and concealed by defendants during the Class Period, the decline in Nash

Finch's stock price removed the artificial inflation and provides a measure of the economic damages that were caused by defendants' fraudulent scheme.

183.   The timing and magnitude of the decline in Nash Finch's stock price on 10/21/05 negate any inference the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to defendants' fraudulent conduct.   On October 21, 2005, the day Nash Finch's revelations caused the stock to drop by 28%, the SML Index gained 0.8%, and the Peer Group gained 1.1%.[3]   Thus, the economic loss, *i.e.*, damages, suffered by lead plaintiffs and other members of the class, was a direct and proximate result of defendants' fraudulent scheme.   The following chart (also attached hereto as Ex. B) illustrates the changes in Nash Finch's stock price during and after the Class Period compared to the SML Index and the Peer Group:

---

[3]      Nash Finch's 2005 proxy, filed on March 23, 2006, listed Nash Finch's peer group of companies as: SuperValu Inc. (SVU), Arden Group Inc. (ARDNA), Great Atlantic & Pacific Tea Co. Inc. (GAP), Ingles Markets Inc. (IMKTA), Pathmark Stores Inc. (PTMK), Ruddick Corporation (RDK), Smart & Final Inc. (SMF), Spartan Stores, Inc. (SPTN), United Natural Foods Inc. (UNFI), Weis Markets Inc (WMK) and Wild Oats Markets Inc. (OATS).



## IX.   CLASS ACTION ALLEGATIONS AND FRAUD ON THE MARKET PRESUMPTION OF RELIANCE

184.   Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Nash Finch common stock on the open market during the Class Period, and were damaged thereby (the "Class").  Excluded from the Class are defendants, directors and officers of Nash Finch and their families and affiliates.

185.   The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, there were 12.6 million to 13.3 million outstanding shares owned by hundreds if not thousands of persons.  Thus, the disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

186.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    whether the federal securities laws were violated by defendants;

(b)    whether defendants engaged in a fraudulent scheme and omitted and/or misrepresented material facts;

(c)    whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether defendants knew or recklessly disregarded that their statements were materially false and misleading;

(e)    whether the prices of Nash Finch common stock were artificially inflated;

(f)    whether defendants' fraudulent scheme, misrepresentations and omissions caused class members to suffer economic losses, *i.e.* damages; and

(g)    the extent of damage sustained by Class members and the appropriate measure of damages.

187.    Plaintiffs' claims are typical of those of the Class because plaintiffs and the Class purchased Nash Finch common stock during the Class Period and sustained damages from defendants' wrongful conduct.  Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation. Plaintiffs have no interests which conflict with those of the Class.

188.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  A class action will achieve economies of time, effort and expense and provide uniformity of decision to the similarly situated members of the Class without sacrificing procedural fairness or bringing about other undesirable results.  Class members have not indicated an interest in prosecuting separate actions as none have been filed.  The number of Class members and the relatively small amounts at stake for individual Class members make separate suits impracticable.   No difficulties are likely to be encountered in the management of this action as a class action.

189.    In addition, a class action is superior to other methods of fairly and efficiently adjudicating this controversy because the questions of law and fact common to the Class predominate over any questions affecting only individual Class members.   Although individual Class members have suffered disparate damages, the fraudulent scheme and the misrepresentations and omissions causing damages are common to all Class members. Further, there are no individual issues of reliance that could make this action unsuited for treatment as a class action because all Class members relied on the integrity of the market and are entitled to the fraud-on-the-market presumption of reliance.

190.    The market for Nash Finch's common stock was open, well-developed and efficient at all relevant times.  Nash Finch's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market.  As a regulated issuer, Nash Finch filed periodic public reports with the SEC and the NASDAQ. Nash Finch regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on

the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

191.   As alleged herein, the change in the price of Nash Finch's stock – compared to the changes in the SML Index (S&P Small Cap 600) and Nash Finch's peer group – in response to the release of unexpected material positive and negative information about the Company, shows there was a cause and effect relationship between the public release of the unexpected information about Nash Finch and the price movement in the Company's stock. The average weekly trading volume of Nash Finch's stock during the Class Period was approximately 955 thousand shares or 7.17% of total outstanding shares. Several analysts followed Nash Finch, attended the Company's conference calls and issued reports throughout the Class Period. The Company was eligible to – and did – register securities on Form S-3 during the Class Period. There were numerous market makers for Nash Finch's stock.

192.   As a result of the foregoing, the market for Nash Finch's common stock promptly digested current information regarding Nash Finch from all publicly available sources and reflected such information in Nash Finch's stock price.   Under these circumstances, all purchasers of Nash Finch common stock during the Class Period suffered similar injury through their purchase of Nash Finch common stock at artificially inflated prices and the subsequent revelations concerning declines in price, and a presumption of reliance applies.

## X.      NO SAFE HARBOR

193.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this Complaint.  The specific statements pled herein were not "forward-looking statements" when made, nor were they adequately identified as such.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the defendants knew that the particular forward-looking statement was false when made.

### FIRST CLAIM FOR RELIEF

### For Violation of Section 10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

194.    Plaintiffs incorporate all paragraphs as if set forth herein.

195.    During the Class Period, defendants participated in a scheme to defraud including the dissemination or approval of the false statements specified above, which they knew or recklessly disregarded were materially false and misleading because they contained material misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

196.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 because they:

(a)      Employed devices, schemes and artifices to defraud;

- 106 -

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Nash Finch common stock during the Class Period.

197.   Plaintiffs and the Class have suffered damages because they relied on the integrity of the market and paid artificially inflated prices for Nash Finch common stock. Plaintiffs and the Class would not have purchased Nash Finch common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' participation in the fraudulent scheme.

198.   As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Nash Finch common stock during the Class Period.

## SECOND CLAIM FOR RELIEF

### For Violation of Section 20(a) of the 1934 Act
### Against All the Individual Defendants

199.   Plaintiffs incorporate all paragraphs as if set forth herein.

200.   The Individual Defendants acted as controlling persons of Nash Finch within the meaning of §20(a) of the 1934 Act.  By reason of their positions as officers and/or directors of Nash Finch, and their ownership of Nash Finch stock, the Individual Defendants had the power and authority to cause Nash Finch to engage in the wrongful conduct complained of herein.  Each of the Individual Defendants had direct and supervisory

involvement in the day-to-day operations of the Company and are therefore presumed to have the power to control or influence the conduct giving rise to the violations of the federal securities laws alleged herein, and exercised the same. They prepared, or were responsible for preparing, the Company's press releases and Marshall and Stewart made statements during the Company's conference calls that were also attended by defendant McDermott. Nash Finch controlled each of the Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief and judgment, including preliminary and permanent injunctive relief, as follows:

A.  Determining that this action is a proper class action, and certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.  Awarding preliminary and permanent injunctive relief in favor of Lead Plaintiff and the Class against defendants and their counsel, agents and all persons acting under, in concert with or for them, including an accounting of and the imposition of a constructive trust and/or an asset freeze on defendants' insider trading proceeds;

C.  Ordering an accounting of defendants' insider-trading proceeds;

D.  Disgorgement of defendants' insider-trading proceeds;

E.  Restitution of investors' monies of which they were defrauded;

F.  Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

G.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

H.      Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED:  June 30, 2006                    LERACH COUGHLIN STOIA GELLER
                                            RUDMAN & ROBBINS LLP
                                         REED R. KATHREIN
                                         CHRISTOPHER P. SEEFER
                                         CONNIE M. CHEUNG
                                         JAMES W. OLIVER


                                         _____
                                                      /s/
                                         CHRISTOPHER P. SEEFER

                                         100 Pine Street, Suite 2600
                                         San Francisco, CA  94111
                                         Telephone:  415/288-4545
                                         415/288-4534 (fax)

                                         Lead Counsel for Plaintiffs

                                         REINHARDT WENDORF & BLANCHFIELD
                                         GARRETT D. BLANCHFIELD, JR. (#209855)
                                         E-1250 First National Bank Building
                                         332 Minnesota Street
                                         St. Paul, MN  55101
                                         Telephone:  651/287-2100
                                         651/287-2103 (fax)

                                         Liaison Counsel

CAVANAGH O'HARA
WILLIAM K. CAVANAGH, JR.
407 East Adams Street
Springfield, IL  62605
Telephone:  217/544-1771
217/544-9894 (fax)

Additional Counsel for Plaintiff

T:\CasesSF\Nash Finch\CPT00031956.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 30, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I further certify that I caused this document to be forwarded to the following designated Internet site at:  http://securities.lerachlaw.com/.

            /s/
            CHRISTOPHER P. SEEFER

            LERACH COUGHLIN STOIA GELLER
              RUDMAN & ROBBINS LLP
            100 Pine Street, 26th Floor
            San Francisco, CA  94111
            Telephone:  415/288-4545
            415/288-4534 (fax)
            E-mail:chriss@lerachlaw.com

# Mailing Information for a Case 0:05-cv-02934-ADM-AJB

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Garrett D Blanchfield, Jr**
  g.blanchfield@rwblawfirm.com k.schulte@rwblawfirm.com

- **Michael J Bleck**
  mbleck@oppenheimer.com kpeterson@oppenheimer.com

- **Gregg M Fishbein**
  gmfishbein@locklaw.com crbaehman@locklaw.com,ssmcneill@locklaw.com

- **Heidi A O Fisher**
  hfisher@oppenheimer.com janderson@oppenheimer.com

- **Bernard J Garbutt, III**
  bgarbutt@morganlewis.com

- **Andrew S Hansen**
  ahansen@oppenheimer.com kjorges@oppenheimer.com

- **Lawrence R King**
  lking@larsonking.com lburks@larsonking.com

- **Mark D Knoll**
  mknoll@morganlewis.com

- **Richard A Lockridge**
  lockrra@locklaw.com emmonrm@locklaw.com

- **Gregory J Myers**
  myersgj@locklaw.com hansoja@locklaw.com

- **Karen Pieslak Pohlmann**
  kpohlmann@morganlewis.com

- **Nathan D Prosser**
  ndprosser@locklaw.com

- **Christopher P Seefer**
  chriss@lerachlaw.com

- **Marc J Sonnenfeld**
  msonnenfeld@morganlewis.com

- **David M Wilk**

dwilk@larsonking.com jrobertson@larsonking.com;mburns@larsonking.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Connie-NA M Cheung**
Not Admitted

**Reed- NA R Kathrein**
Not Admitted

**James-NA W Oliver**
Not Admitted

**Michael-NA A Swick**
Not Admitted