# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

In re Nash Finch Co. Securities
Litigation.

**MEMORANDUM OPINION
AND ORDER**
Civ. No. 05-2934 ADM/AJB

_____

Christopher P. Seefer, Esq., Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San
Francisco, CA; and Garrett D. Blanchfield, Jr., Esq., Reinhardt, Wendorf & Blanchfield, St.
Paul, MN, on behalf of Plaintiffs.

Marc J. Sonnenfeld, Esq. and Karen Pieslak Pohlmann, Esq., Morgan, Lewis & Bockius LLP,
Philadelphia, PA; and David M. Wilk, Esq., Larson • King, LLP, St. Paul, MN, on behalf of
Defendants.

_____

## I. INTRODUCTION

On January 17, 2007, oral argument before the undersigned United States District Judge

was heard on Defendants Nash Finch Company ("Nash Finch" or "the Company"), Ron

Marshall ("Marshall"), LeAnn Stewart ("Stewart"), and Kathleen McDermott's ("McDermott")

(collectively, "Defendants") Motion to Dismiss [Docket No. 37]. In its Consolidated Complaint

("Complaint") [Docket No. 32], Lead Plaintiff Central Laborers' Pension Fund ("Plaintiff")

alleges claims for securities fraud, on behalf of all persons who purchased the common stock of

Nash Finch between February 24, 2005 and October 20, 2005. For the reasons set forth herein,

Defendants' Motion is denied.

## II. BACKGROUND

### A.      Parties

Central Laborers' Pension fund is the court appointed Lead Plaintiff on behalf of all

persons who purchased the common stock of Nash Finch between February 24, 2005 and

October 20, 2005. Compl. ¶ 24. Nash Finch is a food distribution and retail company. Id. ¶ 25.

Ron Marshall ("Marshall") is a former director and Chief Executive Officer ("CEO") of Nash

Finch. Id. ¶ 26. LeAnn Stewart is Nash Finch's former Senior Vice President and Chief

Financial Officer ("CFO"). Id. ¶ 29. Kathleen McDermott is a former Senior Vice President,

Secretary, and General Counsel of Nash Finch. Id. ¶ 30.

**B.     Statements**

This lawsuit largely stems from events surrounding the February 24, 2005, Nash Finch

announcement of acquisition of two food distribution centers in Westville, Indiana, and Lima,

Ohio, from Roundy's Supermarkets, Inc. ("Roundy's"). Id. ¶¶ 2, 59. The closing documents for

the acquisition were signed on March 31, 2005. Id. ¶ 59. In its 110-page Consolidated

Complaint, Plaintiff alleges that Defendants participated in a scheme to defraud class members

by making materially false and misleading statements and omissions in violation of Sections

10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and

Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Id. ¶ 1. Plaintiff alleges that

Defendants defrauded class members by falsely representing throughout the Class Period that the

two acquired distribution centers represented approximately $1 billion in annual food

distribution sales, that the acquisition would be immediately accretive to earnings by improving

operating earnings by $31-$33 million and increasing F05 earnings per share by $0.30-$0.34,

and that the integration was going smoothly. Id. ¶¶ 3-4, 59. Plaintiff contends Defendants made

the alleged misrepresentations in the following instances: (1) the 2/24/05 press release

announcing the acquisition, Compl. ¶¶ 141-42; (2) the 3/2/05 press release reporting 4Q04 and

F04 results, Compl. ¶ 143; (3) the 3/3/05 conference call to shareholders, Compl. ¶¶ 144-46; (4)

the 4/21/05 press release reporting 1Q05 results, Compl. ¶ 149; (5) the 4/21/05 conference call,

2

Compl. ¶¶ 150-52; (6) the 7/21/05 press release reporting 2Q05 results, Compl. ¶ 155; and (7)

the 7/21/05 conference call, Compl. ¶¶ 156-57.  Id. ¶ 3.  Defendants contend that each of the

identified statements is accompanied by cautionary language.

### 1.    February Statements

On February 24, 2005, Nash Finch issued a press release ("February press release")

announcing the acquisition of two of Roundy's wholesale food distribution divisions in

Westville, Indiana, and Lima, Ohio, and two of Roundy's retail stores in Ironton and Van Wert,

Ohio.  Wilk Aff. [Docket No. 40] Ex. 2.  Plaintiff avers the following language from the press

release was false and misleading:[1]

> The Westville and Lima Divisions to be acquired represent approximately $1.0 billion in
> annual food distribution sales . . . .
>
> ***
>
> The Company expects that the acquisition will be immediately accretive to earnings.
> Specifically, depending on the timing and nature of its integration process, the Company
> believes that as a result of the acquisition operating earnings will improve by
> approximately $31 to $33 million, net of implementation costs of approximately $3
> million, during the twelve months following closing of the transaction.

Compl. ¶ 141; Wilk Aff. Ex 2.  The February press release contained the following cautionary

language:

> The impact on earnings per share will depend upon the nature and cost of the related
> financing, as well as the purchase accounting allocations and related amortization.
>
> ***

---

[1] In its Complaint, Plaintiff quotes passages from the press releases and the conference
calls, and highlights some portions of those quoted passages in bold-face type.  In this Order, in
restating the alleged false statements, the Court reproduces primarily the bolded portions from
Plaintiff's quotations.

> The statements in this release that refer to anticipated financial results, improvements, plans and developments are forward-looking statements based on current expectations and assumptions, and entail risks and uncertainties that could cause actual results to differ materially from those expressed in such forward-looking statements. Important factors that could cause material differences include the Company's ability to conclude the acquisition of the two distribution centers within the expected time frame and on favorable financing terms; the Company's ability to successfully integrate into its business the distribution centers to be acquired; the effect of competition on the Company's distribution and retail businesses; general economic conditions; credit risk from financial accommodations extended to customers; changes in consumer spending and buying patterns; limitations on financial and operating flexibility due to debt levels and debt instrument covenants; and other cautionary factors discussed in the Company's periodic reports filed with the SEC.

Defs.' Mem. of Law in Supp. [Docket No. 39] at 8; Wilk Aff. Ex. 2.

### 2.    March Statements

On March 2, 2005, Nash Finch issued a press release ("March press release") that again discussed the acquisitions, and included the same challenged statements from the February press release, along with the following additional, challenged statements:

> This estimate includes a portion of the more than $8 million in annual synergies expected to be realized over several years.

> ***

> The company estimates that its diluted earnings per share for fiscal 2005 will range between $3.40 and $3.55 before the accretive effect of the acquisition discussed above.

> ***

> In addition, the Company anticipates some margin improvement across all segments as we continue to focus on productivity efficiencies.

Compl. ¶ 143; Wilk Aff. Ex. 4. The March press release also repeated the cautionary language of the February press release, and added as potential specific risk factors:

> [T]he Company's ability to identify and execute plans to maximize the value of its remaining retail operations and to expand wholesale operations; . . . the success or failure of new business ventures and initiatives; . . . risks entailed by expansion, affiliations and

> acquisitions; . . . possible changes to the military commissary system; adverse determinations or developments with respect to litigation, other legal proceedings or the SEC investigation; . . . .

Wilk Aff. Ex. 4.  On March 3, 2005, a conference call ("March call")[2] in which Marshall, Stewart, and McDermott participated was held to discuss the acquisition.  Wilk Aff. Ex. 6. Plaintiff avers that Marshall repeated the misrepresentations contained in the February and March press releases, and made these additional misleading statements in response to questions from analysts during the conference call:

> As it relates to Roundy's, you are right; the margins of that business are below the margins that we enjoy in our regular food distribution business, and we think that there are significant opportunities to improve that through enhanced productivity.  You know, we are comfortable with the numbers that we have provided in terms of prospective synergies. . . . [W]e are always very cautious about the sort of numbers that we release on these sorts of matters. . . . We want to make sure that we're very cautious in the guidance that we give.  We're going to work very hard to exceed those numbers and our guys are very, very good.
>
> ***
>
> In our core businesses, we still believe there are opportunities for efficiencies to be gained.

Compl. ¶¶ 144-46; Wilk Aff. Ex. 6.  Defendants aver the following cautionary statements were made during the conference call:

> The Company has asked me to advise you that this call will include forward-looking statements which involve risks and uncertainties that could cause actual results to differ materially from those expressed in the forward-looking statements.  Factors that could cause such differences are described in the Nash Finch press release and the Company's filings with the SEC.

Wilk Aff. Ex. 6.  Defendants argue Marshall qualified his belief statements: "Depending on how quickly the expected benefits are realized and how expensive the integration is, . . . ."  Id.

---

[2] The March press release and March call are collectively the "March Statements."

Defendants also aver that the March Statements referenced Nash Finch's SEC reports, and that those reports included additional cautionary language.  Nash Finch's March 2, 2005 Form 10-K states in relevant part:

> Efforts to grow our distribution businesses may include acquisitions.  Acquisitions entail various risks such as identifying suitable candidates at acceptable rates of return, timely and effectively integrating the operations, systems and personnel of the acquired business, retaining the customer base of the acquired operations, expenses of any undisclosed or potential environmental or legal liabilities and diversion of management's time and attention from other business concerns.  Successful integration of any new operations will depend on our ability to manage those operations, realize opportunities for revenue growth presented by strengthened product offerings and expanded geographic market coverage, maintenance of the customer base and, to some degree, eliminate redundant and excess costs.  A failure to effectively manage these risks could increase the costs or reduce the benefits to be derived from acquisitions and expansion, and therefore negatively impact our business and operations.

Wilk Aff. Ex. 5 at 31.

### 3.      April Statements

On April 21, 2005, Nash Finch issued a press release ("April press release") which repeated some of the allegedly false or misleading statements from earlier press releases, including that "The Westville and Lima Divisions represent approximately $1.0 billion in annual food distribution sales," and "The Company expects the acquisition will be immediately accretive to earnings."  Compl. ¶ 149; Wilk Aff. Ex. 8.  The press release also included the following challenged statements:

> "The acquisition is a key element of our Food Distribution strategy," said Ron Marshall.  "We gain successful customers with a proven track record within their market areas as well as the opportunity to expand marketing and merchandising programs across our network."
>
> ***
>
> The Company is reaffirming its earnings guidance range of between $3.40 and $3.55 in diluted earnings per share for fiscal 2005 before the accretive effect of the acquisition

discussed above.

Compl. ¶ 149; Wilk Aff. Ex. 8.  The April press release also included cautionary language nearly

identical to the cautionary language in the February and March press releases, except for adding

other potential risk factors: "[T]he Company's ability to . . . retain the customers of those

distribution centers; . . . the Company's ability to successfully execute plans to improve retail

operations and to expand wholesale operations."  Wilk Aff. Ex. 8.

The Company also held a conference call on April 21, 2005 ("April call").[3]  Marshall

repeated some of the allegedly false or misleading statements that were made in the March

conference call:

> The acquired assets represent approximately $1 billion in annual sales from
> approximately 500 stores in Indiana, Illinois, Ohio and Michigan markets, which are a
> great fit with our existing distribution network.  Our integration plan is proceeding on
> schedule.  We expect that this acquisition will increase EBITDA by as much as $33
> million net of integration costs during the first 12 months of operation.
>
> ***
>
> As a result of all of these factors, we are clearly very optimistic about the prospects for
> our company for the remainder of 2005 and beyond.  Leaving aside the effect of the
> acquisition, which will be immediately accretive to earnings, our outlook for 2005 is
> unchanged.  We continue to estimate that diluted earnings per share will range between
> $3.40 and $3.55.

Compl. ¶ 150; Wilk Aff. Ex. 9.  Also, in response to an analyst question regarding integration,

Marshall stated:

> The integration plan, Meredith, really extends over a year and there are several elements.
> Obviously, the earliest elements are just making sure that they're plugged into our
> accounting and merchandising and payroll systems here.  That's already been done.
>
> The second step of integration, and the one that has the most visibility with our

---

[3] The April press release and the April call are collectively the "April statements."

customers, is the implementation of the Our Family private label brand into the stores and new customers. That is happening as we speak and, in fact, on March 30th, the day before closing, we had trailers stacked up in the yards of these two distribution centers still with Our Family product. That process will occur in two steps. The first step is an immediate one that should be finished by the end of June, which is replacing like for like items, replacing around these private label items with an Our Family Nash item.

The next step after that, which will be completed by the end of the year, is fully integrating the Nash line. The Nash private label line is both broader and a deeper line than the Roundy's line in those two houses. So that'll take place over the course of the year.

As we go forward, we're going to be expanding our general merchandise and health and beauty care operations in that part of the world that will allow us to acquire some additional volume. That's factored into the synergies. That, too, should be finished this year. As part of that, there'll be some rebalancing of customers and rebalancing of our distribution networks.

There's nothing that's particularly heavy lifting here. There's just a lot of it. We need to be very organized and disciplined about these things and I'm really comfortable this thing's going to move forward gracefully.

Compl. ¶ 151; Wilk Aff. Ex. 9. When asked whether Nash Finch's new customers were

comfortable with the new private label and the new management/ownership, Marshall

responded:

Yes, we really believe they are. And the customer base has been exceptionally supportive.

*** 

So, we've worked very, very hard to make sure that the comfort level of these customers is very high and I think they all appreciate that Nash is a company that better aligns their strategic interests than perhaps other companies and that particularly the Our Family product, once they've gone through the inconvenience of the transition, will be a very strong positive for them.

Compl. ¶ 151; Wilk Aff. Ex. 9. Marshall's response to whether Roundy's was taking up all of

his time was:

Well, you're clearly right now, Roundy's is taking a lot of our time, both from a

8

management perspective and financial perspective.  I think there is a relatively short
period of adjustment that we need to go through here.  I think it is a relatively short
period.  As I said earlier in response to a question, we tend to handle these things fairly
gracefully, and I think we'll be through the heavy lifting really within a couple of
months, and as opportunities arise we'll clearly look at them.

Compl. ¶ 152; Wilk Aff. Ex. 9.  In the April call, the same cautionary language from the March

call was repeated, and Defendants aver Marshall made additional cautionary statements, such as

"we cannot, at this time, provide guidance on how this acquisition will affect the company's

earnings per share."  Wilk Aff. Ex. 9.

### 4.    July Statements

On July 21, 2005, Nash Finch issued a press release ("July press release") which included

these comments about the acquisition:

"Integration of the Lima and Westville operations is proceeding according to plan," said
Ron Marshall, Chief Executive Officer.  "While we expected integration costs to affect
food distribution margins in the short term, as occurred during the second quarter, we did
not fully appreciate the degree to which the demands of integrating a significant
acquisition would divert attention from daily operations and affect our day to day
execution.  Given the front-end loading of the integration costs and the steps we have
taken to improve execution, we expect operating margins in this segment to rebound as
we begin to realize the synergies inherent in this acquisition.

***

The Company expects that the acquisition of the distribution centers will add
approximately $0.30 to $0.34 to its previously disclosed pre-acquisition estimate that
2005 diluted earnings per share would range between $3.40 and $3.55.  As a result, the
Company now estimates that its diluted earnings per share for fiscal 2005 will range
between $3.70 and $3.89.

Compl. ¶ 155; Wilk Aff. Ex. 10.  The press release also included a paragraph of cautionary

language relating potential risk factors, nearly identical to the cautionary language recited in

previous press releases, and added these cautions: "[T]he ability to increase growth and

profitability of our distribution business; . . . changes in consumer spending, buying patterns or

9

food safety concerns; unanticipated problems with product procurement."  Wilk Aff. Ex. 10.

In the July 21, 2005 conference call ("July call"),[4] Stewart stated, "As Ron observed, we are generally pleased with the progress we made during the quarter in integrating these operations into ours and continue to be confident about the possibilities the acquisition presents for us."  Compl. ¶ 156; Wilk Aff. Ex. 11.  Marshall made the following challenged statements during the call:

> Integration of the Lima and Westville distribution centers is proceeding on schedule.  While the initial marketing integration of the acquired division didn't go as well as I would have liked, operational, logistical, and technical integration have gone very smoothly and ahead of schedule in many respects.  We are already seeing improvements in customer service and satisfaction that we knew that we could bring to the businesses.  As we said earlier, these centers fit very well within our existing distribution network and they present a number of unique opportunities to expand our distribution business, increase efficiencies, and improve customer service.
>
> ***
>
> Although food distribution certainly had a good quarter, it should have been, and it will be, better.  We could have done a much better job in the early stages of integration, planning, and organizing the transition.  While these issues were invisible to our customers, they did affect margins.  In addition, the shifting of resources to integrate the acquisition certainly made us less aggressive in managing our core business.
>
> We are fully focused on making necessary improvements and we expect margins to rebound, as spending to integrate the acquired business decreases and as we begin to realize the synergies inherent in the acquisition
>
> ***
>
> In summary, we remain confident about our ability to capitalize on all of the opportunities our Westville-Lima acquisition presents.  We were reminded in the second quarter that any acquisition, especially one as significant as this, also entails some short-term costs beyond the initial purchase price.  Some, like the cost of integrating information technology systems, were very quantifiable and easy to budget.  Others, like the diversion of management attention from day-to-day operations as they focus on the

---

[4] The July press release and the July call are collectively the "July statements."

task of integration, are far less quantifiable post-acquisition impacts. Fortunately, with the integration plan back on track and the steps we are taking to restore focus and improve execution, this will not be a continuing issue

We continue to be very optimistic about the prospects for our Company for the remainder of 2005 and beyond. We still expect that our pre-acquisition business will perform in line with earlier guidance for the year and that the acquisition will increasingly be accretive to earnings. As a result, we estimate that diluted earnings per share for the Company, as a whole, will range between $3.70 and $3.89 for 2005.

Compl. ¶ 156; Wilk Aff. Ex. 11. In response to a question about customer retention, Marshall

stated:

I'll tell you, Gary, as we focus on this integration, the 2 areas that I focused personally on were customer retention and private label integration, moving out the old Roundy's private label and moving in the new Our Family line. And I'm happy to report to you that I'm very pleased, very pleased with the results of both.

As you can imagine, the moment we announced the acquisition, every wholesaler in the Midwest began to call on these customers. The result of all of that activity, Gary, is we lost one $15,000 a week retailer. One $15,000 a week retailer. Now, I think that is a fabulous result.

As it relates to our private label integration, it's gone very, very well. The quality of the Our Family brand I think is selling itself, not only to our retailers but to their customers. And the overall level of service that these customers are getting today I think, and they tell me, is much, much higher than they had been experiencing for years. So I think it's going great.

Compl. ¶ 157; Wilk Aff. Ex. 11. The July call contained the same general caution about

forward-looking statements from the previous conference calls, as well as other language that

Defendants argue is cautionary.

**C.   Facts Making Defendants' Statements False**

Plaintiff alleges that Defendants knew their positive representations about the acquisition

and integration were materially false and misleading. Compl. ¶ 6. In the four quarters following

the acquisition, the acquired distribution centers generated twenty percent less in revenue than

Defendants told investors to expect.  Id. ¶¶ 6, 60.  Also, F05 earnings per share of $3.13 were substantially less than the $3.70-$3.89 Nash Finch told investors to expect.  Id. ¶¶ 6, 61, 163.  Plaintiff contends that after the Class Period, Defendants admitted the lower distribution revenues and earnings per share were caused by previously undisclosed problems with Nash Finch's vendor promotion programs and higher than expected integration costs.  Id. ¶¶ 7, 62, 163.  Plaintiff contends that Defendants knew but did not disclose these problems during the class period.  Id.  Specifically, Plaintiff alleges Defendants knew of the shortfall in earnings and problems with integration caused by (1) the discontinuation of Roundy's improper advertising billing practices, Compl. ¶¶ 63-66; (2) the imposition of a new administrative fee on vendors, Compl. ¶¶ 67-69; (3) the discontinuation of diversion buying, Compl. ¶¶ 71-72; (4) the cancellation or reduction of promotions offered by Nash Finch's vendors and a shortfall in projected vendor promotion earnings, Compl. ¶¶ 69-70, 73-83; (5) the decline in slotting allowance income, Compl. ¶¶ 84-88; (6) the failure to timely process invoices; Compl. ¶¶ 89-92; (7) the loss of customers, Compl. ¶¶ 97-107; (8) the failure of network rationalization, Compl. ¶¶ 108-10; (9) the problems with integrating accounting systems, Compl. ¶¶ 111-20; and (10) the failure to advertise price reductions, Compl. ¶¶ 126-31.  Plaintiff's allegations are based in part on information provided by fourteen confidential witnesses ("CW") who are former Nash Finch employees.  Compl. ¶¶ 34-48.

**D.    Insider Trading**

Plaintiff argues Defendants artificially inflated Nash Finch stock prices by concealing the problems with the integration and falsely representing the acquisition would improve Nash Finch's financial results.  Id. ¶ 17.  During the Class Period, Marshall sold 325,000 shares of

Nash Finch stock for $12.9 million, and McDermott sold 9,000 shares of Nash Finch stock for $364,860.  Id. ¶¶ 27, 31, 132-33.  Plaintiff alleges that the timing and volume of the sales by Marshall and McDermott are suspicious.  Id. ¶¶ 134-35.  On October 20, 2005, Nash Finch issued a press release announcing the shortfall in earnings and identifying the specific problems causing the shortfall.  Id. ¶ 18.  After the press release issued, Nash Finch's stock price declined 28.6%.  Id. ¶¶ 18, 62, 163.  On February 16, 2006, Nash Finch issued a press release announcing the immediate resignations of Marshall and McDermott, and that it had voluntarily contacted the SEC to discuss the results of an internal review of trading in Nash Finch's stock by certain officers and directors during 2005.  Id. ¶¶ 26, 30, 138, 177.  The internal review was initiated after an informal inquiry from the SEC.  Id.

## III. DISCUSSION

### A.    Motion to Dismiss Standard

Rule 12 of the Federal Rules of Civil Procedure provides that a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. Pro. 12(b)(6).  In considering a motion to dismiss, the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true. Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994); Ossman v. Diana Corp., 825 F. Supp. 870, 879-80 (D. Minn. 1993).  Any ambiguities concerning the sufficiency of the claims must be resolved in favor of the nonmoving party.  Ossman, 825 F. Supp. at 880.  "A motion to dismiss should be granted as a practical matter . . . only in the unusual case in which the plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief."  Frey v. City of Herculaneum, 44 F.3d 667, 671 (8th Cir. 1995).

Although the facts alleged in the complaint are taken as true, the Private Securities

Litigation Reform Act ("PSLRA" or "Reform Act"), requires the court to "disregard catch-all or

blanket assertions that do not live up to the particularity requirements of the statute." In re

Amdocs Ltd. Sec. Litig., 390 F.3d 542, 547 (8th Cir. 2004).  Also, although "the plaintiff is

entitled to all reasonable inferences, the Reform Act requires a securities fraud claim to plead

allegations that collectively add up to a strong inference of scienter." Id.

**B.    Securities Litigation Standard**

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5

promulgated thereunder, 17 C.F.R. § 240.10b-5, make it unlawful to use any manipulative or

deceptive device or contrivance in connection with the purchase or sale of securities.  Rule 10b-5

further makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a

material fact necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  Section 20(a) of the

Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), extends liability under § 10(b) and Rule

10b-5 to "controlling persons."  In re Navarre Corp. Sec. Litig., 299 F.3d 735, 741 (8th Cir.

2002).  To proceed on claims under § 10(b) and Rule 10b-5, four elements must be established:

> (1) misrepresentations or omissions of material fact or acts that operated as a fraud or
> deceit in violation of the rule; (2) causation, often analyzed in terms of materiality and
> reliance; (3) scienter on the part of the defendants; and (4) economic harm caused by the
> fraudulent activity occurring in connection with the purchase and sale of a security.

In re K-Tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 888 (8th Cir. 2002).

The PSLRA, 15 U.S.C. § 78u-4(b), enacted "to remedy perceived abuses in securities

class action litigation," creates a heightened pleading standard in securities fraud actions.  Yellen

v. Hake, 437 F. Supp. 2d 941, 949 (S.D. Iowa 2006).  Specifically, the PSLRA requires that in

14

any private action where the defendant is alleged to have made an untrue statement of a material fact or omitted to state a material fact necessary to make statements made not misleading, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  The PSLRA also requires the plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  The required state of mind is scienter.  <u>Amdocs</u>, 390 F.3d at 547 n.3.[5]

## C.     Safe Harbor

Defendants argue for safe harbor protection of most of the alleged misleading statements because the statements were forward-looking, identified as such when made, relate to Nash Finch's predicted earnings or operations following the acquisition, and are accompanied by meaningful cautionary language.  Plaintiff responds that some of the identified statements are not forward-looking because they concern historical or current facts.  For statements that are forward-looking, Plaintiff argues they either do not include meaningful cautionary language, or they were knowingly false when made and therefore can not be protected by the safe harbor.

The safe harbor provision of the PSLRA protects forward-looking statements if (1) they are identified as such, and are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-

_____

[5] "Prior to the enactment of the PSLRA, pleadings were evaluated under Federal Rule of Civil Procedure 9(b) for particularity." <u>Navarre</u>, 299 F.3d at 742.  The PSLRA supercedes and embodies the standards of Rule 9(b). <u>Id.</u>

looking statement;" or (2) they are "immaterial." 15 U.S.C. § 78u-5(c)(1)(A). Forward-looking statements are also protected if (1) made by a natural person, and the plaintiff fails to prove that the forward-looking statement "was made with actual knowledge by that person that the statement was false or misleading," or (2) made by a business entity, and the plaintiff fails to prove that the forward-looking statement was "made by or with the approval of an executive officer of that entity" who had actual knowledge "that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B). The definition of "forward-looking statement" includes: (1) "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;" (2) "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;" (3) "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;" and (4) "any statement of the assumptions underlying or relating to any statement described in" (1)-(3). 15 U.S.C. § 78u-5(i)(1)(A)-(D). Meaningful cautionary language is "'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." Southland Sec. Corp. v. Inspire Ins. Solutions, Inc., 365 F.3d 353, 372 (5th Cir. 2004).

Some statements identified by Defendants are forward-looking because they are statements of projected earnings and future economic performance, statements of management's plans for future operations, or assumptions underlying such statements. For example, the

following statements are forward-looking: (1) "The Westville and Lima Divisions to be acquired

represent approximately $1.0 billion in annual food distribution sales,"[6] Compl. ¶ 141, 143-44,

149-50, (2) "The Company *expects*[7] that the acquisition *will* be immediately accretive to

earnings," Compl. ¶¶ 141, 143-44, 149-50, (3) "the Company *believes* that as a result of the

acquisition operating earnings *will* improve by approximately $31 to $33 million," Compl. ¶¶

141, 143-44, 149-50, (4) "The Company *estimates* that its diluted earnings per share for fiscal

2005 *will* range between $3.40 and $3.55 before the accretive effect of the acquisition," Compl.

¶¶ 143-44, 149-50 (5) "[T]he Company *anticipates* some margin improvement across all

segments," Compl. ¶ 144, (6) "[W]e still *believe* there are opportunities for efficiencies to be

---

[6] Whether this is a forward-looking statement or a statement of present fact is arguable. Defendants allege that Plaintiff has not sufficiently pled that the present fact statement "[t]he acquired assets represent approximately $1 billion in annual sales" is false, and that SEC filings indicate that the acquired distribution centers generated approximately $950 million in sales in 2004. Thus, as a present fact statement, this statement appears true. However, Plaintiff primarily treats this statement as a forward-looking statement, in the sense that the distribution centers generated $1 billion in sales in the past and will do so again in the future. In paragraph 96 of its Complaint, Plaintiff states:

> As alleged above, Nash Finch reported $800 million of sales revenues from the Westville and Lima distribution centers in the four quarters following the acquisition (2Q05-1Q06) which was $200 million or 20% less than the $1 billion they told investors to expect. According to CW11, the Company's budget to actual reports never projected $1 billion of sales from the Roundy's distribution centers and that level of sales was never discussed during the month-end meetings attended by Marshall, Stewart, CW11 and the other senior executives at the Company. According to CW11, $750-$800 million of revenues from the two distribution centers was reflected in the reports that were discussed during the monthly meetings.

The "represents approximately $1 billion" statement is susceptible of both a present fact and forward-looking interpretation. Because Plaintiff treats it as a forward-looking statement, the Court will treat it as a forward-looking statement for purposes of this Motion.

[7] All emphasis in italics is added by the Court.

gained," Compl. ¶ 146, (7) "[W]e *expect* operating margins in this segment to rebound," Compl. ¶ 155, (8) "The Company *expects* that the acquisition of the distribution centers will add approximately $0.30 to $0.34 to its previously disclosed pre-acquisition estimate . . . the Company now *estimates* that its diluted earnings per share for fiscal 2005 *will* range between $3.70 and $3.89," Compl. ¶ 155.

These forward-looking statements were accompanied by cautionary language that identified specific factors that could cause the actual results to differ materially from the projected results. A review of the cautionary language reveals that it is not boilerplate, and in fact, some of the specific potential risks identified eventually occurred. However, for the forward-looking statements to be protected by the safe harbor, the cautionary language must also be "meaningful."

Plaintiff asserts based on information from confidential witnesses, the individual Defendants' high-level positions within Nash Finch, and pre-acquisition due diligence, that Defendants knew or were reckless in not knowing that their positive statements about the acquisition were false and misleading when made. Compl. ¶ 148. Plaintiff alleges that defendants knew (1) earnings would decline due to the discontinuation of diversion buying, the discontinuation of improper advertising billing practices, and the decline in slotting allowances; (2) that Nash Finch was losing customers; and (3) that projected earnings from vendor promotions were not attainable. Id. Plaintiff argues that because Defendants knew or were reckless in not knowing that their forward-looking statements were false and misleading when made, the safe harbor does not apply. Defendants argue that under the first prong of the safe harbor, they are not liable for forward-looking statements that are accompanied by meaningful

18

cautionary language, regardless of their knowledge of the statements' truth or falsity.

The Eighth Circuit has not yet determined whether allegations of actual knowledge defeat the safe harbor when cautionary language is present.  This Court concludes that cautionary language can not be "meaningful" when defendants know that the potential risks they have identified have in fact already occurred, and that the positive statements they are making are false.  See In re SeeBeyond Techs. Corp. Sec. Litig., 266 F. Supp. 2d 1150, 1165 (C.D. Cal. 2003) ("If the forward-looking statement is made with actual knowledge that it is false or misleading, the accompanying cautionary language can only be meaningful if it either states the belief of the speaker that it is false or misleading or, at the very least, clearly articulates the reasons why it is false or misleading.").  Accordingly, if Defendants knew that the specific risks and uncertainties stated to be "potential" in their cautionary language had already been realized, and that their forward-looking statements were false or misleading, then their forward-looking statements are not protected by the safe harbor.

Defendants argue that even if actual knowledge defeats safe harbor protection, as found here, Plaintiff has also failed to plead actual knowledge with particularity.

**D.     Particularity**

The heightened pleading requirements of the PSLRA require the Plaintiff to, in its Complaint, "specify each false statement or misleading omission and explain why the omission was misleading."  Navarre, 299 F.3d at 742.  "Under the Reform Act, the circumstances of the fraud must be stated with particularity, including 'such matters as the time, place and contents of false representations, as well as, the identity of the person and what was obtained or given up thereby.  This means the who, what, when, where, and how.'"  K-Tel, 300 F.3d at 890 (citation

omitted).  Plaintiff must "plead the existence of . . . facts or further particularities that, if true, demonstrate that the defendants had access to, or knowledge of, information contradicting their public statements when they were made."  Navarre, 299 F.3d at 742.  "A plaintiff must set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading when made."  K-Tel, 300 F.3d at 891 (citations omitted).  Allegations that quote an individual and describe him generally but do not identify the individual by name nevertheless may still satisfy the PSLRA's particularity requirements.  See Fla. State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 667-68 (8th Cir. 2001).

### 1.      Confidential Witnesses

Defendants argue that allegations attributed to the CWs are not particularized and do not recite sufficient information to establish reliability.  In its Complaint, Plaintiff avers that:

> Several of the allegations included herein are based on information provided by several former Nash Finch employees referred to as confidential witnesses ("CW").  The information provided by the former employees is reliable and credible because (1) each of the witnesses worked at Nash Finch during the Class Period, (2) each witness stated they had personal knowledge of the information provided, (3) the witnesses' job titles and responsibilities show they had personal knowledge of the information provided, (4) many of the witnesses accounts corroborate one another and (5) the witness accounts are corroborated by other information alleged herein.

Compl. ¶ 34.  Plaintiff avers in paragraphs 35-48 the identity of the confidential witnesses by their positions within the Company and the information the confidential witnesses provided.  Id. ¶¶ 34-48.

Courts have held:

> [W]here plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false.  Moreover, even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the

position occupied by the source would possess the information alleged.

Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 146 (3d Cir. 2004) (citing Novak

v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000)).  "The Court can look to 'the level of the detail

provided by the confidential witnesses, the corroborative nature of the other facts alleged

(including from other sources), the coherence and plausibility of the allegations, the number of

sources, the reliability of the sources, and similar indicia.'"  In re Metawave Commc'ns Corp.

Sec. Litig., 298 F. Supp. 2d 1056, 1068 (W.D. Wash 2003) (citing In re Cabletron Sys., Inc., 311

F.3d 11, 29-30 (1st Cir. 2002)).

Plaintiff has described the CWs with sufficient particularity to support the probability

that persons in their job positions would possess the information alleged.  All of the CWs were

employed by Nash Finch or Roundy's during at least some portion of the class period.  Plaintiff

has described the CW's job titles and duties with particularity, as well as the information

possessed by the various CWs.  It is probable that the CWs would know, based on job title, job

description, and time period, about the various problems alleged.  Additionally, the CW's

accounts corroborate each other.

For example, CW1 was a marketing manager with job responsibilities including

structuring and implementing promotional programs for vendors at the Westville distribution

center until September 2005.  Compl. ¶ 35.  CW2 was an advertising manager at the Westville

distribution center until September 2005 and was responsible for developing and managing

advertising campaigns of products Nash Finch's vendors were promoting.  Id. ¶ 36.  CW4 was a

buyer's assistant who processed purchasing orders, inputted vendor promotions into a Company

database, and billed vendors for promotions at the Westville distribution center until March

21

2006.  Id. ¶ 38.  CW1, CW2, and CW4 would likely have reason to know, based on their job title, job description, and time period, about problems with discontinued advertising billing practices and resulting administrative fees, and problems with integrating the Westville distribution center.  Their information also corroborates one another.  Plaintiff has sufficiently met the PSLRA's requirements for confidential witnesses.  See In re Daou Sys., Inc., 411 F.3d 1006, 1016 (9th Cir. 2005).

> ### 2.    Actual Knowledge

Defendants argue Plaintiff fails to plead with particularity that Defendants had actual knowledge their forward-looking statements were false.  Specifically, Defendants argue Plaintiff failed to plead with particularity each of the alleged problems, the Defendants knowledge of the problems, and how the "aggregation of discrete problems" created an overall impact.  Plaintiff avers Defendants knew their positive statements regarding earnings and integration were materially false and misleading when made.  Specifically, Plaintiff avers Defendants knew their positive statements regarding earnings and integration were false because Defendants knew (1) the discontinuation of advertising billing practices reduced earnings, (2) the discontinuation of diversion buying would reduce earnings, (3) a projected increase in earnings from vendor promotions was unattainable, (4) earnings from slotting allowances were declining, (5) the loss of a large customer would reduce 2005 revenues by $20 million, and (6) the integration plan was not proceeding on schedule.  Compl. ¶ 154.  Plaintiff avers that Nash Finch maintained monthly reports that compared actual to budgeted results at the acquired distribution centers, other divisions within the Company, and in a roll-up report for the Company as a whole.  Id. ¶ 78.  The reports were discussed in monthly meetings attended by, among others, Marshall and Stewart.

Defendants allegedly learned of problems through the reports and at the meetings.  Id. ¶¶ 76-80, 84, 87-88, 96, 121, 123-24.

In paragraphs 63-66, Plaintiff alleges that Defendants knew about Roundy's improper advertising billing practices before the acquisition closed as a result of their pre-acquisition due diligence, and because the vice president of merchandising and marketing reported the improper practices to sales vice president Bob Dernbach and vice president of national accounts Gary Spinazze.  Id. ¶¶ 63-66.  Plaintiff also alleges that Roundy's improper practices were discontinued as soon as the acquisition was completed, which resulted in a $4-$5 million reduction in earnings at the Westville distribution center.  Id.  Plaintiff argues "[t]he only plausible and strong inferences to be drawn from these facts are that defendants reviewed the advertising contracts and discovered the terms were inconsistent with the amounts billed."  Pl.'s Opp'n Mem. [Docket No. 44] at 13.

In paragraphs 67-70, Plaintiff alleges that in June 2005, Nash Finch began charging an administrative fee to vendors in an attempt to recoup the lost earnings caused by the discontinuation of the improper advertising billing practices, but that the administrative fee had to be discontinued when vendors reacted negatively.  Plaintiff alleges through confidential witnesses that the amount of the new administrative fee was decided at the corporate level and was retroactively applied to all invoices received after April 2005.  Compl. ¶¶ 67-68.

In paragraphs 71-83, Plaintiff discusses lost earnings due to discontinued diversion buying and failed vendor promotional programs.  Plaintiff avers through confidential witnesses a prospective synergies report was discussed at meetings attended by, among others, Stewart and Marshall.  The report projected an approximately $2 million reduction in annual earnings from

the discontinuation of diversion buying and an approximately $6 million increase in annual

earnings from increased participation in vendor promotion programs.  Id. ¶¶ 73-76.  However,

the executives responsible for delivering the projected $6 million increase in earnings through

participation in vendor promotional programs repeatedly stated the projected increase was not

attainable.  Id. ¶ 77.  In paragraph 79, Plaintiff avers:

> CW11 said the reports [discussed in monthly meetings] showed the $6 million projected
> increase in earnings included in the budget was not being met, the amount of the shortfall
> was increasing each month and that the total amount of the projected shortfall was
> approximately $2-$3 million or 50% of the projected increase.  During the meetings in
> 5/05 and 6/05, CW11 stated the negative variances were discussed and that Marshall
> blamed his executives for not delivering the projected $6 million and told them to do a
> better job of executing.  In fact, CW11 stated that Marshall constantly yelled at the
> executives, reprimanded them for the shortfalls and even expelled executives from the
> meetings.

Id. ¶ 79.

In paragraphs 84-88 of the Complaint, Plaintiff alleges that Defendants were aware of a

decrease in earnings due to lost slotting allowance rebates because Nash Finch failed to renew

approximately 100 service sales agreements with vendors at the end of 2004.  Plaintiff avers that

"CW11 said the monthly budget to actual reports received by the defendants and discussed

during the month-end meetings reflected the decline in slotting allowance income."  Id. ¶ 84.

Plaintiff avers that Defendants discovered in February 2005 or March 2005 that the agreements

had expired and the vendors had no obligation to pay, Nash Finch "scrambled" to renew the

contracts, and Andrea Sather was hired in April 2005 to help deal with the expired agreements.

Id. ¶¶ 85, 88.  Plaintiff avers that "Sather told CW9 that she attended a meeting in early 6/05

with defendants Marshall, Stewart and other executives at the Edina headquarters during which

the failure to renew the agreements and the difficulty ensuring payment from the vendors was

discussed."  Id. ¶ 88.

Plaintiff's Complaint further alleges Defendants knew vendors were not being paid millions of dollars on past due invoices (Compl. ¶¶ 89-92); Defendants attempted to increase earnings by engaging in other improprieties (Compl. ¶¶ 93-95); Defendants knew Nash Finch was losing customers that generated millions of dollars in revenue (Compl. ¶¶ 96-107); Defendants knew the Company's efforts to reduce costs by $4-$5 million through network rationalization failed and was scrapped (Compl. ¶¶ 108-10); Defendants knew there were problems with the integration of Roundy's accounting system that contradicted their representations that the integration had gone "very smoothly" and was "ahead of schedule" (Compl. ¶¶ 111-20); Defendants increased earnings requirements for other distribution centers in an attempt to make up the lost earnings at the Westville and Lima distribution centers (Compl. ¶¶ 121-25); and Defendants caused the retail segment's profits to decline by failing to advertise price reductions on non-key merchandise and by manipulating the allocation of vendor promotion income between the food distribution and retail segments (Compl. ¶¶ 126-31).

The Court concludes that Plaintiff's allegations are adequately particularized to satisfy pleading requirements.  In Plaintiff's lengthy Complaint, Plaintiff alleges the specific statements it believes to be false and misleading, who made the statements, when the statements were made, and where the statements were made.  Plaintiff also alleges the specific reasons why it believes the statements to be false and misleading.  In doing so, Plaintiff recounts numerous problems occurring during the class period that caused earnings to decline and the integration process to not proceed smoothly as projected, how and when the problems occurred, and who knew about the problems and how they knew about them.  In their Memorandum, to support their argument

Plaintiff's Complaint is not pled with particularity, Defendants review each of Plaintiff's

allegations and raise the absence of some facts.  Defendants focus on Plaintiff's failure to allege

specifics as to what reports were reviewed, when various meetings were held, and what was

concluded at the meetings, as well as Plaintiff's failure to specifically allege how the various

problems with integration combined to create an overall negative impact on Nash Finch.

However, the Court concludes Plaintiff's allegations about reports and meetings are sufficiently

particular to show the basis for the claim that Defendants knew their positive statements about

the effect of the Roundy's acquisition was false or misleading to the shareholders of Nash Finch.

Further, Plaintiff is entitled to the inference that the problems with the acquisitions and

integration combined to create an overall negative impact to the stock price.  On a motion to

dismiss, the question is not whether Plaintiff can be successful on its securities fraud claims, but

rather, whether Plaintiff has pled its allegations and supporting facts with particularity such that

the Complaint should remain for discovery.

**E.     Group Pleading Doctrine**

Defendants argue no liability may be imputed to individuals for material misstatements

or omissions that they did not directly make, or that are contained in group published documents.

Defendants also argue that, although the Eighth Circuit has not directly addressed "group

pleading," the majority of courts to consider the issue have held that it does not satisfy PSLRA

requirements.  Plaintiff argues that the statements in the press release may be attributed to

Stewart because she signed the Forms 8-K attaching the press releases or was listed as the

contact person.  Plaintiff also argues that the statements in the press releases and the conference

calls are attributable to the named Defendants because they assisted in the preparation of press

releases and attended the conference calls.  Plaintiff further argues that the press releases are

attributable to all Defendants under the group pleading doctrine, and that contrary to Defendants'

arguments, a majority of courts have determined the group publication rule survives the passage

of the PSLRA.

The group pleading doctrine "is premised on the assumption that in cases of corporate

fraud where the false or misleading information is conveyed in prospectuses, registration

statements, annual reports, press releases, or other group published information, it is reasonable

to presume that these are the collective actions of the officers."  Makor Issues & Rights, Ltd. v.

Tellabs, Inc., 437 F.3d 588, 602 (7th Cir. 2006).

> Where the misstatements appear in certain types of documents that plaintiffs believe were written by groups, some courts have allowed plaintiffs to link certain defendants to alleged misrepresentations simply by pleading that the defendants were part of the "group" that likely put the challenged documents together.  Instead of being required to plead that a defendant actually made, authored or approved an offending statement in a corporate communication, the "group pleading" doctrine in its broadest form allows unattributed corporate statements to be charged to one or more individual defendants based solely on their corporate titles.

Southland, 365 F.3d at 363 (citations omitted).

Although the Fifth Circuit in Southland and the Seventh Circuit in Makor rejected the

group pleading doctrine as failing the PSLRA's specific requirement that the untrue statements

or omissions be set forth with particularity as to the defendant, "the majority of courts . . . have

found that the doctrine is alive and well."  In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 439

(S.D.N.Y. 2005) (collecting cases); see also In re Raytheon Sec. Litig., 157 F. Supp. 2d 131,

152-53 (D. Mass. 2001) (collecting cases).  This Court finds the more persuasive argument to be

that the group pleading doctrine remains available to attribute group published documents, such

as press releases, to "those individuals with direct involvement in the everyday business of the

company." In re Stellent, Inc. Sec. Litig., 326 F. Supp. 2d 970, 983 (D. Minn. 2004) (citation

omitted).   Accordingly, the allegedly false statements in the press releases are attributable for

pleading purposes to former CEO Marshall, former Senior VP and CFO Stewart, and former

Senior VP, Secretary, and General Counsel McDermott.   Allegedly false oral statements made

during the conference calls, however, should not be attributable to the individual Defendants

unless the individual Defendants directly made the statements in question.

## F.    Puffing Statements

Defendants argue paragraphs 150, 151, 156, and 160 of Plaintiff's Complaint are not

actionable false statements because they are "immaterial puffery."   "[S]ome statements are so

vague and such obvious hyperbole that no reasonable investor would rely upon them."   Parnes v.

Gateway 2000, Inc., 122 F.3d 539, 547 (8th Cir. 1997).   "[S]oft, puffing statements generally

lack materiality because the market price of a share is not inflated by vague statements

predicting growth.   No reasonable investor would rely on these statements, and they are certainly

not specific enough to perpetrate a fraud on the market."   Id.

It appears Defendants are arguing the following statements are immaterial puffery: (1)

"Our integration plan is proceeding on schedule," Compl. ¶ 150, (2) "[W]e are clearly very

optimistic about the prospects for our company for the remainder of 2005 and beyond," Compl. ¶

150, (3) "There's nothing that's particularly heavy lifting here.   There's just a lot of it.   We tend

to be very organized and disciplined about these things and I'm really comfortable [the

integration is] going to move forward gracefully," Compl. ¶ 151, (4) "[W]e are generally pleased

with the progress we made during the quarter in integrating these operations into ours and

continue to be confident about the possibilities the acquisition presents for us," Compl. ¶ 156, (5)

"[W]e remain confident about our ability to capitalize on all of the opportunities our Westville-Lima acquisition presents," Compl. ¶ 156, (6) "We continue to be very optimistic about the prospects for our Company for the remainder of 2005 and beyond," Compl. ¶ 156, and (7) "Our Company has tremendous opportunities ahead of it, but after more than seven years in this position, I believe it is time to turn over the leadership of this enterprise, and consider new challenges," Compl. ¶ 160.

Taken out of context, these statements are "vague and such obvious hyperbole that no reasonable investor would rely upon them." Parnes, 122 F.3d at 547.  However, when analyzed in context, these statements form a portion of press releases or conference calls in which Defendants make specific predictions about growth and earnings per share or specific representations about the procession of the integration.  These "puffing" statements are not the crux of Plaintiff's allegations but rather, lend support to Plaintiff's more specific allegations of false statements and fraud on the market.  These statements, while not independently actionable, can be considered in context, and as part of Defendants' larger statements, are not immaterial puffery.  See City of Monroe Employees Ret. Sys. v. Bridgestone Corp., 399 F.3d 651, 672 (6th Cir. 2005) ("The context of statements is often telling.").

**G.     Present Fact Statements**

Defendants argue that some of the allegedly false statements are present fact statements that are not actionable because they are either not sufficiently alleged to be false or the facts supporting their alleged falsity lack particularity.  Defendants cite April and July statements regarding the integration process, customer support of the integration, and "[t]he acquired assets

represent approximately $1 billion in annual sales from approximately 500 stores in Indiana,

Illinois, Ohio and Michigan markets . . . ."  Compl. ¶¶ 150-51, 155-57.

### 1.     Customers

Defendants argue that Plaintiff fails to plead particularized facts establishing the

dissatisfaction or loss of customers, and how it impacted the value of Nash Finch stock.  In

paragraphs 97-107 of the Complaint, Plaintiff discusses the loss of large customers "that

generated millions of dollars in revenue."  In paragraph 97, Plaintiff states:

> For example, CW1, CW2 and CW11 stated that after the acquisition, Martin's
> Supermarkets—a significant customer with 19 stores in Indiana and
> Michigan—discontinued all health and beauty products supplied by Nash Finch in favor
> of Spartan and discontinued using Nash Finch as a supplier of produce in favor of Caito.
> After the Class Period during the Company's 11/10/05 conference call, Marshall
> admitted the acquired distribution centers lost the produce business of a large customer
> and that the Company expected to lose that business before the acquisition.

Id. ¶ 97.  In paragraph 99, Plaintiff states:

> CW5, the produce procurement manager who worked at the Company's headquarters in
> Edina, stated that Roundy's lost more than $1 million of produce business from a large
> customer believed to be Sentry before the acquisition closed on 3/31/05 because Sentry
> was not satisfied with the quality and service level of Roundy's produce.  CW5 also
> stated that Nash Finch lost other Roundy's customers after the acquisition closed,
> although CW5 could not recall the names of the specific customers.

Id. ¶ 99.  In paragraphs 100-02, Plaintiff alleges that "[D]efendants knew no later than 4/14/05

that Nash Finch would not receive $20 million in revenue in 2005 from Marsh," and that Marsh

was refusing to purchase product it was contractually obligated to purchase because Nash Finch

"replac[ed] Roundy's private label products with the Company's 'Our Family' private label

products which were not an adequate substitute and caused Marsh to lose revenues," and Nash

Finch "fail[ed] to provide the same cost of product and fees and programs, including advertising,

credit and incentive programs, that were previously in effect."  Id. ¶¶ 100-02.

Plaintiff has adequately pled particularized facts regarding the dissatisfaction of customers and the reasons they were dissatisfied.  With respect to Martin's, Plaintiff pleads that it was a "significant customer with 19 stores," that it discontinued using Nash Finch as a supplier of certain products, and that Nash Finch expected to lose a "large customer" (presumably Martin's) prior to the acquisition.  With respect to Marsh, Plaintiff pleads that Marsh was refusing to purchase product from Nash Finch over dissatisfaction with Nash Finch's private label products and that "[D]efendants knew no later than 4/14/05 that Nash Finch would not receive $20 million in revenue in 2005 from Marsh."  Plaintiff's information was supplied by confidential witnesses who worked at the Roundy's distribution centers or for Nash Finch. Defendants argue that certain facts are missing regarding the names of some customers, exact amount of sales lost, and their impact on Nash Finch, and that the loss of some customers can not be material since the acquired distribution centers serviced over 500 customers.  However, the gravamen of Plaintiff's Complaint is not that Nash Finch lost a couple of customers, but rather that factors such as the lost customers, discontinuation of advertising billing practices, discontinuation of diversion buying, and the failure of network rationalization, combined to cause Defendants' positive statements to be false and misleading.  Plaintiff alleges that Defendants were aware of these myriad problems during the class period, and therefore knew that their statements regarding increased earnings, the smooth integration process, and the satisfaction/retention of customers were misleading or false.  Plaintiff has sufficiently pled the materiality of the lost customers.

## 2.    Integration

The April conference call contains present fact statements by Marshall about the stages

of the integration and when they would be completed.  In summary, he states "There's nothing that's particularly heavy lifting here.  There's just a lot of it.  We tend to be very organized and disciplined about these things and I'm really comfortable [the integration is] going to move forward gracefully."  Id. ¶ 151.  Defendants argue that "Nothing in the Complaint refutes the statement that the integration plan extended over a year and had several elements."  Defs.' Mem. of Law in Supp. at 25.  While Defendants appear to be technically correct, the crux of Plaintiff's argument is that the integration did not "move forward gracefully," as Marshall contended, and that some of the integration steps that Marshall averred were completed or would be completed soon did not occur as scheduled.  For example, Marshall stated: "Obviously, the earliest elements are making sure that [the Roundy's distribution centers are] plugged into our accounting and merchandising and payroll systems here.  That's already been done."  Compl. ¶ 151.  Plaintiff avers that Marshall's statement was false when made: "Several witnesses directly involved in the accounting integration stated there were numerous problems and delays related to the transfer from the Roundy's GEAC accounting platform to the Company's Hyperion-Lawson accounting system, including delays in the conversion of the chart of accounts which was still months from being completed."  Id. ¶ 154(g).  Plaintiff has sufficiently pled with particularity that statements regarding integration were false or misleading, that Defendants had actual knowledge of the falsity of the statements, and the facts supporting the alleged falsity of the statements.

In the July statements, Marshall avers that "Integration . . . is proceeding according to plan" and Stewart avers that "we are generally pleased with the progress we made during the quarter in integrating these operations into ours . . . ."  Id. ¶¶ 155-56.  Marshall also admits to

some problems with the integration but avers that it is "back on track" and "will not be a

continuing issue": "While the initial marketing integration of the acquired division didn't go as

well as I would have liked, operational, logistical, and technical integration have gone very

smoothly and ahead of schedule in many respects." Id. ¶ 156.  Plaintiff avers that

> [T]he defendants also knew the operational, logistical and technical integration had not
> gone very smoothly as represented by Marshall during the conference call.  The problems
> with the implementation of the purchasing system at the Lima distribution center caused
> substantial declines in fill rates and revenues and, as a result, the Company delayed the
> implementation of the purchasing system at the Westville distribution center.  Several
> witnesses directly involved in the accounting integration stated there were numerous
> problems and delays related to the transfer from Roundy's GEAC accounting platform to
> the Company's Hyperion-Lawson accounting system, including delays in the conversion
> of the chart of accounts.

Id. ¶ 159(h); see also Compl. ¶¶ 106-07, 111-20.  Defendants argue that Plaintiff has not

sufficiently alleged the statements' falsity and that its averments are not particularized.

However, the Court is satisfied Plaintiff does specifically allege the statements it believes to be

false and why it believes those statements to be false.  For example, in paragraph 106, while

Plaintiff does not specifically identify which customers did not receive merchandise that was

ordered, Plaintiff does specifically state that Nash Finch's fill rates declined from 96.1% to 88-

89%.  Plaintiff sufficiently particularizes this allegation, which supports its allegation that

statements regarding the smooth integration process were false or misleading.

**H.     Scienter**

The PSLRA requires the Plaintiff to "state with particularity facts giving rise to a strong

inference that the defendant acted with the required state of mind," the required state of mind

being scienter.  To determine whether Plaintiff has met the strong inference of scienter pleading

standard, the Court reviews the Plaintiff's Complaint "to determine whether [it] set[s] forth facts

33

that give a strong reason to believe that there was reckless or intentional wrong-doing." <u>Navarre</u>, 299 F.3d at 745.  Generally, there are three ways to establish scienter: (1) from facts demonstrating a mental state embracing intent to deceive, manipulate, or defraud; (2) from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity.  <u>K-Tel</u>, 300 F.3d at 893-94.  "One 'classic' fact pattern giving rise to a strong inference of scienter is that defendants made statements when they knew or had access to information suggesting these public statements to be materially inaccurate." <u>Navarre</u>, 299 F.3d at 746.  Also, "insider sales are probative of motive, which may provide circumstantial evidence of scienter."  <u>Id.</u>  "Insider stock sales are not inherently suspicious; they become so only when the level of trading is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information."  <u>Id.</u> at 747 (citations omitted).  The Eighth Circuit has stated that insider trading in conjunction with false or misleading statements is relevant to scienter.  <u>Id.</u>  Also, the Court can consider whether Plaintiff's allegations collectively add up to a strong inference of scienter.  <u>Green Tree</u>, 270 F.3d at 660.

Plaintiff's allegations "it is undisputed that the acquisition (1) did not represent approximately $1.0 billion in annual food distribution sales, (2) was not immediately accretive to earnings, and (3) did not add approximately $31 to $33 million," Compl. ¶¶ 148(a), 154(a), and 159(a), allege "fraud by hindsight."  <u>See</u> <u>Navarre</u>, 299 F.3d at 742.  These statements, taken separately from the remainder of the Complaint are insufficient to support actual knowledge.  Also, Plaintiff's allegations regarding the short period of time between the July Statements and the October 2005 press release that announced a substantial reduction in earnings per share,

Compl. ¶ 159(k), standing alone, are insufficient to support Plaintiff's claims of actual knowledge.  See In re Marion Merrell Dow Inc., Sec. Litig. II, No. 93-0251, 1994 WL 396187, at *8 (W.D. Mo. July 18, 1994) (temporal proximity alone insufficient); In re Bus. Objects S.A. Sec. Litig, No. 04-2401, 2005 WL 1787860, at *8 (N.D. Cal. July 27, 2005) (same).  However, the Court is to consider the totality of the allegations in determining scienter.

In its Complaint, Plaintiff alleges that during the Class Period, Marshall sold 76.65% of his stock and vested options, and McDermott sold 24.47% of her stock and vested options. Compl. ¶¶ 132-33.  Plaintiff also alleges that their stock sales were dramatically inconsistent with prior trading practices: "Marshall sold 325,000 shares during the Class Period, six times more than the 52,192 shares he sold in the 14 months prior to the Class Period.  McDermott sold 9,000 shares during the Class Period after selling no shares in the 14 months prior to the Class Period."  Id. ¶ 134.  Plaintiff further alleges that the timing of the sales was suspicious because Marshall and McDermott were aware of all of the undisclosed problems, and their sales "were just two to three months before the Company's 10/20/05 public disclosure that F05 EPS would be substantially less than what they told investors to expect before the purported accretive effect of the acquisition."  Id. ¶ 136.  Plaintiff avers that other senior executives sold 52.3%, 81.3%, and 86.2% of their stockholdings during the Class Period.  Id. ¶ 137.  Plaintiff further avers that McDermott and Marshall's resignations, plus a February 2006 Nash Finch press release announcing that Nash Finch had contacted the SEC "to discuss the results of an internal review that focused on trading in the Company's common stock by certain officers and directors of the Company during 2005," heighten the suspicion.  Id. ¶ 138.

The Court is satisfied that Plaintiff has pled with sufficient particularity allegations of

35

knowing false statements; insider sales by Marshall, McDermott, and others dramatically out of line with prior trading practices and at suspicious times; and Marshall and McDermott's unexpected resignations and the SEC's investigation into insider trading, that cumulatively create a strong inference of scienter for Marshall and McDermott.  Although Stewart is not alleged to have conducted any insider trading, she is alleged to have made a statement about the smooth process of the integration at the same time that she knew or had access to information suggesting that the integration was not going as planned, "[o]ne 'classic' fact pattern giving rise to a strong inference of scienter."  Navarre, 299 F.3d at 746.  Accordingly, the Court finds that Plaintiff has sufficiently stated with particularity facts giving rise to a strong inference that Defendants acted with scienter, as required by the PSLRA.

## I.      Stewart and McDermott

The only alleged false statement made directly by Stewart was in the July conference call, and is as follows: "As Ron observed, we are generally pleased with the progress we made during the quarter in integrating these operations into ours and continue to be confident about the possibilities the acquisition presents for us."  Compl. ¶ 156.  Defendants argue Stewart should be dismissed from this lawsuit as she is responsible for making only one of the challenged statements, the statement she made was immaterial puffery, and Plaintiff has not alleged particularized facts that it was false when made.  As stated above, read in context, Stewart's statement is not immaterial puffery.  Also, the Court is satisfied that Plaintiff has pled its facts with particularity, and that statements in the press releases can be attributed to Stewart via the group pleading doctrine.  Accordingly, Stewart is not dismissed from the lawsuit.

Defendants argue that McDermott can not be held liable for statements in the September

2005 press release on the basis that she signed the Form 8-K attaching the press release. This Court agrees: these allegations render the alleged false statements too distant from McDermott to hold her accountable for them. However, McDermott can be held indirectly liable for statements in the press releases on the basis of the group pleading doctrine, at least at this stage of the litigation. Consequently, McDermott is not dismissed from this lawsuit.

**J.      Control Person Claim**

Plaintiff argues that Defendants' claim under § 20(a) should be dismissed because Plaintiff has not sufficiently alleged a primary violation of § 10(b). However, because the Court has concluded that Plaintiff has sufficiently alleged a primary violation of § 10(b), there is no reason to dismiss Plaintiff's derivative § 20(a) claim at this time. See In re Ancor Commc'ns, Inc., 22 F. Supp. 2d 999, 1006 (D. Minn. 1998). Defendants argue that Plaintiff has alleged insufficient facts to support the assertion that McDermott, Nash Finch's General Counsel, was a controlling person. However, at this early stage of the litigation, Plaintiff's allegations are sufficient, and Plaintiff's control person claim can remain against all Defendants. See In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig., 286 F. Supp. 2d 1047, 1060 (D. Minn. 2003) ("Whether a person is a controlling person for purposes of the statute and rules has been described as 'an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions.'") (citation omitted).

Because Plaintiff has pled with sufficient particularity the statements alleged to have been misleading, the reason or reasons why the statements are misleading, and facts giving rise to a strong inference that Defendants acted with scienter, and because Defendants' alleged false

statements are not protected by the safe harbor, Defendants' Motion to Dismiss is denied.

## IV. CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that Defendants' Motion to Dismiss [Docket No. 37] is **DENIED.**

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  May 1, 2007.